**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| CONGRESSMAN ROBERT "BOB" ONDER, RICHARD "RICK" BRATTIN, PATRICIA "PAT" THOMAS, and DEBRA HAVENS, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. ________________ |
| STATE OF MISSOURI and DENNY HOSKINS, in his official Capacity as Missouri Secretary of State, | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Congressman Bob Onder, Rick Brattin, Pat Thomas, and Debra Havens for their Complaint against the State of Missouri and Denny Hoskins, in his official capacity as Missouri Secretary of State, allege as follows.

### Parties and Background

1. Plaintiff Robert "Bob" Onder is the duly elected United States Representative in Congress for Missouri's third Congressional district. He is a

resident of St. Charles County, Missouri and is a registered voter in St. Charles County and the State of Missouri.

2. Congressman Onder is the Republican Nominee for congress in the Third Congressional District as adopted by the Missouri General Assembly in House Bill 1 ("HB 1") in 2025.

3. Congressman Onder has an interest in a fair and accurate election process. *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 77 (2026).

4. Plaintiff Richard "Rick" Brattin is the Republican Nominee for congress in the Fifth Congressional district as adopted in HB 1.

5. Plaintiff Brattin is a resident of Cass County and is a registered voter in the State of Missouri.

6. Brattin has an interest in a fair and accurate election process. *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 77 (2026).

7. Plaintiff Patricia "Pat" Thomas is a registered Missouri voter living in Cole County, Missouri.

8. Thomas has an interest in a fair and accurate election process. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

9. Plaintiff Debra Havens is a registered Missouri voter living in Maries County, Missouri.

10. Havens has an interest in a fair and accurate election process. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

11. Defendant State of Missouri is a sovereign State of the United States of America.

12. Defendant Denny Hoskins is the Missouri Secretary of State.

13. Defendant Secretary of State is charged with administering Missouri's elections process, as well as approving or rejecting referendum petitions submitted to him (including the referendum petition at issue here).

14. Plaintiffs bring this action to prevent Defendants from unconstitutionally usurping the General Assembly's vested authority to reapportion the State of Missouri's congressional districting plan.

## Background

15. On September 12, 2025, the Missouri General Assembly convened in a special session and passed HB 1, which redraws Missouri's eight Congressional districts.

16. Missouri's prior Congressional district map was enacted by the General Assembly in 2022.

17. Under those 2022 districts, Thomas and Havens would cast a congressional vote in the Third Congressional district. Under the new map established by HB1, Thomas and Havens would cast a vote in the Fifth Congressional district.

18. On December 9, 2025, a group called People Not Politicians,

through its executive director Richard von Glahn, submitted a referendum petition on HB1 to Defendant Secretary of State. The petition sought to suspend the effectiveness of HB1 until it was subject to a statewide public vote.

19. On May 13, 2026, the Missouri Supreme Court issued its unanimous decision in *Maggard v. State*. That Court held that mere submission of the referendum petition to the Secretary did not suspend HB 1 or preclude the State from implementing the congressional plan it enacted

20. The statutory deadline for the Secretary of State to issue a certificate of sufficiency or insufficiency on the referendum petition was August 4, 2026, the same date as the Congressional primary elections.

21. The August 4, 2026 Congressional primaries were held using the HB1 map.

22. More than 1.2 million Missourians voted in the August 4 congressional primaries under the HB 1 map and selected nominees in each of Missouri's eight districts.

23. Congressman Onder stood for and won the Republican nomination for the third Congressional district from voters casting ballots under the HB1 map.

24. Thomas and Havens both voted in the August 4 primary for candidates in the Fifth Congressional district.

25. Also on August 4, Defendant Secretary of State issued his

certificate of insufficiency, finding that "the referendum petition is insufficient under the Missouri Constitution because the Missouri Constitution does not authorize a referendum on congressional redistricting plans passed by the General Assembly."

26. People Not Politicians and von Glahn challenged Defendant Secretary of State's decision in state court.

27. The affidavit of Tammy Brown, Missouri election official, explains that implementing a new congressional map requires local election officials to transfer hundreds of thousands of individual voters in the MCVR system. See Exhibit 1.

