**IN THE CIRCUIT COURT OF COLE COUNTY, MISSOURI**

| | | |
|---|---|---|
| RICHARD VON GLAHN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 26AC-CC00440 |
| | ) | |
| DENNY HOSKINS, in his official capacity, | ) | |
| | ) | |
| Defendant. | ) | |

**JUDGMENT**

All parties appeared before this Court on August 19, 2026, and arguments were made by counsel. The Court has considered the pleadings, the evidence in the form of the Joint Stipulation of Facts and Exhibits filed August 18, 2026, the pre-trial briefs, and argument of counsel. Being duly advised, the Court now issues its Judgment in this matter.

**FINDINGS OF FACT**

1. The General Assembly enacted House Bill 1 (HB 1) on September 12, 2025. HB 1 repealed Missouri's prior congressional districting plan and established new boundaries for Missouri's eight congressional districts.

2. HB 1 passed by a margin of 21 to 11 in the Senate and 90 to 65 in the House of Representatives. *See* Mo. Senate J. 25–26 (2d Extra. Sess., 103d Gen. Assembly, Sept. 12, 2025); Mo. House J. 37–38 (2d Extra. Sess., 103d Gen. Assembly, Sept. 9, 2025).

3. Governor Michael L. Kehoe signed HB 1 into law on September 28, 2025.

4. A group called People Not Politicians ("PNP") launched a

referendum campaign to challenge the HB 1 map. PNP eventually submitted a referendum petition to the Secretary of State on December 9, 2025, invoking the referendum provisions in Article III of the Missouri Constitution.

5. Under Article III, Section 52(a), "[a] referendum may be ordered . . . by petitions signed by five percent of the legal voters in each of two-thirds of the congressional districts in the state." Mo. Const. art. III, § 52(a). Article III's referendum provisions are silent regarding congressional redistricting. *See id.* art. III, §§ 49, 52(a)-(b).

6. PNP's submission triggered the Secretary's statutory duty to review the referendum petition. *See Maggard v. State*, 733 S.W.3d 411, 416 (Mo. banc 2026).

7. That review encompasses the timeliness, legality, and sufficiency of the petition, as well as the sufficiency of the signatures offered in support of the petition. *See* §§ 116.120–116.140, RSMo.

8. "After" review, "if the secretary of state finds [the petition] sufficient, the secretary of state shall issue a certificate setting forth that the petition contains a sufficient number of valid signatures to comply with the Constitution of Missouri and with this chapter." § 116.150.1, RSMo.

9. But "[i]f the secretary of state finds the petition insufficient, the secretary of state shall issue a certificate stating the reason for the insufficiency." § 116.150.2, RSMo.

10. The Secretary was required to complete this extensive review "not later than 5:00 p.m. on the thirteenth Tuesday prior to the general election or two weeks after the date the election authority certifies the results of a petition verification pursuant to subsection 2 of section 116.130, whichever is later."

§ 116.150.3, RSMo.

11. The thirteenth Tuesday prior to this year's general election fell on Tuesday, August 4, the date of the State's primary elections.

12. While the Secretary and Missouri's local election officials were reviewing PNP's submission, two plaintiffs separately challenged HB 1's effectiveness, seeking a declaratory judgment and an injunction preventing use of the HB 1 map until voters approved it through the referendum process. *See Maggard*, 733 S.W.3d at 413.

13. The Missouri Supreme Court unanimously rejected their claims, holding that "the December 9 referendum petition filing did not automatically suspend HB 1 under article III, sections 49, 52(a), or 52(b) of the Missouri Constitution." *Id.* at 421. The Missouri Supreme Court also went out of its way to emphasize that its decision should not be read as endorsing referenda on congressional maps. *See id.* at 414 n.7 ("[T]his opinion presupposes without deciding HB 1 is subject to the right of referendum.").

14. Following the Supreme Court's ruling, the Attorney General released an opinion letter requiring "State and local election officials" to "take all appropriate steps to ensure the HB 1 map is fully implemented in advance of the 2026 primary elections." Mo. Att'y Gen., Op. Letter 03-2026 (May 13, 2026). Local election officials then implemented the HB 1 map in Missouri's Centralized Voter Registration ("MCVR") system, transferring hundreds of thousands of voters to the new districts. Stipulated Ex. 26 ¶ 7; Stipulated Ex. 29 at 109. After implementation, state and local officials prepared ballots and conducted the August 4 primary elections under the HB 1 map.

15. A total of 1,206,871 Missourians voted in the State's congressional primary elections under the HB 1 map. *See* State of Missouri Election Results

– Primary Election August 4, 2026, *available at* https://enr.sos.mo.gov/ (last visited Aug. 17, 2026).

16. Prior to 5 p.m. on August 4, the last day to vote in the primary elections, Secretary Hoskins announced that he was issuing a certificate finding PNP's petition insufficient. *See* Stipulated Ex. 5.

17. The Secretary's certificate identified as "the reason for the insufficiency," § 116.150.2, RSMo., that the Missouri Constitution does not permit referenda on congressional maps, *see* Stipulated Ex. 5. The Secretary's certificate relied upon a letter from the Attorney General explaining that insufficiency. *See id.*

18. Plaintiff filed this suit later that evening. Plaintiff alleges that "he is entitled to the immediate suspension of the use and implementation of HB 1." Pet. ¶¶ 42-43; *see also id.* at 8. He also alleges that the Court should "restrain[] the Secretary from taking further steps to implement or use the congressional districts in HB 1 to ensure that . . . the correct congressional districts are utilized to conduct the 2026 general congressional election." *Id.* ¶ 45; *see also id.* at 8.

19. Plaintiff's Petition does not identify what he believes to be "the correct congressional districts . . . to conduct the 2026 general congressional election." *Id.* ¶ 45.

20. To the extent Plaintiff asks the Court to revert Missouri to the plan the General Assembly repealed in HB 1, such an action would move hundreds of thousands of voters into different districts for the imminent 2026 general election compared to the districts in which they cast their ballots in the August primary elections just two weeks ago. *See, e.g.*, Order and Judgment, Findings 27, 30, 40-46, *Wise v. State*, No. 2516-CV29597 (Jackson Cty. Cir. Ct. Mar. 12,

2026); Stipulated Ex. 26 ¶ 7; Stipulated Ex. 29 at 109.

