**No. 26A____**

# In the
# Supreme Court of the United States

DENNY HOSKINS, *in his official capacity as Missouri Secretary of State*,
*Applicant*,

v.

RICHARD VON GLAHN,
*Respondent*.

## EMERGENCY APPLICATION FOR STAY AND ADMINISTRATIVE STAY PENDING APPEAL

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL
207 W. High St.
Jefferson City, MO 65101
Tel: (573) 645-9662
Fax: (573) 751-0774

Louis J. Capozzi III
*Solicitor General*
*Counsel of Record*
William J. Seidleck
*Principal Deputy Solicitor General*
J. Michael Patton
*Deputy Solicitor General*
Graham D. Miller
*Deputy Solicitor General*
Madeline S. Lansdell
*Assistant Solicitor General*
Louis.Capozzi@ago.mo.gov

September 4, 2026

*Counsel for Applicant*

Exhibit 1

## PARTIES TO THE PROCEEDING AND RELATED PROCEEDINGS

Applicant Denny Hoskins, in his official capacity as Missouri Secretary of State, was the Defendant in the Circuit Court of Cole County, Missouri and the Respondent in the Missouri Supreme Court.

Republican National Committee, National Republican Congressional Committee, and Missouri Republican State Committee were Intervenor-Defendants in the Circuit Court of Cole County, Missouri and Intervenor-Respondents in the Missouri Supreme Court.

Respondent Richard von Glahn was Plaintiff in the Circuit Court of Cole County, Missouri and the Appellant in the Missouri Supreme Court.

## RELATED PROCEEDINGS

Circuit Court of Cole County, Missouri (Cole Cnty. Cir. Ct.):

> *Von Glahn v. Hoskins*, No. 26AC-CC00440 (Aug. 19, 2026) (final judgment and order denying injunction)

Missouri Supreme Court (Mo.):

> *Von Glahn v. Hoskins*, No. SC101805 (Sept. 3, 2026) (order granting injunction)
>
> *Von Glahn v. Hoskins*, No. SC101805 (Sept. 4, 2026) (order denying motion for stay pending appeal)

## RULE 29.6 STATEMENT

Pursuant to Supreme Court Rule 29.6, Applicant represents that he and his office do not have any parent entities and do not issue stock.

*/s/ Louis J. Capozzi, III*
Louis J. Capozzi, III

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ **vi**

**DECISIONS BELOW** ........ **6**

**JURISDICTION** ........ **7**

**STATEMENT** ........ **7**

**REASONS FOR GRANTING A STAY** ........ **17**

I. Missouri is likely to succeed on the merits. ........ 17

A. The Missouri Supreme Court's decision violates the U.S. Constitution's Elections Clause. ........ 17

B. The Missouri Supreme Court's injunction disenfranchises hundreds of thousands of Missouri voters in violation of the U.S. Constitution. ........ 23

C. This Court is likely to grant review and reverse. ........ 30

II. The remaining stay factors favor the Missouri Secretary of State's application. ........ 32

A. Missouri and the public will suffer profound irreparable harm. ........ 32

B. The balance of the equities overwhelmingly favors the Secretary's application. ........ 34

**CONCLUSION** ........ **38**

## TABLE OF AUTHORITIES

### Cases

*Abbott v. LULAC*,
146 S. Ct. 418 (2025) .......... 2, 35

*Am. Party of Tex. v. White*,
415 U.S. 767 (1974) .......... 28

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) .......... 3, 19, 21, 22

*Bush v. Gore*,
531 U.S. 98 (2000) .......... 37

*Covington v. North Carolina*,
316 F.R.D. 117 (M.D.N.C. 2016) .......... 24

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) (plurality op.) .......... 4, 24

*Democratic Nat'l Comm. v. Wisconsin State Leg.*,
141 S. Ct. 28, (2020) .......... 18

*Doe v. Dynamic Physical Therapy, LLC*,
607 U.S. 11 (2025) .......... 22

*Does 1-3 v. Mills*,
142 S. Ct. 17 (2021) .......... 30, 31

*Foster v. Love*,
522 U.S. 67 (1997) .......... 32

*Free Enterprise Fund v. Public Co. Accounting Bd.*,
561 U.S. 477 (2010) .......... 19

*Gray v. Sanders*,
372 U.S. 368 (1963) .......... 28

*Hadley v. Junior Coll. Dist. of Metro. Kansas City*,
460 S.W.2d 1 (Mo. 1970) .......... 12, 13, 36

*Hawke v. Smith*,
253 U.S. 221 (1920) ............ 18

*Healey v. Missouri*,
732 S.W.3d 827 (Mo. 2026) ............ 11

*Hollingsworth v. Perry*,
558 U.S. 183 (2010) ............ 2, 17, 34

*Labrador v. Poe*,
144 S. Ct. 921 (2024) ............ 32

*Louisiana v. Callais*,
146 S. Ct. 1131 (2026) ............ 22

*Luther v. Hoskins*,
730 S.W.3d 567 (Mo. 2026) ............ 11

*Maggard v. Missouri*,
733 S.W.3d 411 (Mo. 2026) ............ 10, 11, 27

*Malliotakis v. Williams*,
146 S. Ct. 809 (2026) ............ 5, 7, 35, 36

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ............ 29

*Maryland v. King*,
567 U.S. 1301 (2012) ............ 4, 32

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) ............ 4, 5, 17, 34

*Mo. Gen. Assembly v. von Glahn*,
No. 4:25-CV-1535-ZMB, 2025 WL 3514277 (E.D. Mo. Dec. 8, 2025) ............ 10

*Moore v. Harper*,
600 U.S. 1 (2023) ............ 18, 19, 22, 31, 37

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ............ 19

*NAACP v. Kehoe*,
734 S.W.3d 338 (Mo. 2026) .......... 11

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 7

*Ohio ex rel. Davis v. Hildebrandt*,
241 U.S. 565 (1916) .......... 21

*Page v. Va. State Bd. of Elections*,
58 F. Supp. 3d 533 (E.D. Va. 2014) .......... 24

*People Not Politicians v. Hoskins*,
No. SC101801, slip op. (Mo. Sept. 3, 2026) .......... 20

*Pollard v. Bd. of Police Comm'rs*,
665 S.W.2d 333 (Mo. 1984) .......... 25

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 35

*Reynolds v. Sims*,
377 U.S. 533 (1964) .......... 28, 37

*Smiley v. Holm*,
285 U.S. 355 (1932) .......... 19

*United States v. Classic*,
313 U.S. 299 (1941) .......... 3, 25, 26

*United States v. Mosley*,
238 U.S. 383 (1915) .......... 24

*Vera v. Richards*,
861 F. Supp. 1304 (S.D. Tex. 1994) .......... 25

**Statutes**

2 U.S.C. § 7 .......... 16, 32

28 U.S.C. § 1257 .......... 7

28 U.S.C. § 1651 ........ 7

52 U.S.C. § 20302 ........ 2, 4, 16, 33

Mo. Const. art. III, § 52(a) ........ 3, 13, 15, 20

Mo. Rev. Stat. § 115.125 ........ 6

Mo. Rev. Stat. § 115.339 ........ 25

Mo. Rev. Stat. § 115.343 ........ 25

Mo. Rev. Stat. § 116.120 ........ 10, 11

Mo. Rev. Stat. § 116.130 ........ 11, 26

Mo. Rev. Stat. § 116.150 ........ 11

U.S. Const. art. I, § 2 ........ 3, 13, 23, 24, 26

U.S. Const. art. I, § 4 ........ 2, 3, 10, 13, 17, 18, 19, 20, 21, 22, 23, 37

U.S. Const. art. VI ........ 22, 30

U.S. Const. amend. XIV ........ 4, 13, 27, 28, 29, 30

**Other Authorities**

Dave Wasserman (@Redistrict), X (Sept. 4, 2026, 9:55 AM) ........ 30

Mo. Att'y Gen., Op. Letter 03-2026 (May 13, 2026) ........ 12

Nathaniel Rakich (@baseballot), X (Sept. 3, 2026, 6:39 PM) ........ 30

Nathaniel Rakich (@baseballot), X (Sept. 3, 2026, 6:43 PM) ........ 32, 37



Exhibit 1

TO THE HONORABLE BRETT M. KAVANAUGH, ASSOCIATE JUSTICE OF THE SUPREME COURT OF THE UNITED STATES AND CIRCUIT JUSTICE FOR THE EIGHTH CIRCUIT:

A federal-election-administration disaster is unfolding in Missouri. In August 2025, the Missouri General Assembly adopted a new congressional map (the "HB 1 map"); that map was used about one year later in the August 2026 Primary Election, in which about 1.2 million Missourians voted. But yesterday, the Missouri Supreme Court ordered the State to use a dramatically different map—one adopted in 2022—for the imminent 2026 General Election. The court gave no specific guidance on *how* this is to be done—but it undoubtedly will require the winners of the Primary Election to run in dramatically different districts for the General Election.