28. Further, that is a meticulous process involving careful analysis of printed maps and multiple rounds of proofreading. *Id.*

29. The MCVR system locks shortly before absentee ballots are distributed and remains locked until an election is certified two weeks after election day. *Id.*

30. Even the state trial court found this evidence to be compelling. See, *von Glahn v. Hoskins*, No. 26AC-CC00440 (Cole County, Missouri), Final Judgment, Exhibit 2.

31. The MCVR system will remain locked until at least mid-November because of an ongoing Jackson County special election.

32. The state trial court concluded, therefore, that it would be

"impossible" for election officials to administer the 2026 congressional general election under any plan other than the HB 1 plan.

33. On September 3, 2026, the Missouri Supreme Court nonetheless ordered Defendants to use the 2022 Congressional district map instead of the HB 1 map for the November 3, 2026 general election. *von Glahn v. Hoskins*, No. --- S.W.3d --- (Mo. banc Sep. 3, 2026).

34. The Missouri Supreme Court did not address, much less overturn, the state trial court's finding that it is "impossible" for election officials to administer the general election other than under the HB 1 plan.

35. As a result of the Missouri Supreme Court's decision in *von Glahn*, the State must now do the "impossible" and administer Missouri's November 3 general election using different maps than the maps used in the primary elections for the same offices.

36. Also, as a result of *von Glahn*, hundreds of thousands of registered voters who voted in the August 4 primary in the districts under HB 1 will be moved into different districts for the November 3 general election under the decision in *Von Glahn*.

37. Likewise, Congressman Onder and Rick Brattin won nominations by advocating to a particular set of voters in their respective HB1-designated districts. Under *von Glahn,* they must now run in the general election in districts which include many voters to whom they did not campaign in the

primary.

38. Thomas and Havens wish to vote in the general election in the Fifth Congressional district as they did in the primary but must now educate themselves about new candidates and issues because they are forced to vote in the general election for the Third Congressional district and for nominees whom they was not given a chance to vote for or against.

39. Cole and Maries Counties are in the Fifth Congressional District under HB 1 but are in the Third Congressional District under the 2022 plan.

40. Voters in Cole and Maries Counties voted in the Fifth Congressional District in the August 4 primary election but, under *Von Glahn*, will now vote in the Third Congressional District in the November 3 general election.

41. Thomas and Havens face the prospect of losing their fundamental right to vote in upcoming elections, including but not limited to the November 3, 2026 general election, if Defendants continue in the course of action ordered by *von Glahn*.

42. The entire State of Missouri has now been plunged into legal and electoral uncertainty over which Congressional maps govern Missouri's 2026 general election and which candidates represent whom. This Court should issue all appropriate relief without haste to ensure free and fair elections in November.

43. On September 3, 2026, the Attorney General applied to the Missouri Supreme Court for a stay of its decision in *von Glahn*.

44. On September 4, 2026, the Supreme Court denied that Application for Stay.

**Jurisdiction and Venue**

45. This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331 because a provision of the U.S. Constitution and 42 U.S.C. § 1983 govern the disposition of this case.

46. This Court has supplemental jurisdiction over the state-constitutional claim under 28 U.S.C. § 1367.

47. This Court has the authority to issue the requested declaratory relief under 28 U.S.C. §§ 2201-2202 and this Court's inherent equitable authority.

48. This Court has personal jurisdiction over Defendants because each is either a state agency or sued in their official capacity as a state official, and the violations complained of concern their conduct in such capacities.

49. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) respecting Defendant State of Missouri because Plaintiffs allege said Defendant has undertaken efforts to carry out an unlawful Congressional election within this District and Division and moreover Congressman Onder is

a resident of St. Charles County and Havens is a resident of Maries County both of which are in this judicial district.

## CAUSES OF ACTION

### Violation of the Elections Clause

### U.S. CONST. Art. I, § 4, cl. 1

50. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

51. An actual controversy exists within this Court's jurisdiction that would be resolved by a declaration of the rights and other legal relations of the parties in this action – namely, that *von Glahn*'s suspension of the General Assembly's duly enacted HB 1 plan and authorization of a referendum seeking to overturn HB 1 violates the Elections Clause of the U.S. Constitution.