## CONCLUSIONS OF LAW

### I. Legal Standard

21. The General Assembly "has the power to do whatever is necessary to perform its functions *except as expressly restrained by the Constitution.*" *Luther v. Hoskins*, 730 S.W.3d 567, 571 (Mo. banc 2026) (quotations omitted) (emphasis added).

22. "Deference due the General Assembly requires that doubt be resolved against nullifying its action if it is possible to do so by . . . any reasonable construction of the Constitution." *State v. Clay*, 481 S.W.3d 531, 537 (Mo. banc 2016) (quotations omitted).

23. This case also implicates federal law. The U.S. Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI.

24. The Missouri Constitution enforces this principle, declaring that "Missouri is a free and independent state, subject only to the Constitution of the United States." Mo. Const. art. I, § 4.

25. Thus, federal law controls over any contrary provision of the Missouri Constitution or law.

26. The Secretary has the authority to apply the U.S. Constitution.

27. The Secretary must apply and adhere to the U.S. Constitution—

the supreme law of the land—in every action he undertakes. *See* U.S. Const. art. VI; Mo. Const. art. I, § 4. No statute or state constitutional provision can override that obligation. *See* U.S. Const. art. VI. In fact, the Secretary of State's oath *requires* that he "support the Constitution of the United States and this state." Mo. Const. art. VII, § 11.

## II. Missouri's Referendum Provisions Do Not Apply To Congressional Redistricting.

### A. Article III Does Not Subject Congressional Redistricting To The Referendum.

28. Article III expressly directs that "the general assembly shall by law divide the state into [congressional] districts." Mo. Const. art. III, § 45. This is the *only* constitutional provision addressing congressional redistricting—and it recognizes the General Assembly's authority and mandate over that task. *Luther*, 730 S.W.3d at 571.

29. When the General Assembly conducts congressional redistricting, it acts not only under this express state constitutional command but also under an express federal constitutional grant of authority.

30. The Elections Clause provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof," subject to laws enacted by Congress. U.S. Const. art. I, § 4.

31. The General Assembly's power to conduct congressional redistricting, therefore, is a uniquely robust legislative authority—emanating from a dual mandate prescribed by both the state and federal constitutions—layered on top of its plenary power to do whatever is necessary to perform its functions "except as expressly restrained by the Constitution." *Luther*, 730

S.W.3d at 571 (quotations omitted).

32. Given the General Assembly's unique authority over congressional redistricting, this Court will not lightly infer that the Missouri Constitution elsewhere divested that authority absent a **clear statement**.

33. Missouri courts interpret the Constitution to effectuate its "plain, ordinary, and natural meaning," and any provision must be "considered as a whole with the primary objectives of the provision in issue in mind." *Id.* (quotations omitted); *see also Mo. Prosecuting Att'ys v. Barton Cty.*, 311 S.W.3d 737, 741 (Mo. banc 2010) (explaining that "due regard is given to the primary objectives of the provision at issue as viewed in harmony with all related provisions, considered as a whole") (quotations omitted).

34. Applying those principles here, the Missouri Constitution states that congressional redistricting belongs to the General Assembly. *See* Mo. Const. art. III, § 45.

35. This expectation of clarity is not novel in Missouri law. Missouri courts apply it across multiple doctrinal areas, each reflecting that where the law establishes a settled default, courts do not presume it has been silently displaced.

36. For example, Missouri courts presume that statutes apply only within the State's borders unless the General Assembly clearly says otherwise. *Tuttle v. Dobbs Tire & Auto Centers, Inc.*, 590 S.W.3d 307, 311 (Mo. banc 2019). In addition, Missouri courts presume the State cannot be sued unless the General Assembly expressly waives the State's immunity. *Ramirez v. Mo. Prosecuting Att'ys*, 694 S.W.3d 432, 436 (Mo. banc 2024). And Missouri courts presume that statutes operate prospectively unless the legislature's intent for

retroactive application "clearly appears from the express language of the act or by necessary or unavoidable implication." *Lincoln Credit Co. v. Peach*, 636 S.W.2d 31, 34 (Mo. banc 1982).

37. In each context, the principle is the same: A reasonable reader knows the baseline under Missouri law and expects clarity before concluding it has been changed.

38. That principle also animates the Missouri Supreme Court's substantial deference to the General Assembly's exercise of its plenary legislative power recognized by the Missouri Constitution.

39. Missouri law's baseline expectation that the General Assembly can exercise any and all legislative power is so strong that the Missouri Supreme Court refuses to nullify legislative acts under the Missouri Constitution if "it is possible to do so by . . . any reasonable construction of the Constitution" or by resolving any "doubt . . . against nullifying its action." *Clay*, 481 S.W.3d at 537.

40. If anything, the expectation of clarity applies even more strongly here because congressional redistricting represents the rare circumstance where the General Assembly wields a dual mandate under the State and U.S. Constitutions. *See* Mo. Const. art. III, § 45; U.S. Const. art. I, § 4.

41. In other words, because an express restraint is necessary to limit the General Assembly's legislative authority recognized by the Missouri Constitution, such a restraint at a minimum is required to limit the General Assembly's exercise of its congressional redistricting authority both recognized by the Missouri Constitution *and* granted by the U.S. Constitution. *See Luther*, 730 S.W.3d at 571.

42. Against that backdrop, Plaintiff points only to the generic referendum provision in Article III, Section 49, which provides that "[t]he people reserve power . . . to approve or reject by referendum any act of the general assembly." Mo. Const. art. III, § 49; *see* Petition ¶ 4.

43. But that provision at most merely *raises*, but does not *answer*, the question whether the referendum power extends to congressional redistricting, a domain Article III and the U.S. Constitution separately and specifically assign to the General Assembly.

44. A generic provision that says nothing about congressional redistricting cannot do the work of divesting the General Assembly of the dual mandate the Missouri and U.S. Constitutions assign to it.

45. Because Section 49 does not "expressly restrain[]" the General Assembly's authority over congressional redistricting, it cannot limit, let alone oust, the General Assembly's exercise of that authority. *Luther*, 730 S.W.3d at 571 (quotations omitted). And any doubt on that score must be resolved in favor of the General Assembly, not against it. *See Clay*, 481 S.W.3d at 537.

### B. The Missouri Constitution's Specific Redistricting Provisions Override The Generic Referendum Power.

46. Even if Section 49's generic language could be read to encompass congressional redistricting, a more specific constitutional provision resolves the question. Article III, Section 7(h) provides: "No redistricting plan shall be subject to the referendum." Article III, Section 3 similarly provides: "No reapportionment shall be subject to the referendum."