No court in American history has *ever* given such an extraordinary remedy, which inflicts unprecedented chaos on Missouri. Looking backwards, the order renders a completed federal Primary Election utterly pointless—disenfranchising hundreds of thousands of voters who will now be moved into new districts and forced to vote for candidates they had no role in selecting. Looking forwards, the State is genuinely unsure whether it can switch its governing congressional map in time to run a timely federal election. App., *infra*, at 1665a–1668a. Several weeks ago, the trial court found that "changing the maps at this late juncture is not just 'impractical,' it is impossible" given the complexity of doing so. *Id.* at 52a. The Missouri Supreme Court simply ignored that factual finding (and the substantial evidence underlying it). Certainly, absent a stay, Missouri will be forced to violate the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), which sets a deadline of September 19 to start sending absentee ballots to overseas and military voters. 52

U.S.C. § 20302(a)(8); App., *infra*, at 1667a–68a. Altogether, the chaos present here easily dwarfs that in *any* case where this Court ever invoked *Purcell*-related concerns to grant a stay. *Cf., e.g., Abbott v. LULAC*, 146 S. Ct. 418, 419 (2025) (per curiam) (prohibiting changes to Texas's congressional map for the 2026 elections ten months ago).

Below, Missouri raised several federal constitutional defenses to avoid this catastrophic scenario—but the Missouri Supreme Court simply ignored them. That court deemed Missouri's federal constitutional arguments, as well as warnings that it would be forced to violate federal law, "irrelevant" in footnotes. App., *infra*, at 5a n.5, 12a n.8. Instead, the court reasoned that the Missouri Constitution gives about 3.3% of registered voters an absolute right to void a duly enacted congressional map *before* a statewide referendum vote—and after the Primary Election was completed under a very different congressional map. App., *infra*, at 5a n.5, 11a–13a n.8.

The Missouri Supreme Court's order to change Missouri's congressional map for the 2026 Election patently violates the U.S. Constitution and should be stayed by this Court. There is a "reasonable probability" this Court will grant certiorari and reverse on at least two bases. *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010).

First, the order below violates the U.S. Constitution's Elections Clause. U.S. Const. art. I, § 4. The Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof." *Id.* (emphasis added). But yesterday, the Missouri Supreme Court held that a referendum *petition*—signed by just "five percent of the

legal voters in each of two-thirds of the congressional districts in the state" (approximately 3.3% of the State's voters)—can suspend Missouri's duly-enacted congressional map. App., *infra*, at 5a, 11a–13a (quoting Mo. Const. art. III, § 52(a)). And, the court made clear, this happens *before* any statewide referendum vote—meaning the State must at least temporarily use a congressional map the General Assembly repealed regardless of the ultimate statewide referendum vote. App., *infra*, at 13a. Although this Court has held that the Elections Clause permits statewide referendum votes on congressional maps, *see Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n* ("*AIRC*"), 576 U.S. 787, 808–09 (2015), the Court has never held that just 3.3% of a State's voters can unilaterally suspend a disfavored congressional map by submitting a referendum petition. If *that* profoundly anti-democratic arrangement is permissible, little is left of the Elections Clause.

Second, a judicial order dramatically altering a congressional map *between* a Primary and a General Election violates several constitutional provisions. Article I, Section 2 provides that "[t]he House of Representatives shall be composed of Members *chosen every second Year by the People* of the several States." U.S. Const. art. I, § 2 (emphasis added). This protects the right of Missourians to select their representatives in both Primary and General Elections. *See United States v. Classic*, 313 U.S. 299, 318 (1941). 1.2 million Missourians participated in the State's Primary under the HB 1 map, in August 2026. App., *infra*, at 19a–20a. Yet the Missouri Supreme Court just threw those votes into the dustbin—requiring the winners of the Primary election to run in very different congressional districts.

App., *infra*, at 11a–13a n.8. Thus, absent a stay, hundreds of thousands of voters will be forcibly switched to new districts and forced to vote on General Election candidates they had no role in choosing. App., *infra*, at 19a, 45a. This unprecedented disenfranchisement violates Article I, Section 2, the constitutional right to vote, and the Equal Protection Clause.

Merits aside, the other stay factors *overwhelmingly* favor a stay. *Cf. Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of stay). To start, absent a stay, Missouri will face several irreparable harms. The State will be barred from using a duly enacted congressional map, a classic and weighty irreparable harm, *see Maryland v. King*, 567 U.S. 1301, 1303–04 (2012) (Roberts, C.J., in chambers)—but one that is unusually acute here because Missouri used that map for its Primary Election. Moreover, the order below will force Missouri to violate federal law, including UOCAVA—which requires absentee mail ballots to be sent to military and overseas voters in 15 days. 52 U.S.C. § 20302; App., *infra*, at 1667a–1668a (doing math on why State will violate UOCAVA). The trial court's factual findings (which the Missouri Supreme Court simply ignored) make clear that Missouri election officials cannot change the congressional map and meet this deadline. App., *infra*, at 52a. And worst of all, hundreds of thousands of Missourians will see their votes in the Primary election rendered pointless—destroying public confidence in the integrity of Missouri's elections. *Id.*, at 1669a–1670a; *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196–97 (2008) (plurality op.).

Moreover, the balance of the equities is remarkably one-sided. *Cf. Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring in grant of stay). On the one hand, Richard von Glahn—the referendum petition's proponent—will get his referendum vote on Missouri's congressional map regardless of what this Court does. The only question is whether he (joined by a small minority of the State's voters) can void a congressional map *before* he gets his vote.

On the other hand, Missouri cannot run a timely, lawful federal election absent a stay. App., *infra*, at 42a–43a, 52a, 1665a–1668a. This Court has long recognized that last-minute judicial alterations can upend and inflict chaos on federal elections. *See Milligan*, 142 S. Ct. at 880–81 (Kavanaugh, J., concurring in grant of stay). This is true even when a state court issues the order, *see Malliotakis v. Williams*, 146 S. Ct. 809, 811 (2026) (Alito, J., concurring in grant of stay), and *Purcell*'s equitable concerns are squarely implicated here. Across the State, ahead of a September 8 state-law deadline to alter the ballot, Mo. Rev. Stat. § 115.125.2, county election officials are scrambling to figure out how to comply with the order below—and assessing whether it is even possible to do so. App., *infra*, at 1665a–1668a. Even if the trial court is wrong—and it is *possible* to change the map before November 3, *but see id.*, at 52a—Missouri will be forced to violate UOCAVA and delay the start of voting. *Id.*, at 1667a–68a. Candidates—who have campaigned for over a year and raised tens of millions of dollars based on the HB 1 districts—now face the prospect of all that time and expense being wasted and being forced to campaign afresh before very different electorates. Voters across the State are confused. *Id.*, *infra*, at 1669a–

1670a. Altogether, the chaos inflicted by the order below exceeds that present in any of this Court's *Purcell*-related cases.