52. The Constitution delegates and conveys the authority to prescribe the times, places, and manner of congressional elections only to "the Legislature" of "each State." U.S. CONST. art. I, § 4, cl. 1. Yet in Missouri, Defendants have been ordered not to use the General Assembly's duly enacted HB 1 for the ongoing 2026 general election. This unprecedented act violates both the U.S. and Missouri Constitutions.

53. Just two years ago, the U.S. Supreme Court reaffirmed the core

authority of state legislatures to draw congressional districts for the U.S. House of Representatives. The court emphasized how other state-governmental actors "do not have free rein" to transgress state legislatures' authority to apportion congressional districts. *Moore v. Harper*, 600 U.S. 1, 34 (2023).

54. Despite that constitutional language, some state constitutions have expressly transferred authority over federal redistricting from state legislatures to other entities – like independent redistricting commissions. *See, e.g., Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 576 U.S. 787, 796–98 (2015). Jurists have disagreed on whether such delegations are constitutional. *See id.* at 826 (Roberts, C.J., dissenting).

55. This case does not require this Court to revisit that debate. Where the U.S. Constitution expressly vests authority in a particular actor, that authority cannot be taken away without a clear and express statement. *See Moore*, 600 U.S. at 34–36. In *Arizona State Legislature*, for example, the Arizona Constitution did "directly and immediately" transfer the Arizona's Legislature's authority over redistricting to another entity. 576 U.S. at 801. And in *State of Ohio ex rel. Davis v. Hildebrandt*, concluded that state law "ma[de] it clear" that the legislature had been partially divested of its authority over federal redistricting. 241 U.S. 565, 567-68 (1916) (holding it was "obvious" that state law was "conclusive" on that point).

56. The U.S. Constitution forecloses the holding of *von Glahn*. By vesting authority in the state legislature, the Elections Clause made a "compromise" that ensures a measure of deliberation, but in a representative body close to the people. *Ariz. State Leg.* at 837 (Roberts, C.J., dissenting).

57. The U.S. Constitution does not provide for a citizen veto of the legislature's approved map. "*Hildebrant* in no way suggested that the state legislature could be displaced from the redistricting process, and *Hildebrant* certainly did not hold—as the majority today contends—that "the word ['Legislature' in the Elections Clause] encompassed a veto power lodged in the people." *Ante,* at 2666. *Hildebrant* simply approved a State's decision to employ a referendum *in addition to* redistricting by the Legislature. See 241 U.S., at 569, 36 S. Ct. 708. The result of the decision was to send *the Ohio Legislature* back to the drawing board to do the redistricting." *Ariz. State Leg.* at 840 (J. Roberts Dissent)

58. In choosing to specifically entrust state legislatures with authority over federal congressional redistricting, the Framers of the U.S. Constitution ensured that such power would be exercised by officials "accountable by the people for the rules they write or fail to write." *Democratic Nat'l Comm. v. Wis. State Leg.*, 141 S. Ct. 28, 29 (2020) (Gorsuch, J., concurring in denial of application to vacate stay). They also ensured that redistricting decisions would reflect "the collective wisdom of the whole people" – as expressed

through the people's elected representatives. *Id.*

59. Nor does the Elections Clause leave dissatisfied individuals without recourse. They are free to take their concerns to Congress itself, which can reset the reapportionment rules under the Elections Clause. *See Wise v. Circosta*, 978 F.3d 93, 112 (4th Cir. 2020) (en banc) (Wilkinson and Agee, JJ., dissenting) (emphasizing "the brilliance" of giving Congress the authority to check state legislatures).

60. Absent a clear statement in the Missouri Constitution transferring the apportionment power from the General Assembly to a ballot referendum, Defendants cannot proceed as directed by *von Glahn*. The General Assembly's "vested authority is not just the typical legislative power exercised pursuant to a state constitution. Rather, when a state legislature enacts statutes governing [federal] elections, it operates 'by virtue of a direct grant of authority' under the United States Constitution." *Carson v. Simon*, 978 F.3d 1051, 1060 (8th Cir. 2020) (per curiam).