47. By its plain text, Section 7(h) covers all redistricting. It is not limited to Senate redistricting or redistricting conducted by a commission. Nor

is Section 3 limited to House redistricting. The "plain, ordinary, and natural meaning" of these provisions exempts congressional redistricting from the referendum. *Luther*, 730 S.W.3d at 571.

48. To be sure, Section 7(h) and Section 3 appear among other provisions which address state redistricting. But that placement reflects the impetus for these provisions: undoing the Missouri Supreme Court's decision subjecting Senate redistricting to the referendum in *State ex rel. Gordon v. Becker*, 49 S.W.2d 146 (Mo. banc 1932). That placement, however, does not delineate the scope of Section 7(h) or Section 3, neither of which expresses any limitation on its scope.

49. In all events, the construction that Section 7(h) and Section 3 cover congressional redistricting is at least reasonable, so any "doubt" on this question must be resolved in favor the General Assembly and against subjecting HB 1 to nullification through the referendum. *Clay*, 481 S.W.3d at 537.

### C. Context Confirms That Congressional Redistricting Is Not Subject To The Referendum.

50. Context reinforces that a congressional redistricting statute duly enacted by the General Assembly cannot be subjected to the referendum process. Three features of Missouri's legal landscape reinforce this conclusion.

51. *First*, in the more than eighty years since Missouri ratified its current Constitution in 1945, no referendum petition directed at a congressional redistricting plan has ever reached the ballot.

52. The lone attempt before *Maggard* occurred in 1952, when a group

filed referendum petitions against the congressional map, but the petitions were held untimely because the statute had already taken effect. *See State ex rel. Moore v. Toberman*, 250 S.W.2d 701, 705-06 (Mo. banc 1952).

53. The complete absence of any successful referendum on a congressional map over eight decades of practice underscores that Missouri never deliberately chose to extend the referendum power to this domain.

54. Indeed, given the relative ease of collecting signatures of "five percent of the legal voters in each of two-thirds of the congressional districts in the state," Mo. Const. art. III, § 52(a)—and the charged political stakes involved in redistricting—one would expect that political opponents of the majority party in the General Assembly would have forced a referendum on a congressional redistricting plan long ago if Missouri law provided a viable path to do so. But no such thing has occurred.

55. *Second*, the 1945 Constitution itself repudiated the only Missouri Supreme Court decision that had ever sanctioned a referendum on legislative redistricting of any kind.

56. In *State ex rel. Gordon v. Becker*, 49 S.W.2d 146 (Mo. banc 1932), a divided court permitted a referendum challenging state senate redistricting.

57. The Constitutional Convention responded by inserting Article III, Section 7(h)—the very provision discussed above—which expressly declares that "[n]o redistricting plan shall be subject to the referendum." Mo. Const. art. III, § 7(h) (1945).

58. The Convention thus eliminated referenda in the only redistricting context in which any Missouri court had approved such a referendum. *See*

Debates of the 1943–1944 Constitutional Convention of Missouri 7016 (2008). That deliberate rejection only confirms the Missouri Framers' distrust of referenda in the redistricting sphere.

59. *Third*, Chapter 116, the statutory "framework for exercising the right of referendum" the General Assembly enacted in 1980, *see No Bans on Choice v. Ashcroft*, 638 S.W.3d 484, 487 (Mo. banc 2022), is incompatible with referenda on congressional maps.

60. Two features are particularly telling. As an initial matter, Chapter 116 restricts the ballot summary for any referendum measure to a mere hundred words and makes no provisions for visual aids such as maps. *See* § 116.334, RSMo. Congressional redistricting is a uniquely complex undertaking involving considerations of population, compactness, geography, and communities of interest. *See generally Healey v. State*, 732 S.W.3d 827 (Mo. banc 2026). It is difficult to see how voters could meaningfully evaluate competing redistricting plans based solely on a hundred-word description.

61. Had the General Assembly contemplated that Chapter 116 would govern referenda on congressional maps, it would have written it to furnish voters with far more information so they could make an informed choice regarding that complex issue.

62. Most telling, Chapter 116 sets the presumptive deadline for the Secretary's certification decision on the very same day as the August primary elections. *See* § 116.150.3, RSMo. It is difficult, if not impossible, to fathom that the General Assembly would impose a certification timeline that extends to—or past—primary election day if it believed that a referendum could displace the congressional map under which the very primary was conducted.

63. These points merely confirm what the text already establishes: Missouri has never—by constitutional provision, by statute, or by practice—subjected congressional redistricting to the referendum. At every turn where the question might have been addressed, Missouri's framers and legislators either remained silent or affirmatively rejected referenda on redistricting.

### D. The Referendum Provisions Themselves Exempt Congressional Maps From Their Coverage.

64. In addition, the text of Article III's referendum provisions themselves underscore that they exempt congressional redistricting from their reach.

65. Article III, Section 52(a) carves out from the referendum process "laws necessary for the immediate preservation of the public peace, health or safety." Mo. Const. art. III, § 52(a). Legislation qualifies for this exception when there is "a crisis or emergency which requires immediate or quick legislative action for the preservation of the public peace, property, health, safety, or morals." *State ex rel. Tyler v. Davis*, 443 S.W.2d 625, 631 (Mo. banc 1969).

66. Missouri courts have explained that this standard is satisfied when federal law imposes a deadline that the State must meet through prompt legislation.

67. For example, in *Osage Outdoor Advertising, Inc. v. State Highway Commission*, 687 S.W.2d 566, 569-70 (Mo. App. 1984), the federal Highway Beautification Act required Missouri to enact effective billboard-control legislation before a set date or lose ten percent of its federal highway appropriation. After the General Assembly passed the required statute, the court upheld it as emergency legislation, explaining that "[t]his sequence of

events demonstrates the necessity for immediate action by the legislature and prompt enactment of the law." *Id.* at 569.

68. The same rationale applies here with greater force. Federal law requires each State's Legislature to prescribe the times, places, and manner of holding congressional elections. *See* U.S. Const. art. I, § 4. Federal law also imposes several constitutional and statutory mandates with which Missouri must comply, including a nationwide federal general election day on the first Tuesday in November of even-numbered years, 3 U.S.C. § 1; 2 U.S.C. §§ 1, 7, and a strict 45-day ballot transmission requirement prior to any federal primary or general election, 52 U.S.C. § 20302(a)(8). HB 1 is the legislation through which Missouri satisfies those federal requirements for congressional elections.