To ensure Missouri can run a timely and lawful federal election, this Court should also enter an immediate administrative stay of the Missouri Supreme Court's injunction ordering the use of a new congressional map for the 2026 General Election. Although this Court is not bound by it, Missouri has a state-law deadline of September 8 to alter the ballot, Mo. Rev. Stat. § 115.125.2; an administrative stay by that time would provide much needed clarity to confused election officials. More importantly, UOCAVA requires Missouri to send out absentee ballots on September 19. To enable Missouri to comply with that federal deadline, Secretary Hoskins respectfully requests this Court issue a decision **no later than September 14, 2026**. The Secretary also proposes a briefing schedule in which Respondent's brief is due **no later than 5:00 p.m. on September 7, 2026**, and in which the Secretary's reply becomes due **no later than 5:00 p.m. on September 8, 2026**.

## DECISIONS BELOW

The Missouri Supreme Court's September 3, 2026 merits opinion is attached. App., *infra*, at 1a–14a. The Missouri Supreme Court's September 3, 2026 mandate is attached. *Id.*, at 15a.

Applicant's September 3, 2026 motion to the Missouri Supreme Court seeking a stay of the court's injunction pending an emergency application for stay to this Court is attached. *Id.*, at 1639a–1663a. The Missouri Supreme Court's September 4, 2026 denial of the Applicant's motion for stay is attached. *Id.*, at 16a.

The Cole County Circuit Court's August 19, 2026 judgment, findings of fact, and conclusions of law is attached. *Id.*, at 17a–53a.

## JURISDICTION

The Court has jurisdiction under 28 U.S.C. §§ 1257(a), 1651(a). "Title 28 U.S.C. § 1257(a) gives [this Court] jurisdiction to review '[f]inal judgments or decrees' that are rendered by a State's highest court and adjudicate federal constitutional claims." *Malliotakis*, 146 S. Ct. at 810 (Alito, J., concurring in grant of stay) (second alteration original) (quoting 28 U.S.C. § 1257(a)). That includes review of a state supreme court's refusal to stay a "state-court order" that violates the U.S. Constitution. *Id.* at 810–11.

Likewise, Title 28 U.S.C. § 1651(a) "preserve[s]" the "'inherent'" authority of this Court to grant a stay, which is "'necessary or appropriate in aid of [its] jurisdiction[].'" *Nken v. Holder*, 556 U.S. 418, 426–27 (2009) (quoting 28 U.S.C. § 1651(a)) (citing *In re McKenzie*, 180 U.S. 536, 551 (1901)).

Under these rules, the Missouri Supreme Court's September 3, 2026 opinion and mandate, and the court's September 4, 2026 denial of the Secretary's motion for stay, are final judgments and decrees of the Missouri Supreme Court subject to appellate review in this Court to the extent that the Missouri Supreme Court's injunction violates the U.S. Constitution. This Court's exercise of its inherent authority to grant a stay is also necessary and appropriate in aid of its jurisdiction.

## STATEMENT

On September 12, 2025, the Missouri General Assembly passed House Bill 1 ("HB 1"), which redistricted the boundaries of Missouri's eight congressional districts.

HB 1 abrogated Missouri's previous congressional map enacted in 2022. A copy of the two maps is reproduced below:

**Missouri's 2025 Congressional Map**




**Missouri's 2022 Congressional Map**






Exhibit 1

HB 1 passed overwhelmingly in the Missouri General Assembly. App., *infra*, at 17a. The margin was 21 to 11 in the Missouri Senate and 90 to 65 in the Missouri House of Representatives. *Id.* Governor Michael L. Kehoe signed HB 1 into law on September 28, 2025. *Id.*

In response, Respondent and his organization, People Not Politicians (PNP) initiated the referendum petition at issue in this case. Respondent's public statements have long emphasized that he merely wants a statewide vote on the HB 1 map. *See, e.g.*, App., *infra*, 1244a. But Respondent has also acknowledged a less democratic goal: exploiting the Missouri Constitution's referendum provisions to suspend the State's congressional map merely by submitting a referendum *petition* signed by "five percent of the legal voters in each of two-thirds of the congressional districts in the state" (approximately 3.3% of Missouri's voters). Mo. Const. art. III, §§ 52(a), 52(b); *see also* Jason Rosenbaum, *Missouri's stack of redistricting lawsuits expected to grow over whether new map is in effect*, St. Louis Public Radio (Dec. 16, 2025) (Von Glahn claimed, "[Secretary Hoskins] has to issue a certificate of sufficiency or insufficiency, and until that point, the law is suspended.'").[1] To be clear, Respondent's theory is that state law entitles him to suspend a duly-enacted congressional map for an entire election cycle *without* a referendum vote—even though this has never been attempted before in Missouri history. Also, as far as Missouri is aware, this tactic has never been tried in any other State.

[1] https://www.stlpr.org/government-politics-issues/2025-12-16/missouris-redistricting-lawsuits-whether-new-map-effect.

Keenly aware of Respondent's objective, the Missouri Secretary of State (alongside the Missouri General Assembly and the State of Missouri) sued PNP and von Glahn in federal district court last October—seeking an injunction and declaratory relief preventing displacement of the HB 1 map. *See* App., *infra*, at 608a–35a. The Secretary relied on the Elections Clause—among other arguments. App., *infra*, at 627a–28a. The district court, however, dismissed the Secretary's complaint on ripeness grounds. This was so, the district court explained, because the Secretary possesses authority under Missouri law to reject von Glahn's referendum petition as unconstitutional—thereby "prevent[ing] displacement of the new map." *Mo. Gen. Assembly v. von Glahn*, No. 4:25-CV-1535-ZMB, 2025 WL 3514277, at *1, *4 n.4 (E.D. Mo. Dec. 8, 2025) (citing Mo. Rev. Stat. § 116.120).

On December 9, 2025, the day after the federal district court's decision, Respondent submitted his referendum petition to the Secretary of State's office. App., *infra*, at 18a. The Attorney General and Secretary promptly declared that the HB 1 map had gone into effect and would remain in effect—at least until the Secretary certified the referendum as legal. *See Maggard v. Missouri*, 733 S.W.3d 411, 412–13, 419 (Mo. 2026). The Missouri Supreme Court subsequently rejected a challenge to that public declaration in *Maggard*—holding that the mere submission of a referendum petition does not freeze a duly enacted congressional map. *Id.* at 421. The *Maggard* decision also expressly reserved the question whether referenda can proceed against federal congressional maps. *Id.* at 414 n.7.

The Missouri Supreme Court also rejected four other legal challenges to the HB 1 map—including as recently as May 2026. *See Luther v. Hoskins*, 730 S.W.3d 567 (Mo. 2026); *Healey v. Missouri*, 732 S.W.3d 827 (Mo. 2026); *Maggard v. Missouri*, 733 S.W.3d 411 (Mo. 2026); *NAACP v. Kehoe*, 734 S.W.3d 338 (Mo. 2026). Because of those decisions, even Democracy Docket—the publication founded by Marc Elias, the Democratic Party's leading election lawyer—admitted the HB 1 map would likely need to govern Missouri's elections in 2026. App., *infra*, at 1246a.

While all this litigation was unfolding, the Secretary strictly complied with his state-law duties in processing Respondent's referendum petition. *See* Mo. Rev. Stat. §§ 116.120–116.150. Within two weeks of the petition's submission, the Secretary forwarded Respondent's referendum petition to Missouri's 116 local election authorities so that they could begin reviewing the signatures on Respondent's petition to verify validity. *See id.* § 116.130.1. Review of the petition's signatures was necessary *before* any ruling on the constitutionality of the referendum petition because Missouri law establishes that any defect not raised in a Secretary's certificate is waived. *See id.* § 116.150; App., *infra*, at 5a. Additionally, Missouri law explicitly granted the Secretary until August 4, 2026—the same day as Missouri's Primary Election day—to issue his certificate of sufficiency or insufficiency as to Respondent's referendum petition. App., *infra*, at 3a; Mo. Rev. Stat. § 116.150.3.