61. While the U.S. Supreme Court has recognized that express state constitutional amendments can divest legislatures of their apportionment power, the court has never held that a general referendum provision can curtail the legislature's exercise of that authority. *See Ariz. State Leg.*, 576 U.S. at 814 (holding that a State can adopt an express constitutional provision transferring the legislature's apportionment authority to an independent

commission).

62. Because the Framers of the Federal Constitution made "a deliberate choice" to vest reapportionment power in state legislatures, other state actors cannot use the vagaries of state law to transfer that power elsewhere. *Moore*, 600 U.S. at 34. Hence, state law must plainly delineate the legislature's federal congressional-apportionment authority. *Cf. id.* at 34–36 (holding that state "courts do not have free rein" to intrude upon the legislature's apportionment power absent "a fair reading" of state law limiting the power); *Carson*, 978 F.3d at 1060 (discussing how state officials cannot "override" the state legislature's exercise of power under the Elections Clause).

63. Moreover, serious constitutional doubt persists about whether state-ballot initiatives can ever divest state legislatures of their congressional-apportionment authority. The "text, structure, or history of the Constitution" plainly show that Article I, Section 4 deliberately vests "the 'Legislature,'" not "'the people'" with the power to reapportion congressional representation. *Ariz. State Leg.*, 576 U.S. at 825 (Roberts, C.J., dissenting). "Direct lawmaking by the people was 'virtually unknown when the Constitution of 1787 was drafted.'" *Id.* at 793 (majority opinion). And the U.S. Supreme Court has never upheld the use of a ballot referendum to nullify a legislature's congressional reapportionment against an Elections Clause challenge. *See id.* at 840 (Roberts, C.J., dissenting) (explaining how the only instance where the

Supreme Court considered the use of such a referendum did not involve Elections Clause challenge to state law in *Hildebrandt*).

64. Such clear-statement rules are fixtures of American constitutional law because they ensure that the relevant governmental actors actually intended to push the boundaries and potentially upset the careful balances struck by the U.S. Constitution's Framers. *See West Virginia v. EPA*, 597 U.S. 697, 736-37 (2022) (Gorsuch, J., concurring); Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. REV. 109, 166–67 (2010). For example, even though the Constitution vests legislative power in Congress, courts allow Congress to delegate major policy decisions to the Executive Branch – but only if Congress provides a clear statement of authority. *West Virginia*, 597 U.S. at 723; id. at 746–49 (Gorsuch, J., concurring); *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari). Similarly, courts demand a clear statement before assuming Congress intended to legislate in areas of traditional state authority – to protect the U.S. Constitution's commitment to federalism. *See Sackett v. EPA*, 598 U.S. 651, 679-80 (2023); *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

65. Given its novelty and lack of textual support, *von Glahn* contravenes the United States Constitution's vesting of redistricting authority in the General Assembly. The Missouri Constitution's referendum provision does not expressly say that a referendum can overturn the exercise of the

General Assembly's federal redistricting decisions, and "state courts may not transgress the ordinary bounds of judicial review such that they arrogate to themselves the power vested in state legislatures to regulate federal elections." *Moore*, 600 U.S. at 36.

66. To the contrary, the Missouri Constitution specifically recognizes the General Assembly's power to divide the State into congressional districts. *See* MO. CONST. art. III, § 45 (stating General Assembly "shall" perform this function). Given these provisions, Missouri has not made a deliberate and clear choice to override the Elections Clause's vesting the General Assembly with congressional apportionment authority. *See Ariz. State Leg.*, 576 U.S. at 817 (emphasizing how the State had made the deliberate choice of reallocating that authority to an independent commission).

67. And Missouri should have a chance to make that knowing choice before this unprecedented effort proceeds. Subjecting Missouri's congressional redistricting to ballot referenda will invite chaos. If opponents of a Congressional map succeed in using the referendum, every apportionment decision going forward could now become subject to a referendum. In effect, this could create apportionment paralysis – where the General Assembly is unable to implement a congressional map because successive referendum efforts nullify them. This threatens to wreak havoc on the General Assembly's basic obligations to reapportion congressional districts after each census.