69. Just as the billboard statute in *Osage* was necessary to avoid the loss of federal highway funds, HB 1 is necessary to avoid a far graver consequence: the inability to hold a constitutionally valid election.

70. "[T]he political franchise of voting" has long been recognized as "preservative of all rights," *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966) (quotations omitted), and legislation that makes a federal election possible is plainly necessary to preserve the public peace. It cannot be suspended at the behest of a small minority of voters who prefer a different redistricting plan—particularly when that minority seeks to impose on the public a different plan in the weeks between a primary and a general election.

## III. Federal Law Independently Confirms That Missouri Has Not Ousted The General Assembly's Redistricting Authority.

71. Although Missouri law alone requires dismissal of the Petition, this Court's conclusion is independently supported by federal law.

72. As explained, when the General Assembly conducts congressional redistricting, it wields authority expressly granted it by the U.S. Constitution's Elections Clause. *See* U.S. Const. art. I, § 4. Federal law, in turn, imposes its own **clear statement** requirement before this federal legislative authority can be displaced. Missouri's referendum provisions do not satisfy that requirement for the same reasons they fail it under Missouri law: They say nothing about congressional redistricting.

### A. Clear Statement Rules Protect and Uphold The U.S. Constitution's Express Delegations of Authority.

73. Enforcing constitutional boundaries ranks among courts' most vital duties. Given the tendency of institutions to encroach on each other's powers, *see* THE FEDERALIST No. 51 (James Madison) (C. Rossiter ed., 1961), courts must serve as a "bulwark[]" against those incursions, THE FEDERALIST No. 78 (Alexander Hamilton) (C. Rossiter ed., 1961).

74. Consistent with that role, courts will not lightly infer a significant restructuring of a constitutional allocation of power. Where the Constitution assigns authority to a specific actor, that power cannot be divested absent a **clear statement**. (Emphasis added) *See West Virginia v. EPA*, 597 U.S. 697, 735 (2022) (Gorsuch, J., concurring) (explaining that clear-statement rules "operate[] to protect foundational constitutional guarantees").

75. Courts deploy an array of clear statement rules to safeguard the prerogatives of each branch of the federal government in its proper sphere. For example, Article I of the Constitution delegates responsibility "to make the laws that govern us" to "the people's elected representatives." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring).

76. To protect Article I's grant of authority, courts will not infer that Congress delegated to executive agencies the power to resolve major policy questions absent a clear statement. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000).

77. This expectation of clarity reflects and reinforces the constitutional structure. *See West Virginia*, 597 U.S. at 723 (explaining that the major questions doctrine rests on "both separation of powers principles and a practical understanding of legislative intent").

78. "Because the Constitution vests Congress with 'all legislative Powers,' a reasonable interpreter would expect it to make the big-time policy calls itself, rather than pawning them off to another branch." *Biden v. Nebraska*, 600 U.S. 477, 515 (2023) (Barrett, J., concurring) (citation omitted). Accordingly, the clear statement rule keeps the legislative power "where . . . it belongs." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 124 (Gorsuch, J., concurring).

79. Clear statement rules likewise protect the President's constitutional prerogatives in Article II. It is axiomatic that "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) (quotations omitted). So "unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect," courts will presume it does not apply extraterritorially. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (cleaned up).

80. In this context, the clear statement rule reflects the structural principle that Congress does not ordinarily intend to intrude on the President's

authority to conduct foreign relations. *See RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 348 (2016).

81. Underscoring the point, federal courts routinely employ clear statement rules to protect their Article III authority. Federal courts will not imply a repeal of their jurisdiction in "the absence of clear congressional language mandating" that result. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 483-84 (1991); *see also Goncalves v. Reno*, 144 F.3d 110, 122 (1st Cir. 1998) (applying "the long-standing rule disfavoring repeal of jurisdictional provisions by implication").

82. For example, the U.S. Supreme Court has long required that if Congress intends to make exceptions to the Supreme Court's appellate jurisdiction it must do so with unmistakable clarity, not "by mere implication." *Ex parte Yerger*, 75 U.S. 85, 106 (1869). This principle ensures that any retrenchment of federal courts' core functions occurs, if at all, only by Congress speaking with the clarity the Constitution's separation of powers demands.

83. Clear statement rules also help police the "constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). The Constitution's structure, including the Tenth Amendment's reservation of powers, counsels restraint in inferring federal limitations on state authority.

84. Hence, "if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 65 (1989) (cleaned up).

85. This clear statement rule governs attempts to displace state sovereign immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 55 (1996)

("unequivocal[] express[ion]" required "to abrogate the immunity") (quotations omitted), to preempt state legislation, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (courts will assume state police powers not superseded "unless that was the clear and manifest purpose of Congress"), to impose conditions on states accepting federal funds, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("unambiguous[]" language required to "impose a condition on the grant of federal moneys"), and to criminalize conduct traditionally regulated by the states, *Bond v. United States*, 572 U.S. 844, 857 (2014) (absent "clear indication," courts will not read statutes to "intrude[] upon traditional state criminal jurisdiction") (quotations omitted).

86. In short, across multiple doctrinal settings, clear statement rules serve as a structural safeguard ensuring that only a deliberately expressed choice—not ambiguity or implication—can recalibrate the Constitution's usual balance of shared authorities among competing actors.

**B. The Elections Clause Requires A Clear Statement To Displace The State Legislature's Redistricting Authority.**

87. The Elections Clause, no less than other enumerated delegations, requires a clear statement before courts may determine that a state has reallocated power over redistricting from the state legislature.

88. This clear statement rule flows from the Elections Clause itself, which expressly provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S. Const. art. I, § 4 (emphasis added).

89. This delegation reflects a reasoned constitutional settlement. The Framers recognized "electoral districting problems and considered what to do

about them," and they "settled on a characteristic approach, assigning the issue to the state legislatures, expressly checked and balanced by the Federal Congress." *Rucho v. Common Cause*, 588 U.S. 684, 699 (2019). Courts "must respect" the Constitution's "deliberate choice" to "expressly vest[] power" to conduct congressional redistricting "in 'the Legislature' of each State." *Moore v. Harper*, 600 U.S. 1, 34 (2023).