On May 13, 2026—following the Missouri Supreme Court's rejection of multiple challenges to the HB 1 map—the Attorney General issued an opinion making clear that the HB 1 map must be used during the 2026 Primary Election.

App., *infra*, at 19a; Mo. Att'y Gen., Op. Letter 03-2026 (May 13, 2026). No court ever stated that this opinion letter was unlawful or wrong.

Consistent with the Attorney General's Opinion, Missouri conducted its 2026 Primary Election under the HB 1 map. About 1.2 million Missourians voted in the elections. App., *infra*, at 19a–20a.

On the same day, the Secretary met his statutory deadline and issued a certificate of insufficiency rejecting the referendum on a host of legal grounds. *Id.* at 599a. As part of that certificate, the Secretary attached and incorporated an Attorney General opinion—which he noted "more fully articulated" the "grounds for insufficiency." *Id.* In particular, the certificate concluded "the Missouri Constitution does not authorize a referendum on congressional redistricting plans passed by the General Assembly." *Id.* at 600a. Among other things, the certificate noted exceptions in the Missouri Constitution to the referendum right. *Id.* at 603a–04a. The certificate also concluded that—even if the Missouri Constitution did authorize a statewide vote on a congressional redistricting plan—it would violate the U.S. Constitution to allow a small minority of voters to unilaterally void a redistricting plan in the interim. *Id.* at 600a. And even if all that were wrong, the Secretary's certificate concluded that it would violate federal law and Missouri's equivalent of the *Purcell* principle—the *Hadley* doctrine—to change congressional maps after the Primary Election. *Id.* at 605a–06a; *Hadley v. Junior Coll. Dist. of Metro. Kansas City*, 460 S.W.2d 1, 2–3 (Mo. 1970).

Respondent Richard von Glahn promptly sued. App., *infra*, at 54a., 56a. His complaint sought an injunction "reversing Defendant Hoskins' certification decision," and an injunction "[r]estraining" the Secretary "and those acting in concert with him from taking any further steps to implement or mandate the use of HB 1." *Id.* at 61a. Respondent's complaint provided zero explanation regarding how the latter injunction could even be implemented—given that Missouri completed its Primary Election on August 4, 2026.

The trial court rejected Respondent's challenge on every conceivable ground. It agreed with the Secretary that the Missouri Constitution does not authorize referenda on congressional maps. *Id.* at 22a–30a. It also held that the U.S. Constitution's Elections Clause forbids changing Missouri's congressional map based on a referendum petition signed by just "five percent of the legal voters in each of two-thirds of the congressional districts in the state." *Id.* at 27a (quoting Mo. Const. art. III, § 52(a)). The trial court further held that changing Missouri's congressional map between a Primary and General Election would violate Article I, Section 2 of the U.S. Constitution and the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 39a–42a. Finally, the trial court held that *even if* it were wrong on the first three bases for its judgment, it would still decline to change the HB 1 map before the 2026 election in light of the *Hadley* principle—the Missouri equivalent to the *Purcell* principle. *Id.* at 49a–50a (citing *Hadley*, 460 S.W.2d 1).

The trial court's holdings were also buttressed by several factual findings—none of which were contested (or even mentioned) by the Missouri Supreme Court.

The trial court found that "changing the maps at this late juncture is not just 'impractical,' it is impossible." *Id.* at 52a. The trial court also found that, "Candidate filing closed months ago. Over 1.2 million Missourians voted in the August 4 Primary. Nominees have been selected. Campaigns for the general election are underway." *Id.* at 50a. Also, the trial court found that "revert[ing] Missouri to the plan the General Assembly repealed in HB 1 . . . would move hundreds of thousands of voters into different districts for the imminent 2026 general election compared to the districts in which they cast their ballots in the August primary elections." *Id.* at 20a. The court also found that "[t]hose voters would possess materially less voting power than voters whose districts remained the same." *Id.* at 45a.

The court further emphasized that "Plaintiff has not demonstrated how State officials could reverse course and implement some entirely new map, how nominees selected by voters in one set of districts would campaign in different ones, or how voters would make sense of a last-minute overhaul of the districts they just voted in." *Id.* at 50a. In light of these findings, the trial court "decline[d] to order an unprecedented remedy that is impossible to implement." *Id.* at 52a.

Shockingly, the Missouri Supreme Court reversed and directly issued an injunction prohibiting the Secretary—"and all those acting in concert with him"—"from implementing, using, or mandating the use of the congressional redistricting in HB 1." *Id.* at 13a–14a. Although the court provided no detail on *how* Missouri is to comply with its order, a footnote in the court's opinion stated that Missouri must

use "the congressional redistricting [plan] the General Assembly established in 2022." *Id.* at 12a.

Why this extraordinary injunction? Despite the trial court and Missouri's statewide officials disagreeing, the Missouri Supreme Court concluded that, under the Missouri Constitution, just 3.3% of the State's voters can unilaterally override the state legislature and impose their preferred congressional map for an entire election cycle. *See id.* at 5a, 11a–13a (citing Mo. Const. art. III, §§ 52(a), 52(b)). Remarkably, the Missouri Supreme Court explicitly eschewed any consideration of the "confusion, expense, and practical difficulties" that "may result" from its injunction. *Id.* at 12a. And the Missouri Supreme Court did so while never questioning or discussing the trial court's finding that "changing the maps at this late juncture is not just 'impractical,' it is impossible." *Id.* at 52a.

What of the Secretary's federal defenses? The Missouri Supreme Court blatantly ignored them. The court hinted in a footnote that it ignored these federal constitutional arguments because the Secretary did not raise these points in his *certificate of insufficiency*, *id.* at 5a—even though the certificate expressly incorporated by reference an Attorney General opinion that did address these arguments, *id.* at 599a. Never mind that the Secretary explicitly raised these federal defenses in his answer and affirmative defenses. *Id.* at 257a–58a. Never mind that the Secretary raised these defenses in his trial brief. *Id.* at 311a–13a, 323a–29a. Never mind that the trial court explicitly accepted *all* of these federal constitutional defenses in its judgment. *Id.* at 39a–46a. Never mind that all

parties explicitly discussed these defenses in their briefing before the Missouri Supreme Court. *Id.* at 1391a–97a, 1409a–14a, 1490a–1501a, 1570a–82a. And never mind that the Missouri Supreme Court did not cite a single case suggesting the Secretary could not incorporate by reference other documents justifying his decision. *Id.* at 5a.

After ignoring the U.S. Constitution, the Missouri Supreme Court is now the first court—*ever*—to enjoin an entire congressional map four weeks after a *completed* Primary Election. Moreover, federal law requires voting to start in just *15 days*. 52 U.S.C. § 20302(a)(8). Understandably, voters are confused and concerned about being disenfranchised in the Primary Election. App., *infra*, at 1669a–1670a. And Missouri election officials are scrambling to pick up the pieces. There is a public disagreement between election officials on whether it is even *possible* to switch the congressional map. *Id.* at 904a–07a, 1023a–28a, 1665a–68a; *see also* Kacen Bayless, *'We will be ready.' Jackson County says it will comply with Supreme Court map ruling*, Kansas City Star (Sept. 4, 2026).[2] In light of the trial court's finding that it will be "impossible" for Missouri election officials to change the congressional map, App., *infra*, at 52a, the Secretary is gravely concerned that Missouri will be unable to conduct lawful congressional elections by November 3, *id.* at 1665a–68a; *see also* U.S. Const. art. I, § 2 (requiring a congressional election "every second Year"); 2 U.S.C. § 7; 52 U.S.C § 20302(a)(8). After consulting with his staff, the Secretary has concluded that—at a minimum—attempting to comply with the Missouri Supreme

[2] https://www.kansascity.com/news/politics-government/article317128194.html.

Court's order will force the State to violate UOCAVA's requirements on sending out absentee ballots to military and overseas voters. App., *infra*, at 1665a–68a.