68. The problem runs even deeper than that. Under *von Glahn*, nothing would stop a voter from proposing the federal congressional map in the first instance – thus entirely cutting the General Assembly out of the redistricting process. The provision of the Missouri Constitution governing citizen-proposed statutory initiatives is worded – in all material respects – identically to the referendum provision. *See* MO. CONST. art. III, §§ 49–53. That provision just generally refers to "laws" – without any specific reference to federal redistricting bills. *See id.* So, under the logic of *von Glahn*, voters can wield an absolute veto over the General Assembly's duties under the Elections Clause.

69. Finally, no history in Missouri supports a reading like *von Glahn*. While a closely divided Missouri Supreme Court upheld the use of referenda for apportionment of seats in the General Assembly, *see State ex rel. Gordon v. Becker*, 49 S.W.2d 146, 149 (Mo. 1932), that case is inapt. In 1945, the Framers of Missouri's current Constitution specifically overrode *Gordon*. *See* MO. Const. art. III, § 7(h). The Missouri Constitution now provides in unqualified terms that "[n]o redistricting plan shall be subject to the referendum." *Id.*; *see also id.* art. III, § 3(i).

70. Additionally, *Gordon* addressed federal and state legislative apportionment, which are governed by separate provisions in the Missouri Constitution. MO. CONST. art. IV, §7(Constitution of 1875); see MO. CONST. art.

III, §§ 3, 7, 10 (state legislative) and MO. CONST. art. III, § 45 (congressional). *Gordon* never considered whether, per the Elections Clause, the General Assembly retained sole authority to apportion congressional districts. Because the authority to set federal congressional districts is a power delegated by the U.S. Constitution, federal congressional reapportionment implicates uniquely federal interests not reflected in state-legislative reapportionment. *See Moore*, 600 U.S. at 34 ("As in other areas where the exercise of federal authority or the vindication of federal rights implicates questions of state law, we have an obligation to ensure that state court interpretations of that law do not evade federal law."); *Carson*, 978 F.3d at 1060 (emphasizing how setting federal elections occurs "'by virtue of a direct grant of authority' under the United States Constitution").

71. If anything, *Gordon* casts further doubt on Defendants' legal theory. Chief Justice Atwood, in dissent, carefully analyzed Missouri constitutional history and concluded that the Missouri Constitution was not originally understood to extend the referendum even to state legislative apportionment. *See Gordon*, 49 S.W.2d at 152–57 (Atwood, C.J., dissenting) (contending that construction of prior Missouri constitutional provisions did not support the practice). And if such doubt exists for state legislative districting, it is hard to see how Defendants could satisfy the U.S. Constitution's clear-statement rule applicable to federal congressional

redistricting efforts.

72. Defendants cannot identify any language that "makes it clear" that the Missouri Constitution transfers authority over federal redistricting away from the General Assembly. *Hildebrandt*, 241 U.S. at 568. While Missouri has chosen to allow voters to revisit legislation passed by the General Assembly, nothing in the Missouri Constitution expressly says that federal congressional reapportionment may be subjected to a referendum. See MO. CONST. art. III, §§ 49, 52(a). In other words, the people of Missouri have never made the conscious choice to undermine the Framers' decision to vest this State's legislature with the reapportionment authority.

73. With no express authority bestowed on the referendum process to overturn federal congressional apportionments, Defendants' efforts – compelled by *von Glahn* – to revisit the General Assembly's exercise of its authority under the Elections Clause are unlawful. Plaintiffs are entitled to a judgment declaring Defendants' actions unlawful under the Elections Clause of the U.S. Constitution. The Court should grant appropriate declaratory and injunctive relief.

**Violation of Article I, Section 2**

**42 U.S.C. § 1983; U.S. CONST. Art. I, § 2**

74. Plaintiffs incorporate by reference all preceding paragraphs as if

fully set forth herein.