90. As with other express delegations in the U.S. Constitution, courts require a **clear statement** before concluding that a state has displaced its legislature's authority over congressional redistricting.

91. It is well established that Congress must employ "positive and clear statutes" in order to override a state legislature's prerogative to regulate federal elections. *United States v. Gradwell*, 243 U.S. 476, 485 (1917); *see also United States v. Oregon*, 828 F. Supp. 3d 1092, 1095-96 (D. Or. 2026) (same, citing *Gradwell*, 243 U.S. at 485); *United States v. Caldwell*, No. CV 26-2025 (ZNQ) (JTQ), 2026 WL 2186515, at *3 (D.N.J. July 29, 2026) (same, citing *Gradwell*, 243 U.S. at 485).

92. Because Congress—the sole actor the Elections Clause empowers to supersede state legislative regulations—may do so only through unmistakable, affirmative enactments, any contention that some state actor or process has displaced the state legislature's redistricting role must at a minimum rest on equally explicit and unequivocal language.

93. The U.S. Supreme Court's Elections Clause cases confirm the point. In *State of Ohio ex rel. Davis v. Hildebrant*, the U.S. Supreme Court considered whether a constitutional referendum could displace the Ohio General Assembly's authority to redistrict. 241 U.S. 565, 566-67 (1916). The

U.S. Supreme Court concluded that it could only because state law "conclusive[ly]" "ma[d]e[] it clear that . . . the referendum constituted a part of the state Constitution and laws" applicable to congressional redistricting. *Id.* at 568.[1]

94. More recently, in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, the U.S. Supreme Court weighed whether Arizona could create an independent commission to draw congressional districts. 576 U.S. 787, 792-93 (2015). The U.S. Supreme Court sustained that arrangement because Arizona's Constitution expressly "remove[d] congressional redistricting authority from the State Legislature." *Id.* at 796-97. In both cases, no doubt existed that the state had deliberately overridden the legislature's authority.

95. The U.S. Supreme Court's decision in *Davis v. Hildebrant* is not controlling here for several additional reasons.

96. *First*, the provision at issue in *Hildebrant* did not involve a provision like Article III, Section 7(h) of the Missouri Constitution exempting redistricting from the referendum. Ohio's referendum provision applied broadly to "any law, section of any law or any item in any law . . . passed by the General Assembly." *State ex rel. Davis v. Hildebrant*, 94 Ohio St. 154, 158-59 (1916). Missouri's Constitution, by contrast, contains an express exemption:

[1] *Hildebrant* is also inapposite because it pre-dated the U.S. Supreme Court's one-person, one-vote jurisprudence and other subsequent legal developments that require states to conduct congressional elections in equipopulous single-member districts. *See, e.g.*, *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969). Thus, at the time of *Hildebrant*, extending a referendum process to a legislature's duly enacted congressional districting plan did not place the state in peril of violating the one-person, one-vote mandate or other federal requirements that foreclose Plaintiff's claim and requested relief here. *See, e.g.*, *infra* Parts IV-V. Moreover, *Hildebrant* arose in a non-election year, not between a primary and general election in the same year. *See, e.g.*, *infra* Parts V-VI.

"No redistricting plan shall be subject to the referendum." Mo. Const. art. III, § 7(h).

97. *Second*, the U.S. Supreme Court in *Hildebrant* did not address whether the Ohio referendum provision comported with the Elections Clause. Instead, it addressed only whether an act of Congress at issue in that case comported with the Elections Clause. *See* 241 U.S. at 567-68.

98. *Third*, *Hildebrant* arose in a non-election year. The referendum was conduct in 1915—not between a primary and a general election. *See id.* It therefore did not present the concerns at issue here regarding disruption to an ongoing election cycle.

99. *Fourth*, *Hildebrant* pre-dated the U.S. Supreme Court's one-person, one-vote jurisprudence and other subsequent legal developments that require states to conduct congressional elections in equipopulous single-member districts. *See, e.g.*, *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969). At the time of Hildebrant, extending a referendum process to a legislature's duly enacted congressional districting plan did not place the state in peril of violating the one-person, one-vote mandate or other federal requirements that foreclose Plaintiff's claim and requested relief here.

### C. Missouri's Referendum Provisions Do Not Provide A Clear Statement Displacing The General Assembly's Authority.

100. The Missouri Constitution does not supply *any* statement—let alone a clear one—reallocating authority over congressional redistricting away from the General Assembly to a referendum process.

101. "Article III, section 45 is the only provision of the Missouri Constitution directly addressing congressional redistricting," *Luther*, 730

S.W.3d at 571, and it mandates that "the *general assembly* shall by law divide the state into [congressional] districts," Mo. Const. art. III, § 45 (emphasis added).

102. Plaintiff directs this Court's attention to the generic referendum provision in Article III, Section 49, which provides that "[t]he people reserve power . . . to approve or reject by referendum any act of the general assembly." Mo. Const. art. III, § 49; *see* Petition ¶ 4.

103. This is a textbook example of a broad, undifferentiated clause that does not provide a **clear statement** overriding the U.S. Constitution's express grant of authority over congressional redistricting to the General Assembly. *See Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 139 (2005) (plurality opinion) ("**[C]lear statement** rules ensure [the state] does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation.").

104. Section 49 gives no indication that Missouri "specifically considered" whether to displace the General Assembly's federally assigned authority over redistricting and "intentionally legislated on the matter." *Sossamon v. Texas*, 563 U.S. 277, 290 (2011).

105. Accordingly, it does not provide a "conclusive" statement divesting the General Assembly of its Elections Clause authority over congressional redistricting, much less vesting that authority in the referendum process. *Hildebrant*, 241 U.S. at 568.

106. Lacking any **clear statement** in Missouri law to support his claim, Plaintiff's Petition fails.

## IV. The U.S. Constitution Invalidates Article III, Section 52(B) As Applied To A Congressional Map Enacted By The Legislature.

107. Even if Missouri's referendum provisions could somehow be read to encompass congressional redistricting, the U.S. Constitution would not permit it. *See* U.S. Const. art. VI; Mo. Const. art. I, § 4. Both the Elections Clause and the Guarantee Clause forbid the application of Article III, Section 52(b) to a congressional map enacted by the General Assembly.