Confronted with an unprecedented election-administration emergency, the Secretary asked the Missouri Supreme Court to stay its decision the same day it was issued. *Id.* at 1639a–1663a. This morning, that court denied the request for a stay. *Id.* at 16a.

## REASONS FOR GRANTING A STAY

To obtain a stay, Missouri "must show (1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay." *Hollingsworth*, 558 U.S. at 190. In cases involving federal elections, this Court has issued stays based on the equities alone when an order under review threatens chaos in an upcoming federal election. *See, e.g.*, *Merrill*, 142 S. Ct. at 880–81 (Kavanaugh, J., concurring in grant of stay). Under either approach, the Court should grant a stay.

### I. Missouri is likely to succeed on the merits.

#### A. The Missouri Supreme Court's decision violates the U.S. Constitution's Elections Clause.

The People's elected representatives passed the HB 1 map by strong margins—21 to 11 in the Senate and 90 to 65 in the House of Representatives. *See* App., *infra*, at 17a. Nevertheless, the Missouri Supreme Court concluded that approximately 3.3% of registered voters unilaterally suspended the HB 1 map by submitting a

referendum petition. *See* App., *infra*, at 11a–13a (citing Mo. Const. art. III, § 52(b)); *see also* Mo. Const. art. III, § 52(a). This Court has *never* sanctioned such a profoundly anti-democratic arrangement, and the Elections Clause forbids permitting a small fraction of a State's voters from suspending a congressional map—and imposing a new map—before a statewide vote. *Cf. Democratic Nat'l Comm. v. Wisconsin State Leg.*, 141 S. Ct. 28, 29 (2020) (Gorsuch, J., concurring in denial of application to vacate stay) ("The Constitution provides that state legislatures—not federal judges, not state judges, not state governors, not other state officials—bear primary responsibility for setting election rules.").

The Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof." U.S. Const. art. I, § 4 (emphasis added). The term "Legislature" was "not . . . of uncertain meaning when incorporated into the Constitution": It referred to "the representative body which made the laws of the people." *Hawke v. Smith*, 253 U.S. 221, 227 (1920).

"[T]he Elections Clause expressly vests power to carry out its provisions in 'the Legislature' of each State, a deliberate choice that this Court must respect." *Moore v. Harper*, 600 U.S. 1, 34 (2023). Thus, this Court reviews claims where state actors invoke state law to change federal election rules to ensure they "do not evade federal law." *Id.*

Of course, this Court has held that the Elections Clause does not mean that *only* a state legislature can set rules for federal elections. *See id.* The Court has

primarily employed a history-and-tradition-based approach in this context, *cf. N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 79 (2022) (Kavanaugh, J., concurring), observing that gubernatorial vetoes and ordinary judicial review have coexisted with state legislative authority since the founding, *see Moore*, 600 U.S. at 24–25; *Smiley v. Holm*, 285 U.S. 355, 368 (1932). More controversially, this Court has also rejected challenges to using state-legislative redistricting commissions and statewide popular votes to set aside redistricting plans. *See AIRC*, 576 U.S. at 824.

But this Court has *never* sanctioned the Missouri Supreme Court's bizarre and profoundly anti-democratic holding. According to that court, a tiny minority of the State's registered voters can unilaterally void a redistricting map passed by the state legislature and signed by the governor *merely* by submitting a referendum petition. App., *infra*, at 11a–13a. No statewide vote. Just a petition signed by about 3.3% of the voters. As far as Missouri is aware, no State has ever been forced to use a different congressional map for an election cycle merely because a small minority of voters submitted a petition. And it certainly has never been done after a completed primary election. Here, as in other contexts, "[p]erhaps the most telling indication of the severe constitutional problem" present here is that Respondent has not "located any historical analogues for this novel" arrangement. *Free Enterprise Fund v. Public Co. Accounting Bd.*, 561 U.S. 477, 505–06 (2010) (quoting 537 F.3d. 667, 669 (D.C. Cir. 2008) (opinion of Kavanaugh, J.)).

Moreover, the Missouri Supreme Court's holding would annihilate the Missouri General Assembly's authority over redistricting. *Contra Moore*, 600 U.S. at

34 (reaffirming importance of Elections Clause's delegation of authority to state legislature). Just consider how redistricting will play out going forward in Missouri. *Every* time Missouri redistricts in a way that favors the majority political party, the minority political party will obviously be incentivized to submit a referendum petition freezing the new map. Such a step is easy; a campaign merely needs to gather around 106,000 signatures in Missouri. *See* Mo. Const. art. III, § 52(a). Here, Respondent gathered those signatures in about a month. *See People Not Politicians v. Hoskins*, No. SC101801, slip op. at 2–3 (Mo. Sept. 3, 2026) (per curiam). Even groups with far less funding than Respondent routinely put measures on Missouri's statewide ballot. *See, e.g.*, Kurt Erickson, *Unions move to block 'right to work' law in Missouri*, ST. LOUIS POST-DISPATCH (Aug. 18, 2017).[3] Thus, political parties (and many other entities) have the resources and incentive to use von Glahn's maneuver—especially as that could give them one or more congressional seats for at least two years (as would be true here). And imagine if this happens after a decennial Census, in which Missouri gains or loses a congressional seat. Under the Missouri Supreme Court's approach, state law would seemingly require Missouri to use an old congressional map with the wrong number of seats. In all events, the General Assembly's authority over redistricting would be destroyed.

The Missouri Supreme Court offered zero contrary reasoning and *completely ignored* this defense under the Elections Clause. *See* App., *infra*, at 11a–13a. It did so even though the Secretary raised this defense at trial, App., *infra*, at 311a–16a,

[3] https://www.stltoday.com/news/local/government-politics/article_d7fb08a4-2417-508c-a81d-ab3f0e361971.html.

the trial court agreed with this federal defense in its judgment, App., *infra*, at 30a–42a, and all parties briefed this issue and discussed it during oral argument in front of the Missouri Supreme Court, App., *infra*, at 1391a–1403a, 1490a–93a, 1570a–77a. The Secretary's motion for stay in the Missouri Supreme Court also raised this Elections-Clause defense. App., *infra*, at 1652a–56a. Instead of addressing a clearly-preserved federal legal defense, the court simply insisted state law requires its absurd result—even though nothing like this has ever happened before in Missouri (or anywhere else).

Respondent will likely invoke this Court's decision in *Ohio ex rel. Davis v. Hildebrandt*, 241 U.S. 565 (1916), but that argument fails. Although this Court seemingly sanctioned statewide votes disapproving congressional maps as consistent with the Elections Clause, *but see AIRC*, 576 U.S. at 824–50 (Roberts, C.J., dissenting), it certainly did not sanction the Missouri Supreme Court's unprecedented approach. *Hildebrandt* merely recognized the ability to *veto* redistricting legislation via a statewide referendum vote. *AIRC*, 576 U.S. at 840 (discussing *Hildebrandt*). "The result of the decision was to send *the Ohio Legislature* back to the drawing board to do the redistricting." *Id.* (emphasis in original). *Hildebrandt* never suggested that just 3.3% of registered voters could force a State to use their preferred map for an entire election cycle even *before* a statewide vote. If *that* is permissible, little will be left of the Elections Clause.

Nor does this Court's closely divided decision in *AIRC*, 576 U.S. 787, help Respondent. In rejecting an Elections Clause challenge to independent redistricting

commissions, the majority relied in substantial part on its belief that independent redistricting commissions could enhance democracy. *See AIRC*, 576 U.S. at 797–98; *id.* at 816–17; *id.* at 822–24. Those considerations *cannot* support the Missouri Supreme Court's ruling, which undermines democracy by giving small political minorities uncheckable political power over the majority. App., *infra*, at 11a–13a. Inherent in a healthy approach to *stare* decisis is respecting the logical limits of decisions. *See, e.g.*, *Louisiana v. Callais*, 146 S. Ct. 1131, 1163 (2026) ("Respect for precedent cannot be a one-way street."). That wisdom counsels against extending *AIRC*—contrary to its own reasoning—to this markedly new context.