75. Holding a general election under a different congressional map than the one used in the August 4 primary would violate Article I, Section 2 of the U.S. Constitution.

76. That provision guarantees that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States." U.S. Const. art. I, § 2.

77. The Supreme Court has long recognized that "[w]here the state law has made the primary an integral part of the procedure of choice," then "the right of the elector to have his ballot counted at the primary[] is likewise included in the right protected by Article I, § 2." *United States v. Classic*, 313 U.S. 299, 318 (1941).

78. Missouri law makes the primary integral: "all candidates for elective office shall be nominated at a primary election," § 115.339, RSMo, and "[t]he person receiving the greatest number of votes at a primary election as a party candidate for an office shall be the only candidate of that party for the office at the general election," § 115.343, RSMo. More than 1.2 million Missourians voted in the August 4 congressional primaries under the HB 1 map and selected nominees in each of Missouri's eight districts.

79. *Von Glahn* ignores those votes, stripping the nominees of the mandate in their respective districts which their voters conferred.

80. Article I, Section 2 forbids this result.

81. Changing the congressional map reassigns hundreds of thousands of voters to entirely different districts, with different boundaries, different candidates, and different opponents—none of whom those voters ever had the chance to evaluate in the primary.

82. It is the wholesale dismantling of the election those voters already participated in.

83. *Von Glahn* does not even attempt to explain how State and local officials could reverse course and implement some entirely new map, how nominees selected by voters in one set of districts would campaign in different ones, or how voters would make sense of a last-minute overhaul of the districts they just voted in.

84. The Supreme Court has long recognized that primary and general elections are not separate events but a unified process.

85. In *Smith v. Allwright*, the Court described "[t]he fusing . . . of the primary and general elections into a single instrumentality for choice of officers." 321 U.S. 649, 660 (1944).

86. Because the primary and general election constitute a "single instrumentality for choice of officers," *id.*, then changing the districts between those two stages does not merely alter the ballot; it fractures the instrumentality itself. *See also Storer v. Brown*, 415 U.S. 724, 735 (1974)

(describing the primary as "not merely an exercise or warm-up for the general election but an integral part of the entire election process, the initial stage in a two-stage process by which the people choose their public officers").

**Violation of the Equal Protection Clause**

**42 U.S.C. § 1983; U.S. CONST. amend. XIV, § 1**

87. Holding a general election under a different congressional map than the one used in the primary would violate the Equal Protection Clause. U.S. Const. amend. XIV, § 1.

88. The Supreme Court has held that primary-election procedures constitute "'state action' within the meaning of the Fourteenth Amendment" and "must be exercised in a manner consistent with the Equal Protection Clause." *Bullock v. Carter*, 405 U.S. 134, 140-41 (1972).

89. The Supreme Court has also made clear that "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Gray v. Sanders*, 372 U.S. 368, 379 (1963). Defendants are and have been acting under color of law.

90. By requiring Thomas and Havens to vote in a general election without allowing them to cast a ballot for the candidates in a primary for such election, *von Glahn* commands Defendants to violate Thomas's and Havens's

fundamental right to equal protection under the law.

91. The congressional map change in *Von Glahn* between the primary and general elections, forces hundreds of thousands of Missourians to vote in a district different from the one in which they cast their primary ballots.

92. Those voters would possess materially less voting power than voters whose district remained the same because the former group would have to select from candidates they never had the opportunity to evaluate, support, or oppose in the primary.

93. They would thus be denied the right to choose their own representative through the integrated primary and general elections.

94. Meanwhile, voters who happened to remain in the same district would retain the full benefit of their primary vote.

95. The order in *Von Glahn* which changes the congressional map thus creates two classes of voters—those who had the opportunity to select their general election candidate and those who did not—in direct violation of the Equal Protection Clause.

96. Thomas and Havens face the prospect of losing their fundamental right to vote in upcoming elections, including but not limited to the November 3, 2026 general election, if Defendants continue in the course of action ordered by *von Glahn*.

97. At the time *von Glahn* was decided, Missouri election officials,

candidates, political parties, and other advocates had already begun preparing for the general election under the HB1 Congressional map. Early voting and absentee-ballot distribution are imminent.