108. As discussed, the Elections Clause vests redistricting authority squarely in the state legislature. *See* U.S. Const. art. I, § 4. Indeed, the U.S. Supreme Court recently cautioned that state law may not be wielded to "arrogate" the "power vested in state legislatures to regulate federal elections." *Moore*, 600 U.S. at 29.

109. That is what would happen if Article III, Section 52(b) applies to congressional maps.

110. Section 52(b) provides that legislation subject to a referendum is suspended once a sufficient petition is filed. Mo. Const. art. III, § 52(b); *see also Maggard*, 733 S.W.3d at 418. A referendum petition is sufficient if signed by merely "five percent of the legal voters in each of two-thirds of the congressional districts in the state." Mo. Const. art. III, § 52(a).

111. On Plaintiff's theory, a small fraction of voters can freeze a congressional map duly enacted by the General Assembly before any majority of Missourians has voted for or against it—and even *after* that map has been used to conduct primary elections.

112. That theory inverts the constitutional design. The Elections Clause guarantees that the People's elected representatives control the time, place, and manner of federal elections, not that a small, unelected minority can wield effective veto power over the General Assembly's redistricting decisions.

113. HB 1 passed overwhelmingly in both chambers of the General Assembly and was signed by the Governor. *See* Mo. Senate J. 25–26 (2d Extra. Sess., 103d Gen. Assembly, Sept. 12, 2025); Mo. House J. 37–38 (2d Extra. Sess., 103d Gen. Assembly, Sept. 9, 2025). Yet Plaintiff claims that a small minority of voters can suspend the map months before the election without any statewide vote.

114. The Elections Clause forbids any arrangement that would so thoroughly "annihilate" the General Assembly's redistricting authority. *Hildebrant*, 241 U.S. at 569.

115. The Guarantee Clause compels the same conclusion.

116. That clause provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4. It also "necessarily implies a duty on the part of the States themselves to provide" a republican form of government. *Minor v. Happersett*, 88 U.S. 162, 175 (1874).

117. It is clear that disputes under the Guarantee Clause are nonjusticiable political questions. But the Secretary reasoned in part that the referendum is invalid under the Guarantee Clause as part of his independent obligation to uphold the Constitution. *See Minor*, 88 U.S. at 175. That reasoning is sufficient to support the Secretary's action—and Plaintiff asserts that the very question is nonjusticiable. If Guarantee Clause questions are

political questions confined to the political branches, and the legislature is one political branch and the Secretary of State is another, then courts cannot override the Secretary's determination and must defer to the judgment of those elected branches.

118. A republican government is one in which "the scheme of representation takes place"—that is, the people govern through elected representatives who enact laws on their behalf. THE FEDERALIST No. 10 (Madison) (C. Rossiter ed., 1961).

119. "[T]he distinguishing feature of that form is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *Duncan v. McCall*, 139 U.S. 449, 461 (1891); *accord Madden v. Missouri Pac. Ry. Co.*, 192 S.W. 455, 458 (Mo. banc 1917) (Woodson, J., concurring in the judgment).

120. The result Plaintiff seeks is inconsistent with a republican form of government. On his theory, a small minority of voters can nullify a congressional map enacted by the People's elected representatives without any majority vote. *See* THE FEDERALIST No. 22 (Hamilton) (C. Rossiter ed., 1961); THE FEDERALIST No. 58 (Madison) (C. Rossiter ed., 1961) ("it would no longer be the majority that would rule: the power would be transferred to the minority").

121. The "immediate suspension" of HB 1, Pet. ¶¶ 42-43, would leave Missouri with no congressional map whatsoever for the imminent general election.

122. Permitting a sliver of the electorate to void the "legitimate acts . . . of the people themselves" cannot be squared with Missouri's constitutional duty to maintain a republican form of government. *Duncan*, 139 U.S. at 461.

**V. Federal Law Forecloses Any Alteration to Missouri's Congressional Map At This Late Stage Of The Electoral Process.**

123. Federal law also prohibits Plaintiff's requested relief: "immediate suspension of the use and implementation of HB 1." Pet. ¶¶ 42-43; *see also id.* at 8.

124. More than 1.2 million Missourians have *already* voted under the HB 1 map in the primary elections. *See* State Of Missouri Election Results – Primary Election August 4, 2026, *available at* https://enr.sos.mo.gov/ (last visited Aug. 17, 2026).

125. Plaintiff asks the Court to nullify those votes and adopt some other congressional map for the imminent general election. Doing so would violate federal law in multiple respects.

126. *First*, UOCAVA protects the voting rights of military servicemembers and citizens living abroad by requiring state election officials to transmit absentee ballots no fewer than 45 days before any federal election. *See* 52 U.S.C. § 20302(a)(8); *see also* § 115.914, RSMo.

127. That requirement applies independently to each federal election, including a primary.

128. Accordingly, if this Court were to suspend the use of HB 1, UOCAVA would require ballot transmission to military and overseas voters 45 days before any primary under the new map. Missouri law would then require a three-day waiting period after the primary before the results could be certified. *See* §§ 115.920.1, 115.508, RSMo. And UOCAVA would again

require ballot transmission 45 days before the subsequent general election on November 3, 2026. 3 U.S.C. § 1; 2 U.S.C. §§ 1, 7.

129. Accordingly, the State needs 93 days minimum before the general election on November 3, 2026, to comply with the federal election day statute and UOCAVA.

130. That deadline has already passed. *See Foster v. Love*, 522 U.S. 67, 74 (1997) (holding that a State may not conduct federal elections in conflict with congressionally mandated timing under 2 U.S.C. § 7).

131. An injunction against HB 1 would therefore require state officials to violate federal law. And UOCAVA is enforceable by the U.S. Attorney General in federal court, 52 U.S.C. § 20307(a), meaning that Plaintiff's requested relief would expose Missouri officials to an adverse federal injunction.

132. The Court concludes that the Secretary correctly avoided that result by declining to certify the referendum petition. *See* Stipulated Ex. 5 at 9-10.

133. *Second*, holding a general election under a different congressional map than the one used in the August 4 primary would violate Article I, Section 2 of the U.S. Constitution.

134. That provision guarantees that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States." U.S. Const. art. I, § 2.

135. The U.S. Supreme Court has long recognized that "[w]here the state law has made the primary an integral part of the procedure of choice," then "the right of the elector to have his ballot counted at the primary[] is

likewise included in the right protected by Article I, § 2." *United States v. Classic*, 313 U.S. 299, 318 (1941).