* * *

To be clear, this case is *not* about the Missouri Supreme Court's interpretation of the Missouri Constitution. What is at stake is the Supremacy Clause, which prohibits state courts from ignoring federal legal arguments that would bar their actions. *See* U.S. Const. art. VI ("This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *cf. Doe v. Dynamic Physical Therapy, LLC*, 607 U.S. 11, 11 (2025) (per curiam) ("Defining the scope of liability under state law is the State's prerogative. But a State has no power to confer immunity from *federal* causes of action." (emphasis original)). Although the Missouri Supreme Court unquestionably has a right to judicial review of Missouri redistricting legislation, it "do[es] not have free rein" to trample the Elections Clause. *Moore*, 600 U.S. at 34. And this Court has a "duty to

safeguard limits imposed by the Federal Constitution," including the Elections Clause. *Id.* at 35. That duty requires this Court's intervention when, as here, a State's supreme court openly ignores federal constitutional arguments. Only this Court can correct the Missouri Supreme Court's egregious error in holding that approximately 3.3% of Missouri's voters can force the use of their preferred congressional map for the 2026 congressional elections before any statewide vote.

### B. The Missouri Supreme Court's injunction disenfranchises hundreds of thousands of Missouri voters in violation of the U.S. Constitution.

1. Even setting the Elections Clause aside, the Missouri Supreme Court's injunction is unconstitutional under Article I, Section 2 and violates the right to vote because it disenfranchises hundreds of thousands of Missourians who voted in the August Primary Election.

The Missouri Supreme Court's injunction requires the Secretary to change the State's congressional map between the Primary and the General Election. *See* App., *infra*, at 13a–14a. Yet the trial court found that an injunction requiring implementation of Missouri's 2022 map would force hundreds of thousands of Missourians to vote for candidates in the General Election that they had no role in nominating in the Primary Election. *Id.* at 20a, 45a. For example, voters in Osage County, Missouri nominated Rick Brattin and Emanuel Cleaver as the candidates for Missouri's General Election CD-05. App., *infra*, 1669a–1670a. But the Missouri Supreme Court is now forcing every voter in Osage County to choose between Bob Onder and Bethany Mann—who were nominated by entirely different voters in CD-03. *Id.* Other voters across the State now confront the same reality—being forced to

vote on General Election candidates they had no role in selecting in the Primary. Understandably, those voters are now confused and upset over being disenfranchised in the Primary Election. *Id.*, at 1669a–1670a.

The Missouri Supreme Court's injunction defies Article I, Section 2 of the U.S. Constitution, which provides, "The House of Representatives shall be composed of Members *chosen* every second Year *by the People of the several States*." U.S. Const. art. I, § 2, cl. 1 (emphasis added). This language protects the right to vote and prohibits States from nullifying votes cast in federal congressional elections. *See id.* Additionally, this Court has recognized that the Constitution protects a fundamental right to vote. *See, e.g.*, *Crawford*, 553 U.S. at 189–91 (2008) (plurality op.). If that right protects *anything*, surely it prohibits nullifying a Primary Election and forcing voters to choose between candidates in a General Election that they had no role in nominating. *See United States v. Mosley*, 238 U.S. 383, 386 (1915) (recognizing that the constitutional right to vote includes "right to have one's vote counted"). That is why a host of federal judges have recognized that "[p]rimary elections for offices chosen by the electorate in separate geographical districts obviously make no sense unless the districts are the same for the ensuing general election as for the primary." *Terrazas v. Slagle*, 821 F. Supp. 1154, 1159 (W.D. Tex. 1992) (per curiam three-judge panel); *see, e.g.*, *Covington v. North Carolina*, 316 F.R.D. 117, 176–77 (M.D.N.C. 2016) (Op. of Wynn, Circuit Judge) (allowing General Election "to proceed as scheduled under the challenged plans" despite being determined unconstitutional after the Primary); *Page v. Va. State Bd. of Elections*, 58 F. Supp. 3d 533, 554 (E.D. Va. 2014)

(Op. of Duncan, Circuit Judge) ("[G]eneral principles of equity dictate that Virginia's 2014 elections should proceed as scheduled under the challenged districting plans" after plan found invalid one month before General Election.), *vacated on other grounds sub nom.*, *Cantor v. Personhuballah*, 135 S. Ct. 1699 (2015); *Vera v. Richards*, 861 F. Supp. 1304, 1310, 1351 (S.D. Tex. 1994) (Op. of Jones, Circuit Judge) (ordering election held on unconstitutional map after Primary had already been held), *aff'd sub nom.*, *Bush v. Vera*, 517 U.S. 952 (1996). Nevertheless, the Missouri Supreme Court's order would render hundreds of thousands of votes in the Primary Election effectively null and void. *See* App., *infra*, at 20a, 45a.

Nor does the fact that the Missouri Supreme Court's injunction nullifies a Primary Election—as opposed to a General Election—change anything. This Court's precedent establishes that "[w]here the state law has made the Primary an integral part of the procedure of choice . . . the right of the elector to have his ballot counted at the Primary, is likewise included in the right protected by" the Constitution's right to vote. *United States v. Classic*, 313 U.S. 299, 318 (1941). And that is obviously true in Missouri, which has long recognized that congressional primaries are "an integral part of the electoral process" in the State. *Pollard v. Bd. of Police Comm'rs*, 665 S.W.2d 333, 340 (Mo. 1984) (citing *Classic*, 313 U.S. 299; *Smith v. Allwright*, 321 U.S. 649 (1944)). And sure enough, Missouri law specifically provides that "all candidates for elective office shall be nominated at a primary election." Mo. Rev. Stat. §§ 115.339, 115.343. And the Primary "exclud[es] from the ballot on the general election the names of candidates rejected at the primary" such that it "impose[s]

restrictions upon the choice of candidates by the voters save by voting at the primary election." *Classic*, 313 U.S. at 313; *see* Mo. Rev. Stat. § 115.343. Thus, the Missouri Supreme Court's injunction violates Article I, Section 2 of the U.S. Constitution and the Constitution's right to vote by disenfranchising hundreds of thousands of Missourians who voted in the August Primary Election and are now forced to vote in different districts for the General Election. App., *infra*, at 20a, 1669a–70a.

What did the Missouri Supreme Court have to say about all this? Nothing. Once again, the Secretary made this argument at trial; the trial court agreed with this argument; and this argument was prominently briefed and orally argued before the Missouri Supreme Court. *See, e.g.*, App., *infra*, at 20a, 323a–28a, 1501a–02a, 1579a–80a. The Missouri Supreme Court apparently deemed this consideration "irrelevant"—and insisted that state constitutional requirements must apply regardless of any disenfranchisement. *Id.* at 12a–13a.

Reading between the lines, what seems to have driven the Missouri Supreme Court's disinterest in federal law was its displeasure with the Secretary's processing of Respondent's referendum petition. *See id.* at 12a. In particular, the court faulted the Secretary for waiting until the statutory deadline—which was the same day as the primary decision—to reject the referendum petition on state constitutional grounds. *Id.* ("[T]he secretary chose to delay his certification until the last possible day—August 4—and, in the meantime, utilized the congressional redistricting in HB 1 while [verifying signatures]."). But to be clear, all agree that the Secretary *complied* with the state-law deadline for processing referendum petitions. *See* Mo.

Rev. Stat. § 116.130.2. Although Respondent never presented any facts or evidence that the Secretary intentionally delayed a decision—and the trial court made no such finding—it bears mentioning that the Secretary and local election officials around the State needed to review the hundreds of thousands of signatures submitted in support of the referendum petition. *See id.* § 116.130.1; *Maggard*, 733 S.W.3d at 416. And the Missouri Supreme Court acknowledged in May 2026 that not all signatures had been processed. *See id.* at 420. Thus, at most, the Missouri Supreme Court seemingly faults the Secretary for not making a certification decision (before the deadline) in the summer—with an imminent Primary Election approaching. That decision would have inflicted chaos on the Primary Election and no statute or precedent suggests the Secretary was obliged to act before a state-law deadline in a manner that would jeopardize the Primary Election.