98. The order in *von Glahn* constitutes a judicial alteration of state election law "in the period close to an election." *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

99. As the Supreme Court has repeatedly recognized, "[l]ate judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring).

100. It is well-established that states have less say in regulating federal elections than "statewide and local elections." *See Anderson*, 460 U.S. at 789.

101. The standard four-factor stay test does not govern this Court's review of the order in *von Glahn*. Where, as here, the Missouri Supreme Court has ordered a change to state election law "close to an election," the "traditional test for a stay does not apply (at least not in the same way) in election cases when a lower court has issued an injunction of a state's election law in the period close to an election." *Merrill*, 142 S. Ct. at 880; *La Union*, 119 F.4th at 408.

102. Chief among those considerations is the potential for a last-minute order "to confuse voters, unduly burden election administrators, or otherwise

sow chaos or distrust in the electoral process." *Robinson v. Ardoin*, 37 F.4th 208, 228 (5th Cir. 2022).

103. Congressional redistricting is among the most complex and disruptive election changes a court can order. Implementing new district boundaries between the primary and general elections requires, at minimum: publishing new district maps; updated the Missouri Consolidated Voter Registration system in 117 separate local election authorities, re-notifying all affected voters of changed district assignments; reprinting and redistributing ballots statewide; and retraining election officials across dozens of counties – all within a window of 15 days before military ballots go out and 18 days before absentee voting begins.

104. Altering voters' choices mid-election further harms the interests of the voters themselves, especially those such as Thomas and Havens, who were not permitted to vote in the primary: "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Lubin v. Panish,* 415 U.S. 709, 716 (1974).

105. The redistricting mandate in *von Glahn* is incredibly complex and disruptive, and cannot constitutionally be implemented between the primary and general elections (if ever).

106. First, the underlying merits were not "entirely clearcut" in favor of

the party seeking a new map. The Missouri Supreme Court's own prior decision in *Maggard* acknowledged that it was "impossible" to determine with certainty whether the HB1 map had gone into effect. Legal questions that the state's highest court itself found irresolvable cannot satisfy the "entirely clearcut" standard.

107. Second, irreparable harm will result from *von Glahn*. Congressional candidates who prevailed in primary elections under the existing district boundaries face substantial harm – including disruption of campaign infrastructure, wasted resources, and educating and advocating to new voters in a truncated post-primary period – if those boundaries are altered before the general election.

108. Third, implementing a full congressional remap between the primary and general elections is not feasible without significant cost, confusion, and hardship to voters, candidates, and election administrators alike – as the scale of administrative disruption described above makes plain.

109. Because none of the conditions identified in *Merrill* are satisfied, the order in *von Glahn* compels Defendants to violate Plaintiffs' rights under the United States Constitution.

## PRAYER FOR RELIEF

Brattin, Congressman Onder, Thomas, and Havens pray that this Court:

A. Declare, adjudge, and decree that the actions detailed herein are unlawful under Article I, § 4, cl. 1, Article I, § 2, and Amend. XIV, § 1 of the U.S. Constitution;

B. Issue declaratory relief stating that Defendants' failure to use the HB1 Congressional maps – as ordered by *von Glahn* – is unconstitutional;

C. Issue temporary, preliminary, and permanent injunctive relief to prevent Defendants from using any Congressional map other than the HB1 map until amended by the Missouri General Assembly; and

D. Award all other relief this Court deems equitable and just.

Respectfully submitted,

**ELLINGER BELL LLC**

By: */s/ Marc H. Ellinger*
Marc H. Ellinger, #40828(MO)
Stephanie S. Bell, #61855(MO)
Cole D. Bradbury, #62760(MO)
308 East High Street, Suite 300
Jefferson City, MO 65101
Telephone: (573) 750-4100
Facsimile: (314) 334-0450
E-mail: mellinger@ellingerlaw.com
E-mail: sbell@ellingerlaw.com
E-mail: cbradbury@ellingerlaw.com

*Attorneys for Plaintiffs*