136. Missouri law makes the primary integral: "all candidates for elective office shall be nominated at a primary election," § 115.339, RSMo., and "[t]he person receiving the greatest number of votes at a primary election as a party candidate for an office shall be the only candidate of that party for the office at the general election," § 115.343, RSMo.

137. A candidate may be replaced only if he or she dies, is disqualified, or voluntarily withdraws. *See* § 115.363.3(1)-(3), .4, RSMo.

138. The Missouri Supreme Court has thus confirmed that "primary elections have constitutional stature" and serve as an "*integral* part of [the State's] election machinery." *State ex rel. McClellan v. Kirkpatrick*, 504 S.W.2d 83, 86 (Mo. banc 1974) (emphasis added).

139. Plaintiff's requested relief plainly violates the right of Missouri voters to have their ballot counted. More than 1.2 million Missourians voted in the August 4 congressional primaries under the HB 1 map and selected nominees in each of Missouri's eight districts. Plaintiff asks this Court to ignore those votes, *see* Pet. ¶¶ 42-43; *see also id.* at 8, stripping the nominees of the mandate their voters conferred. Article I, Section 2 forbids this result.

140. The U.S. Supreme Court has long recognized that primary and general elections are not separate events but a unified process. In *Smith v. Allwright*, the Court described "[t]he fusing . . . of the primary and general elections into a single instrumentality for choice of officers." 321 U.S. 649, 660 (1944).

141. Because the primary and general election constitute a "single instrumentality for choice of officers," *id.*, then changing the districts between those two stages does not merely alter the ballot; it fractures the instrumentality itself. *See also Storer v. Brown*, 415 U.S. 724, 735 (1974) (describing the primary as "not merely an exercise or warm-up for the general election but an integral part of the entire election process, the initial stage in a two-stage process by which the people choose their public officers").

142. *Third*, an order requiring a general election under a different congressional map than the one used in the primary would violate the Equal Protection Clause. U.S. Const. amend. XIV, § 1.

143. The U.S. Supreme Court has held that primary-election procedures constitute "'state action' within the meaning of the Fourteenth Amendment" and "must be exercised in a manner consistent with the Equal Protection Clause." *Bullock v. Carter*, 405 U.S. 134, 140-41 (1972).

144. The Supreme Court has also made clear that "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Gray v. Sanders*, 372 U.S. 368, 379 (1963).

145. If the congressional map changes between the primary and general elections, it would force hundreds of thousands of Missourians to vote in a district different from the one in which they cast their primary ballots.

146. Those voters would possess materially less voting power than voters whose district remained the same because the former group would have to select from candidates they never had the opportunity to evaluate, support, or oppose in the primary.

147. They would thus be denied the right to choose their own representative through the integrated primary and general elections. Meanwhile, voters who happened to remain in the same district would retain the full benefit of their primary vote. An order changing the congressional map would thus create two classes of voters—those who had the opportunity to select their general election candidate and those who did not—in direct violation of the Equal Protection Clause.

148. In sum, federal law precludes this Court from ordering the State to use a different congressional map than the one under which Missouri conducted the 2026 primary elections.

## VI. The Court Will Not Enter Any Changes To The General Assembly's Duly Enacted Map For The Ongoing 2026 Election.

149. In all events, the Court will not order any changes to the General Assembly's duly enacted 2025 Plan for the ongoing 2026 election. *See, e.g., Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).

150. Missouri has already completed its August 4 primary elections, in which over 1.2 million Missourians selected nominees who are now the only candidates of their respective parties for the general election, *see* § 115.343, RSMo., which will be completed in only eleven weeks from now.

151. Any judicially ordered changes to the map at this late juncture would "result in voter confusion and consequent incentive to remain away from the polls" and erode the "[c]onfidence in the integrity of our electoral processes . . . essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *accord Hadley v. Junior Coll. Dist. of Metro. Kansas City*, 460 S.W.2d 1, 2 (Mo. banc 1970).

152. Months ago, the U.S. Supreme Court stayed a three-judge federal district court's order enjoining use of Texas's 2025 congressional redistricting plan and requiring the State to revert to its 2022 plan. *Abbott v. League of United Latin American Citizens*, 607 U.S. ----, 146 S. Ct. 418, 419 (2025).

153. The district court issued its injunction shortly after the opening of candidate filing, approximately four months before the primary, and eleven months before the November 2026 general election. *See League of United Latin Am. Citizens v. Abbott*, 809 F. Supp. 3d 502 (W.D. Tex. 2025).

154. The U.S. Supreme Court issued the stay because the district court had "improperly inserted itself into an active primary campaign, causing much confusion" with its late-breaking injunction. *Abbott*, 146 S. Ct. at 419; *see*

*Robinson v. Ardoin*, 37 F.4th 208, 228-29 (5th Cir. 2022) (per curiam), *stay issued sub nom., Ardoin v. Robinson*, 142 S. Ct. 2892, 2892-93 (June 28, 2022) (staying injunction of congressional redistricting plan issued five months before primary elections); *Callais v. Landry*, 732 F. Supp. 3d 574, 613-14 (W.D. La. Apr. 30, 2024), *stay issued sub nom., Robinson v. Callais*, 144 S. Ct. 1171 (May 15, 2024) (staying injunction of congressional redistricting plan issued more than six months before the next election).

155. It is a "basic tenet of election law" that "[w]hen an election is close at hand, the rules of the road should be clear and settled." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (mem.) (Kavanaugh, J., concurring). "[L]ate-breaking, court-ordered rule changes can 'result in voter confusion and consequent incentive to remain away from the polls,' and thus undermine the '[c]onfidence in the integrity of our electoral processes . . . essential to the functioning of our participatory democracy.'" *Bost v. Ill. State Bd. of Elections*, 607 U.S. ----, 146 S. Ct. 513, 521 (2026) (quoting *Purcell*, 549 U.S. at 4-5); *see also Abbott*, 146 S. Ct. at 419.

156. After all, "running a statewide election is a complicated endeavor," involving "a host of difficult decisions about how best to structure and conduct the election." *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring). And those decisions must then be communicated to the "state and local officials" tasked with implementing them, who in turn "must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting." *Id.*

157. When a "court alters election laws near an election," *id.*, candidates, voters, and even officials are left scrambling to understand the

court-imposed alteration, "inviting confusion and chaos and eroding public confidence in electoral outcomes," *id.* at 30 (Gorsuch, J., concurring).