More fundamentally, Missouri's squabble over whether Secretary Hoskins appropriately handled the referendum petition is irrelevant here. Even assuming the Missouri Supreme Court's impugning of the Secretary is fair, it is hard to see how that could justify disenfranchising hundreds of thousands of voters in violation of federal law. Indeed, the Missouri Supreme Court did not actually claim otherwise—but merely ignored the federal constitutional argument altogether.

2. The Missouri Supreme Court's injunction also violates the Equal Protection Clause by transferring hundreds of thousands of voters to new districts, but leaving other voters in the same district. App., *infra*, at 20a, 45a. This strange and unprecedented order thus disadvantages voters based solely on where they live—

unlawfully diluting the influence of the moved voters compared to the non-moved voters, in violation of the Equal Protection Clause. *Id.* at 45a–46a

The Equal Protection Clause forbids weighting the votes of some Missourians "more heavily" than others. *Gray v. Sanders*, 372 U.S. 368, 379 (1963). "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and *wherever their home may be* in that geographical unit." *Id.* (emphasis added). "This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications." *Id.* at 379–80.

Indeed, the Equal Protection Clause protects the rights of all Missourians to have their "vote weighted equally with those of all other citizens." *Reynolds v. Sims*, 377 U.S. 533, 576 (1964). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 555. This Court's precedents are also clear that if a State grants some voters a privilege and "den[ies] the privilege to other classes of otherwise qualified voters in similar circumstances, without affording a comparable alternative means to vote," the State engages in "arbitrary discrimination violative of the Equal Protection Clause." *Am. Party of Tex. v. White*, 415 U.S. 767, 795 (1974).

For obvious reasons, the trial court found that changing the congressional map between the Primary and General Elections would violate these standards. App., *infra*, at 45a–46a. The trial court found that "[i]f the congressional map changes between the Primary and General Elections, it would force hundreds of thousands of Missourians to vote in a district different from the one in which they cast their primary ballots." *Id.* at 45a. Also, the trial court found that "[t]hose voters would possess materially less voting power than voters whose district remained the same because the former group would have to select from candidates they never had the opportunity to" "support" or "oppose" through voting "in the primary." *Id.* Instead, hundreds of thousands of Missourians would be forced to consider candidates that they had no role in nominating. *Id.* at 20a, 45a–46a, 1669a–70a. This places these voters at a clear disadvantage relative to Missourians who enjoyed the right to select nominees for the General Election in their district. *Id.* at 45a.

Once again, the Missouri Supreme Court simply ignored this federal constitutional argument. The Secretary made this argument at trial; the trial court accepted it and made related factual findings; the argument was briefed to the Missouri Supreme Court. *E.g.*, *id.* at 20a, 325a–28a, 355a, 1497a–1501a, 1581a–82a. Yet that court's opinion proceeds as if this argument did not exist. Such cavalier treatment of federal law is shocking and, frankly, unacceptable in a legal system where federal law is the supreme law of the land. U.S. Const. art. VI, cl. 2; *Testa v. Katt*, 330 U.S. 386, 391 (1947) ("[T]he Constitution and the laws passed pursuant to

it are the supreme laws of the land, binding alike upon states, courts, and the people.").

This Court, of course, will not ignore federal law. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803). To protect the right to vote, safeguard the Equal Protection Clause, and enforce the Supremacy Clause, this Court should grant a stay.

**C. This Court is likely to grant review and reverse.**

Whether Missouri can hold a timely and lawful federal congressional election is worthy of this Court's attention. *See Does 1-3 v. Mills*, 142 S. Ct. 17, 17–18 (2021) (Barrett, J., concurring in the denial). Missouri's election is in chaos. App., *infra*, at 1667a–68a. As the trial court found, "[c]hanging the map at this late juncture is not just 'impractical,' it is impossible." *Id.* at 52a. Missouri election officials have also testified that the entire congressional election is at risk under the Missouri Supreme Court's injunction. *Id.* at 1025a–26a. Election analysts with prominent national media outlets are openly questioning how Missouri can possibly comply with the Missouri Supreme Court's order. *See, e.g.*, Dave Wasserman (@Redistrict), X (Sept. 4, 2026, 9:55 AM) ("Before Dems get carried away celebrating the Missouri redistricting ruling, important to keep in mind that SCOTUS/state courts would likely need to greenlight an entirely new election calendar w/ 60 days left before 11/3. No guarantees here.");[4] Nathaniel Rakich (@baseballot), X (Sept. 3, 2026, 6:39 PM) ("Not done yet in Missouri. SCOTUS could very well say it's too close to the election

[4] https://x.com/Redistrict/status/2095888400200999059

and keep Missouri's 7-1 map in place for 2026.").[5] Only this Court can intervene to fix this problem.

The Missouri Supreme Court's injunction departs far from the usual course of judicial proceedings—disenfranchising hundreds of thousands of Missourians in violation of the U.S. Constitution. Respondent will undoubtedly argue that there is no split of authority on the legal questions framed above. But that is only because no other court has *ever* issued an order like the Missouri Supreme Court's injunction. No other court has invalidated an entire congressional map one month *after* a completed Primary Election. Nor is Missouri aware of any precedent allowing a small fraction of the State's voters to force the use of their preferred map for an election cycle. In other words, there is no split on the merits questions in this case because no court has ever issued an order this destabilizing to an imminent federal election before. That reality strengthens, rather than weakens, the case for certiorari. *See Does 1–3*, 142 S. Ct. at 17–18 (Barrett, J., concurring in the denial).

In *Moore v. Harper*, this Court held that it "ha[s] an *obligation* to ensure that state court[s] . . . do not evade federal law." 600 U.S. at 34 (emphasis added). This Court also recognized its "duty to safeguard limits imposed by the Federal Constitution." *Id.* at 35. If there were ever a case that called for this Court's exercise of its duty, this is it.

[5] https://x.com/baseballot/status/2095658021259026651

## II. The remaining stay factors favor the Missouri Secretary of State's application.

### A. Missouri and the public will suffer profound irreparable harm.

Without this Court's intervention, Missouri and its citizens will suffer profound irreparable harm. Of course, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring) (quoting *Maryland v. King*, 567 U.S. at 1303 (Roberts, C.J., in chambers)). Allowing a tiny fraction of the State's voters to unilaterally void a congressional map *after a Primary Election* is an especially extreme instantiation of that harm.

But Missouri's injury runs far deeper than that. Federal law requires Missouri to hold its General Election on November 3, 2026. 2 U.S.C. § 7; *see Foster v. Love*, 522 U.S. 67, 73–74 (1997) (holding that State may not run federal election in conflict with federal timing of 2 U.S.C. § 7, which requires an election this year on November 3, 2026). But the trial court in this case found that holding the General Election under a different congressional map would be "impossible." App., *infra*, at 52a. The Missouri Supreme Court never disagreed with this point. Instead, it explicitly held that any "practical difficulties" caused by its injunction were "irrelevant" to its analysis. *Id.* at 12a. That might help explain why one prominent election analyst is openly suggesting that Missouri should violate the federal election calendar to comply with the Missouri Supreme Court's order. *See* Nathaniel Rakich (@baseballot), X (Sept. 3, 2026, 6:43 PM) ("If Missouri does have to use the 6-2 map,



Exhibit 1

that's fundamentally incompatible with the primaries, which were conducted under the 7-1 map. Easiest solution would probably be to hold jungle primaries on Nov. 3, with runoffs at a later date.").[6]

Even if Missouri election officials can undertake heroic efforts to disprove the trial court's factual finding, the Missouri Supreme Court's order will certainly require Missouri to violate UOCAVA, 52 U.S.C. § 20302. UOCAVA requires Missouri to send mail ballots to overseas and military voters by September 19—15 days from now. Even assuming Missouri election officials immediately start working—over Labor Day weekend—to comply with the Missouri Supreme Court's order, they will not be able to meet UOCAVA's deadline. App., *infra*, at 1667a–68a.