158. These considerations counsel judicial restraint and deference to the democratic process on the eve of an election. The General Assembly is responsible for redrawing the State's congressional districts. *See* Mo. Const., art. III, § 45; U.S. Const. art. I, § 4, cl. 1; *see also Ariz. State Legis. v. Ariz. Ind. Redistricting Comm'n*, 576 U.S. 787, 808 (2015).

159. This allocation makes practical sense. Legislatures "enjoy far greater resources for research and factfinding" than courts, and "make policy and bring to bear the collective wisdom of the whole people when they do, while courts dispense the judgment of only a single person or a handful." *Democratic Nat'l Comm.*, 141 S. Ct. at 29 (Gorsuch, J., concurring).

160. "It is one thing for state legislatures to alter their own election rules in the late innings and to bear the responsibility for any unintended consequences. It is quite another thing for a . . . court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent." *Id.* at 31 (Kavanaugh, J., concurring).

161. Missouri's own precedent reinforces these principles. In *Hadley v. Junior College District of Metropolitan Kansas City*, the Missouri Supreme Court confronted a remand after the U.S. Supreme Court found that junior college trustee districts violated the one-person, one-vote principle. *See* 460 S.W.2d at 1. By the time the Missouri Supreme Court addressed the case, the State's election machinery was already in motion. Five candidates had filed for office, officials had begun printing absentee ballots and adjusting voting machines, and the State had already incurred substantial expense. *Id.* at 2-3.

Moreover, the candidate-filing deadline fell just two days away and the election itself loomed one month out. *Id.*

162. In light of these considerations, the Missouri Supreme Court held that "it would be wholly inequitable and impracticable to attempt at this late date to apply the principles enunciated" by the U.S. Supreme Court, and ordered the election to proceed under the existing apportionment. *Id.*

163. In other words, even a *proven* violation of the U.S. Constitution could not justify disrupting an ongoing election. As the Missouri Supreme Court explained, "a court is entitled to *and should* consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." *Id.* at 2 (emphasis added) (quoting *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)).

164. This case presents the scenario *Hadley* and *Purcell* were designed to prevent. If courts cannot change a congressional map four months before a primary, *see Abbott*, 146 S. Ct. at 419, this Court certainly will not do so *after* the primary has already occurred and mere weeks before the general election.

165. Candidate filing closed months ago. Over 1.2 million Missourians voted in the August 4 primary. Nominees have been selected. Campaigns for the general election are underway. Plaintiff has not demonstrated how State officials could reverse course and implement some entirely new map, how nominees selected by voters in one set of districts would campaign in different ones, or how voters would make sense of a last-minute overhaul of the districts they just voted in.

166. The disruption Plaintiff seeks would exceed anything contemplated in *Abbott*, *Ardoin*, or *Callais*—and the U.S. Supreme Court stayed all of those injunctions as impermissible.

167. Missouri election officials are not aware of any precedent, in Missouri or any other State, in which a court has changed a congressional map between a State's primary and general elections. Stipulated Ex. 26 ¶¶ 5, 16.

168. On the contrary, courts have rejected attempts to change district boundaries after a primary. In *Terrazas v. Slagle*, 821 F. Supp. 1154 (W.D. Tex. 1992), after Texas held its primary elections under court-ordered interim state senate redistricting plans, the Secretary of State issued a directive attempting to switch the general election to entirely different senate districts under a new plan. The three-judge federal court enjoined the directive and explained that "[p]rimary elections for offices chosen by the electorate in separate geographical districts obviously make no sense unless the districts are the same for the ensuing general election as for the primary." *Id.* at 1159. The court agreed with the Justice Department's undisputed assertion that the State had "never held or sought to hold a general election under a redistricting plan different from the plan used for the preceding primary election."

169. In fact, courts have refused to change maps even when the existing districts are unconstitutional. In *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), the court had found that the state legislature had engaged in one of the most extensive unconstitutional racial gerrymanders ever encountered by a federal court, affecting nearly 70% of House and Senate districts. *See Covington v. North Carolina*, 270 F. Supp. 3d 881, 892, 896 (M.D.N.C. 2017). Yet with "the 2016 primary elections already held under the challenged maps and Election Day less than three months away," the court concluded that immediate injunctive relief was "impractical" and allowed the general election to proceed under the unconstitutional maps. *Id.* at 887, 892; *see also Covington*, 316 F.R.D. at 177.

170. In fact, changing the maps at this late juncture is not just "impractical," it is impossible. As one election official explained, implementing a new congressional map requires local election officials to transfer hundreds of thousands of individual voters in the MCVR system. *Id.* ¶ 7; *see also* Stipulated Ex. 29 at 109. That is a meticulous process involving careful analysis of printed maps and multiple rounds of proofreading; it ordinarily takes more than two weeks, and at least 7-10 days even under emergency conditions. Stipulated Ex. 26 ¶ 7.

171. But even that timeline is academic here, because the MCVR system locks shortly before absentee ballots are distributed and remains locked until an election is certified two weeks after election day. *Id.* ¶ 8. This year, the system will remain locked until at least mid-November because of a Jackson County special election in September 2026. *Id.* ¶¶ 9-10. The Court declines to order an unprecedented remedy that is impossible to implement. *See Hadley*, 460 S.W.2d at 3 (refusing to alter districts where doing so would be "wholly inequitable and impracticable").

WHEREFORE, this Court hereby issues its Judgment and Order in favor of Defendant Denny Hoskins and Intervenors Republican National Committee, National Republican Congressional Committee, and Missouri Republican State Committee and against Plaintiff on Plaintiff's Petition for Declaratory Judgment and Injunctive Relief and further ORDERS, DECLARES, and ADJUDGES that:

A. Missouri's referendum provisions in Article III, Sections 49 and 52 of the Missouri Constitution do not apply to congressional redistricting enacted by the General Assembly pursuant to Article III, Section 45;

B. The Secretary of State's decision to not certify the referendum petition directed at HB 1 was lawful;

C. HB 1 remains in full force and effect for the 2026 general election;

D. The Petition is dismissed and judgment is entered for Defendant;

E. The parties are to bear their own costs.

F. As soon as a notice of appeal is filed, if any, this Court relinquishes its jurisdiction over this matter and deems this Judgment final for purposes of appeal. *See* Rule 81.045

So ORDERED, this 19 day of August 2026.

Daniel Green
Circuit Court Judge