A longtime Jackson County election official explained this in an affidavit credited by the trial court, and the Secretary of State's office fully agrees with her assessment. *Id.* at 1667a–68a. To switch congressional maps, Missouri election officials in counties that are transposed into new districts will have to manually reassign hundreds of thousands of voters to new districts in the MCVR election system. *Id.* at 1024a–25a. This is a painstaking, labor-intensive process that would ordinarily take two-to-three weeks. *Id.* at 1667a. The Jackson County election official estimated that—if election staff work emergency hours on nights and weekends—that the process could be shortened to 7–10 days. *Id.* at 1024a–25a. Then, after the map is changed in MCVR, ballots must be designed and tested, which takes about 14 days. *Id.* at 1026a. And after that, local election officials need an

---

[6] https://x.com/baseballot/status/2095659079708344747

additional 7 days (one week) for printing ballots. *Id.* That is a combined 28 days—*at best*. Obviously, 28 days is more than the 15 days Missouri election officials have before they start violating UOCAVA.

Rarely will this Court receive a stay application presenting more urgent and profound irreparable harms. The Court should grant a stay.

### B. The balance of the equities overwhelmingly favors the Secretary's application.

It is hard to imagine a case with more lopsided equities. *Hollingsworth*, 558 U.S. at 190. On the one hand, Respondent would suffer no meaningful prejudice from a stay. Regardless of this Court's decision, Respondent will get a statewide vote on the HB 1 congressional map. That is what his public statements have insisted his referendum campaign is all about. App., *infra*, at 1244a. At most, a stay would merely prevent him and a small minority of Missourians from forcing the State to use a congressional map rejected by the People's elected representatives—who at least presumptively reflected the majority's wishes in enacting the HB 1 map.

On the other hand, this Court's *Purcell* precedents demonstrate that Missouri's harms are overwhelming and warrant equitable relief. As this Court has recognized *many* times, "[w]hen an election is close at hand, the rules of the road must be clear and settled." *Milligan*, 142 S. Ct. at 880–81 (Kavanaugh, J., concurring in grant of stay). And this Court has recognized that changing a federal congressional map is one of *the most disruptive* changes a court can make. *Id.* at 879–80. That is why, for example, this Court applied the *Purcell* principle to foreclose challenges to Texas's congressional map for the 2026 elections *ten* months ago—*during* Texas's candidate

filing period. *See Abbott v. LULAC*, 146 S. Ct. at 419. If a federal court had entered the order under review here, this Court would deem it frivolous under *Purcell*.

Admittedly, this Court has not addressed whether the *Purcell* principle can ever *independently* justify a state court's last-minute alteration to federal election rules. However, the primary rationale underlying *Purcell v. Gonalez*—preventing chaos in a federal election, 549 U.S. 1, 4–5 (2006)—squarely fits this case. The Missouri Supreme Court's order dramatically changes the congressional map after a Primary Election—an unprecedented act this Court has probably *never* reviewed before. Missouri election officials are confident that—absent relief—they will be forced to violate the federal election calendar. App., *infra*, at 1668a. Indeed, they are unsure whether they can hold a timely election on November 3 at all. *Id.* at 1027a, 1667–68a. If the Missouri Supreme Court's order is somehow immune from being stayed under *Purcell*, no federal election is safe from last-minute state court-ordered disruptions.

In any event, this Court need not decide whether *Purcell* independently requires staying the order here. At a minimum, this Court already recognized in *Malliotakis v. Williams* that *Purcell*-related equitable concerns can *support* staying a state court order that disrupts congressional maps before an upcoming election. 146 S. Ct. at 810–11 (Alito, J., concurring in grant of stay). There, this Court stayed a state court order that altered New York's congressional map despite New York's insistence that the *Purcell* principle actually shielded its actions. *Id.* As Justice Alito explained, the Court's "stay, far from causing disruption or upsetting legitimate

expectations, eliminates much of the uncertainty and confusion that would exist if the [New York] Independent Redistricting Commission proceeded to draw a new district that this Court would likely strike down if the cases reached us in time." *Id.* at 811.

This case is far easier than *Malliotakis*. There, New York's Primary Election was scheduled to begin four months *after* the Court granted the stay. *See id.* at 816 (Sotomayor, J., dissenting from grant of stay). This Court has recognized that a state court changing a congressional map before a Primary—as occurred in *Malliotakis*—is disruptive. *Id.* at 810–11 (Alito, J., concurring in grant of stay). Certainly changing a map *after the Primary* is far worse. And here, voting for the 2026 General Election begins in just 15 days—three-and-a-half months less time than existed before the Primary Election in New York. Under the unique and extraordinary circumstances present in this case, the equities overwhelmingly favor a stay.

One final point bears mention. Recognizing that *Purcell*-related concerns support a stay is hardly unfair to Respondent or the Missouri Supreme Court. The Missouri Supreme Court itself has adopted this Court's *Purcell* principle as a matter of state law. *See Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 460 S.W.2d 1, 2–3 (Mo. 1970). In *Hadley*, the Missouri Supreme Court relied on this Court's *Reynolds* opinion and held that "[i]n awarding or withholding immediate relief [after invalidation of a redistricting map], a court is entitled to *and should* consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." *Id.* at 2



Exhibit 1

(emphasis added) (quoting *Reynolds*, 377 U.S. at 585). In light of this principle, *Hadley* held that it was too late to change the unconstitutional districts in that case a few days before the close of the relevant candidate-filing period. *Id.* at 2–3. Here, the relevant candidate-filing period closed over five months ago. Missouri also completed its Primary Election over a month ago. Yet, without even mentioning *Hadley*, the Missouri Supreme Court held that any consideration of "the confusion, expense, and practical difficulties that may result" from enjoining the congressional map was irrelevant. App., *infra*, at 12a–13a. The Missouri Supreme Court's refusal to engage with its own precedent "impermissibly distort[s]" state law—yet another violation of the Elections Clause. *Bush v. Gore*, 531 U.S. 98, 115 (2000) (Rehnquist, C.J., concurring); *accord Moore*, 600 U.S. at 39 (Kavanaugh, J., concurring) (endorsing Chief Justice Rehnquist's approach in *Bush v. Gore*).

* * *

The balance of the equities is more lopsided in this case than *any* case in which this Court has ever granted a *Purcell*-related stay. Missouri has completed a Primary Election, yet it now faces the unprecedented scenario of being forced to apply a starkly different congressional map in the 2026 General Election. Voting starts in Missouri's General Election in 15 days. Election officials and public commentators are unsure whether it is even possible to comply with the Missouri Supreme Court's order. App., *infra*, at 1027a, 1667a–68a; *see also* Nathaniel Rakich (@baseballot), X (Sept. 3, 2026, 6:43 PM) ("If Missouri does have to use the 6-2 map, that's fundamentally incompatible with the primaries, which were conducted under the 7-1 map. Easiest

solution would probably be to hold jungle primaries on Nov. 3, with runoffs at a later date.").[7] Only this Court can prevent Missouri from being forced to disenfranchise hundreds of thousands of voters; and only this Court can ensure that Missouri hosts a timely and lawful federal congressional election. The Court should do so and grant a stay.

## CONCLUSION

This Court should grant the application for stay pending appeal and an immediate administrative stay while it considers the application.

---

[7] https://x.com/baseballot/status/2095659079708344747

September 4, 2026

Respectfully submitted,

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

*/s/ Louis J. Capozzi, III*
Louis J. Capozzi, III
*Solicitor General*
*Counsel of Record*
William J. Seidleck
*Principal Deputy Solicitor General*
J. Michael Patton
*Deputy Solicitor General*
Graham D. Miller
*Deputy Solicitor General*
Madeline S. Lansdell
*Assistant Solicitor General*
OFFICE OF THE MISSOURI ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, MO 65102
(573) 645-9662
Louis.Capozzi@ago.mo.gov

*Counsel for Applicant*