**No. 26A-304**

---

**IN THE SUPREME COURT OF THE UNITED STATES**

---

DENNY HOSKINS, IN HIS OFFICIAL CAPACITY,

*Applicant*,

REPUBLICAN NATIONAL COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, MISSOURI REPUBLICAN STATE COMMITTEE,

*Intervenors-Respondents*

v.

RICHARD VON GLAHN

*Respondent.*

---

**Application from the Supreme Court of Missouri**

**(No. SC101805)**

---

# INTERVENORS-RESPONDENTS' BRIEF IN SUPPORT OF APPLICANT'S EMERGENCY APPLICATION FOR STAY PENDING DISPOSITION OF A PETITION FOR A WRIT OF CERTIORARI

---

MARC H. ELLINGER
STEPHANIE S. BELL
COLE D. BRADBURY
ELLINGER BELL LLC
308 East High Street, Suite 300
Jefferson City, MO 65101
Phone: (573) 750-4100
mellinger@ellingerlaw.com

JOHN M. GORE
*Counsel of Record*
E. STEWART CROSLAND
NATHANIEL C. SUTTON
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
jmgore@jonesday.com

*Counsel for Intervenors-Respondents*

Exhibit 2

## RULE 29.6 STATEMENT

As required by Supreme Court Rule 29.6, Intervenors-Respondents hereby submit the following corporate-disclosure statement.

1. Intervenor-Respondent Republican National Committee has no parent corporation; no publicly held corporation owns any portion of Republican National Committee; and Republican National Committee is not a subsidiary or an affiliate of any publicly owned corporation.

2. Intervenor-Respondent National Republican Congressional Committee has no parent corporation; no publicly held corporation owns any portion of National Republican Congressional Committee; and National Republican Congressional Committee is not a subsidiary or an affiliate of any publicly owned corporation.

3. Intervenor-Respondent Missouri Republican State Committee has no parent corporation; no publicly held corporation owns any portion of Missouri Republican State Committee; and Missouri Republican State Committee is not a subsidiary or an affiliate of any publicly owned corporation.

Date: September 4, 2026

*/s/ John M. Gore*
JOHN M. GORE
*Counsel of Record*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
jmgore@jonesday.com

## TABLE OF CONTENTS

**Page**


RULE 29.6 STATEMENT ............................................................ i

OPINIONS BELOW ............................................................ 4

STATEMENT OF THE CASE ............................................................ 5

JURISDICTIONAL STATEMENT ............................................................ 10

REASONS FOR GRANTING THE APPLICATION ............................................................ 11

I. THE MISSOURI SUPREME COURT VIOLATED FEDERAL LAW BY ORDERING THE STATE TO REVERT TO THE 2022 MAP AFTER THE PRIMARY. ............................................................ 13

A. The Injunction Violates Article I, Section 2 Of The U.S. Constitution. ............................................................ 14

B. The Injunction Violates The Equal Protection Clause. ............................................................ 15

C. The Injunction Forces State Officials To Violate UOCAVA. ............................................................ 17

II. THE MISSOURI SUPREME COURT IGNORED FEDERAL LAW BY OUSTING THE GENERAL ASSEMBLY'S REDISTRICTING AUTHORITY WITHOUT A CLEAR STATEMENT. ............................................................ 18

A. Clear Statement Rules Protect And Uphold The U.S. Constitution's Express Delegations Of Authority. ............................................................ 19

B. The Elections Clause Requires A Clear Statement To Displace The State Legislature's Redistricting Authority. ............................................................ 23

C. Missouri's Referendum Provisions Do Not Provide A Clear Statement Displacing The General Assembly's Authority. ............................................................ 27

D. The Elections Clause Invalidates Article III, Section 52(b) As Applied To A Congressional Map Enacted By The Legislature. ............................................................ 28

III. APPLICANT WILL SUFFER IRREPARABLE HARM ABSENT A STAY, AND THE BALANCE OF THE EQUITIES CLEARLY FAVORS A STAY. ............................................................ 30

IV. THIS COURT WOULD LIKELY GRANT CERTIORARI DUE TO THE IMPORTANT QUESTIONS PRESENTED BY THIS CASE. ............................................................ 35

CONCLUSION ............................................................ 38




Exhibit 2

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott v. League of United Latin American Citizens*,
607 U.S. ----, 146 S. Ct. 418 (2025) ........ 4, 30, 31, 32

*Arizona State Legislature v. Arizona Independent Redistricting Comm'n*,
576 U.S. 787 (2015) ........ 12, 24, 25, 26, 32

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........ 18

*Bond v. United States*,
572 U.S. 844 (2014) ........ 19

*Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026) ........ 27

*Bullock v. Carter*,
405 U.S. 134 (1972) ........ 14

*Callais v. Landry*,
732 F. Supp. 3d 574 (W.D. La. Apr. 30, 2024) ........ 27, 29

*Covington v. North Carolina*,
270 F. Supp. 3d 881 (M.D.N.C. 2017) ........ 31, 32

*Covington v. North Carolina*,
316 F.R.D. 117 (M.D.N.C. 2016) ........ 31, 32

*Democratic Nat'l Comm. v. Wis. State Legislature*,
141 S. Ct. 28 (2020) ........ 27, 28

*Does 1-3 v. Mills*,
142 S. Ct. 17 (2021) ........ 10, 31

*Ex parte Yerger*,
75 U.S. 85 (1869) ........ 18



Exhibit 2

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .................................................. 17

*Foster v. Love*,
522 U.S. 67 (1997) .................................................. 15

*Goncalves v. Reno*,
144 F.3d 110 (1st Cir. 1998).................................................. 18

*Gray v. Sanders*,
372 U.S. 368 (1963) .................................................. 14, 15

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .................................................. 16, 19

*Healey v. State*,
732 S.W.3d 827 (Mo. banc 2026).................................................. 1

*Hollingsworth v. Perry*,
558 U.S. 183 (2010) .................................................. 10

*In re Delaware R.R. Tax*,
85 U.S. 206 (1874) .................................................. 20

*Jefferson Branch Bank v. Skelly*,
66 U.S. 436 (1861) .................................................. 20

*Kirkpatrick v. Preisler*,
394 U.S. 526 (1969) .................................................. 23

*Labrador v. Poe*,
144 S. Ct. 921 (2024) .................................................. 32

*League of United Latin Am. Citizens v. Abbott*,
809 F. Supp. 3d 502 (W.D. Tex. 2025) .................................................. 27

*Malliotakis v. Williams*,
607 U.S. ----, 146 S. Ct. 809 (2025) .................................................. 4, 11, 30

*Luther v. Hoskins*,
730 S.W.3d 567 (Mo. banc 2026).................................................. 1



Exhibit 2

*Maggard v. State*,
733 S.W.3d 411 (Mo. banc 2026) .......... 1, 6, 7, 28

*McNary v. Haitian Refugee Ctr., Inc.*,
498 U.S. 479 (1991) .......... 18

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022) .......... 30

*Moore v. Harper*,
600 U.S. 1 (2023) .......... 3, 12, 19, 24, 28, 37

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010) .......... 18

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
595 U.S. 109 (2022) .......... 17, 18

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 19

*Providence Bank v. Billings*,
29 U.S. 514 (1830) .......... 19

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 26, 27, 28

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 19

*RJR Nabisco, Inc. v. Eur. Cmty.*,
579 U.S. 325 (2016) .......... 16, 18

*Robinson v. Ardoin*,
37 F.4th 208 (5th Cir. 2022) .......... 27, 29

*Rucho v. Common Cause*,
588 U.S. 684 (2019) .......... 21

*Seminole Tribe v. Florida*,
517 U.S. 44 (1996) .......... 19

*Shays v. Fed. Election Comm'n*,
414 F.3d 76 (D.C. Cir. 2005) ........................................................................ 30

*Smith v. Allwright*,
321 U.S. 649 (1944) ........................................................................ 13

*Sossamon v. Texas*,
563 U.S. 277 (2011) ........................................................................ 24

*Spector v. Norwegian Cruise Line Ltd.*,
545 U.S. 119 (2005) ........................................................................ 24

*State ex rel. McClellan v. Kirkpatrick*,
504 S.W.2d 83 (Mo. banc 1974) ........................................................................ 13

*State of Ohio ex rel. Davis v. Hildebrant*,
241 U.S. 565 (1916) ........................................................ 9, 24, 25, 26, 28, 29

*Storer v. Brown*,
415 U.S. 724 (1974) ........................................................................ 13

*Terrazas v. Slagle*,
821 F. Supp. 1154 (W.D. Tex. 1992) ........................................................................ 31

*United States v. Classic*,
313 U.S. 299 (1941) ........................................................................ 13

*United States v. Curtiss-Wright Export Corp.*,
299 U.S. 304 (1936) ........................................................................ 18

*United States v. Gradwell*,
243 U.S. 476 (1917) ........................................................................ 3, 21

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........................................................................ 17

*Will v. Michigan Dep't of State Police*,
491 U.S. 58 (1989) ........................................................................ 19

**CONSTITUTIONAL AND STATUTORTY AUTHORITIES**

U.S. Const. Amendment XIV........................................................................ 16



Exhibit 2

U.S. Const. Article I, § 2 .......... 14

U.S. Const. Article I, § 4 .......... 18, 23, 28, 32

U.S. Const. Article VI .......... 13

Mo. Const. Article I, § 4 .......... 12

Mo. Const. Article III, § 3 .......... 5, 22, 24

Mo. Const. Article III, § 7 .......... 5, 22, 24

Mo. Const. Article III, § 45 .......... 22, 24

Mo. Const. Article III, § 49 .......... 5, 24

Mo. Const. Article III, § 52 .......... 1, 5, 25

2 U.S.C. § 7 .......... 15

28 U.S.C. § 1257 .......... 9

52 U.S.C. § 20302 .......... 15

52 U.S.C. § 20307 .......... 16

§ 115.339, RSMo. .......... 13

§ 115.343, RSMo. .......... 13, 26

§ 115.914, RSMo. .......... 15

§ 116.150, RSMo. .......... 5, 6

**OTHER AUTHORITIES**

*The 2026 Races That Could Determine House Control* (Aug. 28, 2026), https://www.wsj.com/politics/elections/the-2026-races-that-could-determine-house-control-9500c90d (last visited September 4, 2026) .......... 32

State Of Missouri Election Results – Primary Election August 4, 2026, *available at* https://enr.sos.mo.gov/ .......... 10

Sup. Ct. R. 10 .......... 32



Exhibit 2

To the Honorable Brett M. Kavanaugh, Associate Justice of the Supreme Court of the United States and Circuit Justice for the Eighth Circuit:

The Missouri General Assembly enacted the State's congressional redistricting plan, House Bill 1 ("HB 1"), by overwhelming majorities in both houses. The Missouri Supreme Court upheld HB 1 against all four prior challenges. *See Healey v. State*, 732 S.W.3d 827 (Mo. banc 2026) (consolidated with *Wise v. State*, No. SC101572); *Luther v. Hoskins*, 730 S.W.3d 567 (Mo. banc 2026); *Maggard v. State*, 733 S.W.3d 411 (Mo. banc 2026). Election officials successfully implemented HB 1 for the recent congressional primary elections. More than 1.2 million Missourians voted in those primary elections under the HB 1 plan.

General election day, November 3, is now less than nine weeks away. Candidates, voters, political parties, and members of the public are already exercising their constitutional rights to participate in the general election under the HB 1 plan. That participation includes actively raising and spending money, organizing get-out-the-vote efforts, mobilizing support, and preparing to cast ballots. Election officials, too, are preparing to administer the general election under the same HB 1 plan used in the primary elections.

Against this backdrop—and in a decision issued just yesterday—the Missouri Supreme Court empowered a small minority of voters to overturn settled State law on the eve of an election, nullify the results of the primary elections, and unleash chaos upon the State's democratic and electoral machinery. According to that court, a mere "five percent of the legal voters in each of two-thirds of the congressional districts in the state," Mo. Const. art. III, § 52(a), suspended the General Assembly's



Exhibit 2

duly enacted congressional redistricting plan for the ongoing 2026 election after 1.2 million Missourians had voted under that plan in the primary elections. The Missouri Supreme Court thus ordered the State to revert to its repealed 2022 plan and to place hundreds of thousands of voters into different districts for the imminent 2026 general election than the districts they voted in during the primary elections.

It is difficult to imagine a judicial action that could sow more confusion among the electorate or inflict more damage to the public's confidence in the integrity of the congressional elections than the relief the Missouri Supreme Court granted. In fact, the Missouri Supreme Court did not consider whether its ruling could even be carried out. The Missouri trial court (the Cole County Circuit Court) found as a matter of fact that changing the State's congressional map before the general election is "impossible" because Missouri's centralized voter registration system is locked until at least mid-November and cannot timely process the transfer of hundreds of thousands of voters. The Missouri Supreme Court did not even *mention*, let alone disturb, that factual finding. The Missouri Supreme Court's injunction thus leaves Missouri unable to conduct the general election on November 3, let alone to comply with the federal deadlines beforehand.

The Missouri Supreme Court's decision violates federal law in at least two respects, each of which justifies a stay. *First*, federal law precludes the Missouri Supreme Court's order changing the State's redistricting plan between a primary and general election. Suspending HB 1 and ordering use of a new congressional plan fractures the integrated primary-general election process in violation of Article I,

Section 2 of the U.S. Constitution, creates two classes of voters in violation of the Equal Protection Clause, and requires state officials to violate the Uniformed and Overseas Citizens Absentee Voting Act's ("UOCAVA") ballot-transmission mandate. The Missouri Supreme Court did not hold otherwise. Instead, it simply ignored federal law when crafting its remedy because it concluded that state law limits review of a referendum petition to compliance with the Missouri Constitution. That holding directly contravenes the Supremacy Clause, and this Court would likely summarily reverse on that ground alone.

*Second*, the Missouri Supreme Court failed to "respect" the Constitution's "deliberate choice" to "expressly vest[] power" to conduct congressional redistricting "in 'the Legislature' of each State." *Moore v. Harper*, 600 U.S. 1, 34 (2023). It disregarded the rule, consistently applied by this Court, requiring a clear statement before concluding that an authority the Constitution expressly assigns to a specific actor has been displaced. *See, e.g., United States v. Gradwell*, 243 U.S. 476 (1917). Instead of demanding a clear statement, the Missouri Supreme Court found divestiture from constitutional silence—reading the Missouri Constitution's generic referendum provision, which says nothing about congressional redistricting, to strip the General Assembly of authority the Elections Clause expressly confers. And, even if a clear statement existed under Missouri law, the Elections Clause would prohibit the State from permitting a fraction of the electorate to suspend the General Assembly's duly enacted congressional plan during an ongoing election.



Exhibit 2

Compounding the harm, the Missouri Supreme Court entered its sweeping injunction far too late in the day—weeks after 1.2 million Missourians *already voted* in the State's primary elections. The injunction changes the boundaries of all of the State's congressional districts, enjoining Missouri from using its duly enacted 2026 map and resurrecting the repealed 2022 map. The chaos caused by such an injunction is obvious: replacement candidates would have to familiarize themselves with entirely new electorates, campaigns would abandon months of investment and strategy in districts that no longer exist, and local election authorities would have to reassign hundreds of thousands of voters and communicate an entirely new electoral plan to the public—all in less than nine weeks. This Court has stayed injunctions issued under far less disruptive circumstances, including four months *before* the primary and eleven months before the general election in *Abbott v. League of United Latin American Citizens*, 607 U.S. ----, 146 S. Ct. 418, 419 (2025); *see also Malliotakis v. Williams*, 607 U.S. ----, 146 S. Ct. 809, 811 (Alito, J., concurring).

To avoid further disruption and allow for filing in correct districts, this Court should stay the injunction pending further review by September 8, 2026, and issue a decision no later than September 14, 2026.

## OPINIONS BELOW

The Missouri Supreme Court's merits opinion is attached to the Secretary's stay application at Appendix 1a. The Missouri Supreme Court's September 3, 2026, mandate is attached to the Secretary's application at Appendix 15a.



Exhibit 2

Applicant's September 4, 2026, motion to the Missouri Supreme Court seeking a stay of that court's injunction pending an emergency application for stay to this Court is attached to the Secretary's application at Appendix 1639a. The Missouri Supreme Court's September 4, 2026, denial of Applicant's motion for stay is attached to the Secretary's application at 16a.

The Cole County Circuit Court's August 19, 2026, judgment, findings of fact, and conclusions of law is attached to the Secretary's application at Appendix 17a.

**STATEMENT OF THE CASE**

The Missouri General Assembly enacted HB 1 on September 12, 2025. 17a ¶ 1. HB 1 repealed Missouri's prior congressional districting plan and established new boundaries for Missouri's eight congressional districts. *Id.* HB 1 passed by a margin of 21 to 11 in the Senate and 90 to 65 in the House of Representatives. *Id.* ¶ 2 (citing Mo. Senate J. 25–26 (2d Extra. Sess., 103d Gen. Assembly, Sept. 12, 2025); Mo. House J. 37–38 (2d Extra. Sess., 103d Gen. Assembly, Sept. 9, 2025)). Governor Michael L. Kehoe signed HB 1 into law on September 28, 2025. 17a ¶ 3.

A group called People Not Politicians ("PNP") launched a referendum campaign to challenge HB 1. 17a-18a ¶ 4. PNP eventually submitted a referendum petition to the Secretary of State on December 9, 2025, invoking the referendum provisions in Article III of the Missouri Constitution. *Id.* Under Article III, Section 52(a), "[a] referendum may be ordered . . . by petitions signed by five percent of the legal voters in each of two-thirds of the congressional districts in the state." Mo. Const. art. III, § 52(a). Article III's referendum provisions are silent regarding

congressional redistricting. *See id.* art. III, §§ 49, 52(a)-(b). Article III, however, elsewhere expressly states that "[n]o redistricting plan shall be subject to the referendum." *Id.* art. III, § 3(i); *see also id.* § 7(h) (same).

PNP's submission triggered the Secretary's statutory duty to review the referendum petition. *See Maggard*, 733 S.W.3d at 416; 3a. That review encompasses the timeliness, legality, and sufficiency of the petition, as well as the sufficiency of the signatures offered in support of the petition. *See* §§ 116.120–116.140, RSMo; *see also* 3a. "After" review, "if the secretary of state finds [the petition] sufficient, the secretary of state shall issue a certificate setting forth that the petition contains a sufficient number of valid signatures to comply with the Constitution of Missouri and with this chapter." § 116.150.1, RSMo. But "[i]f the secretary of state finds the petition insufficient, the secretary of state shall issue a certificate stating the reason for the insufficiency." § 116.150.2, RSMo.

The Secretary was required to complete this extensive review "not later than 5:00 p.m. on the thirteenth Tuesday prior to the general election or two weeks after the date the election authority certifies the results of a petition verification pursuant to subsection 2 of section 116.130, whichever is later." § 116.150.3, RSMo. The thirteenth Tuesday prior to this year's general election fell on Tuesday, August 4, the date of the State's primary elections. 3a.

While the Secretary and Missouri's local election officials were reviewing PNP's submission, two plaintiffs separately challenged HB 1's effectiveness, seeking a declaratory judgment and an injunction preventing use of the HB 1 plan until voters

approved it through the referendum process. *See Maggard*, 733 S.W.3d at 413. The Missouri Supreme Court unanimously rejected their claims, holding that "the December 9 referendum petition filing did not automatically suspend HB 1 under article III, sections 49, 52(a), or 52(b) of the Missouri Constitution." *Id.* at 421.

Following the Missouri Supreme Court's ruling, the Attorney General released an opinion letter requiring "State and local election officials" to "take all appropriate steps to ensure the HB 1 map is fully implemented in advance of the 2026 primary elections." 19a ¶ 14 (quoting Mo. Att'y Gen., Op. Letter 03-2026 (May 13, 2026)). Local election officials then implemented the HB 1 plan in Missouri's Centralized Voter Registration ("MCVR") system, transferring hundreds of thousands of voters to the new districts. 19a ¶ 14. After implementation, state and local officials prepared ballots and conducted the August 4 primary elections under the HB 1 plan. *Id.*

A total of 1,206,871 Missourians voted in the State's congressional primary elections under the HB 1 plan. *See* 19a-20a ¶ 15 (citing State Of Missouri Election Results – Primary Election August 4, 2026, *available at* https://enr.sos.mo.gov/ (last visited Aug. 24, 2026)). Prior to 5 p.m. on August 4, the last day to vote in the primary elections, Secretary Hoskins announced that he was issuing a certificate finding PNP's petition insufficient. 3a.

Respondent filed this suit later that evening. 3a. Respondent alleged that "he is entitled to the immediate suspension of the use and implementation of HB 1." 20a. He also alleged that the Court should "restrain[] the Secretary from taking further steps to implement or use the congressional districts in HB 1 to ensure that . . . the

correct congressional districts are utilized to conduct the 2026 general congressional election." *Id.* Respondent's Petition did not identify what he believes to be "the correct congressional districts . . . to conduct the 2026 general congressional election." *Id.* ¶ 19. And, at trial, Respondent likewise did not clarify which plan should govern the 2026 general election. It was not until his appeal to the Missouri Supreme Court that Respondent finally demanded a reversion to the 2022 plan the General Assembly repealed in HB 1. Such an action would move hundreds of thousands of voters into different districts for the imminent 2026 general election compared to the districts in which they cast their ballots in the August primary elections just two weeks ago. *See* 20a-21a ¶ 20 (citing Order and Judgment, Findings 27, 30, 40-46, *Wise v. State*, No. 2516-CV29597 (Jackson Cty. Cir. Ct. Mar. 12, 2026)).

Intervenors-Respondents intervened in the circuit court to defend HB 1. The circuit court tried the matter on stipulated facts and exhibits on August 19, 2026, and entered judgment in favor of Applicant that same day. *See* 17a. The circuit court ruled that the Missouri Constitution's referendum provisions do not apply to congressional redistricting. 22a-30a. The circuit court further ruled that the Elections Clause requires a clear statement before the General Assembly's redistricting authority can be displaced and Missouri's generic referendum provision lacks any such statement. 30a-38a. In fact, even if the referendum could reach congressional redistricting, the circuit court ruled that the Elections Clause would prevent a fraction of voters from freezing the General Assembly's duly enacted map.

39a-42a. The circuit court also held that federal law forecloses any alteration to Missouri's congressional map for the ongoing 2026 election. 42a-46a.

The circuit court also made detailed factual findings establishing that changing the plan before the general election is not merely inequitable; it is "*impossible*." 52a (emphasis added). No changes in voters' district assignments can currently be made in MCVR, which is locked and will remain locked until at least mid-November. *See id.*; *see also* Decl. of Denny Hoskins ¶ 6. Moreover, implementing any plan other than the HB 1 plan would require transferring hundreds of thousands of voters through a multi-week process that cannot be completed before the general election. *See id.*; *see also* Decl. of Denny Hoskins ¶¶ 9-12.

The Missouri Supreme Court did not even mention, let alone reverse, the circuit court's findings of impossibility. It nevertheless reversed on September 3, 2026, resting its decision on two holdings relevant here. *See* 1a. *First*, it concluded that the Elections Clause does not prohibit Missouri from allowing a small minority of voters to oust the General Assembly's authority over congressional redistricting through a referendum petition. 5a-7a. It relied on *State of Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916), reading that decision to establish that any state referendum procedures may reach without limitation a state legislature's exercise of its authority to conduct congressional redistricting. 6a. The Missouri Supreme Court thus did not require the clear statement this Court's precedents demand before concluding the State had displaced the General Assembly's redistricting authority. 7a. The Missouri Supreme Court, moreover, did not address critical differences

between what happened in *Hildebrant*—where the people of Ohio actually voted to reject a redistricting plan in a non-election year—and what happened here. Here, by contrast, a fraction of voters sought to suspend the General Assembly's map before any majority of Missourians voted for or against it and to resurrect a map the General Assembly repealed, in the middle of an ongoing election cycle in which 1.2 million citizens had already cast their ballots.

*Second*, the Missouri Supreme Court enjoined the Secretary from using the HB 1 map and reverted the State to the 2022 plan. 13a. The Missouri Supreme Court failed to consider whether this remedy violates federal law. In fact, the Missouri Supreme Court appeared to think that state law *required* state officials to *disregard* federal law because the Secretary's statutory review was limited to "examin[ing] the petition to determine whether it complies with the Constitution of Missouri" and state law. 5a. The Missouri Supreme Court thus did not address the circuit court's conclusions that changing the map between the primary and general elections would violate federal law. *See* 42a-46a.

## JURISDICTIONAL STATEMENT

This Court has certiorari jurisdiction over "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had . . . where the validity of a statute of any State is drawn in question on the ground of its being repugnant to the Constitution . . . or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or . . . statutes of . . . the United States." 28 U.S.C. § 1257(a). These conditions are

satisfied here. The Missouri Supreme Court issued a final judgment. As Applicant argued below, the Missouri Supreme Court's ruling violates various provisions of federal law, including the Elections Clause, Article I, Section 2, and the Equal Protection Clause.

## REASONS FOR GRANTING THE APPLICATION

The Court should grant a stay to preserve the constitutional authority of the Missouri General Assembly and ensure Missouri's elections are conducted according to the laws enacted by its elected representatives.

This Court will grant a stay if there is "(1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam); *accord Does 1-3 v. Mills*, 142 S. Ct. 17, 17-18 (2021) (Barrett, J., concurring).

A stay is warranted because this Court is likely to grant certiorari and reverse the ruling below on two independent grounds. *First*, federal law forecloses the Missouri Supreme Court's change to the State's congressional plan between the primary and general elections. More than 1.2 million Missourians have already voted under the HB 1 map in the primary elections. *See* State Of Missouri Election Results – Primary Election August 4, 2026, *available at* https://enr.sos.mo.gov/ (last visited Aug. 24, 2026). The Missouri Supreme Court's injunction nullifies those votes in violation of Article I, Section 2 of the U.S. Constitution and the Equal Protection

Clause. Moreover, the injunction would force state officials to violate the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), because it is impossible for a new map to be implemented and accurate ballots to be transmitted before UOCAVA's deadlines pass.

*Second*, the Elections Clause of the U.S. Constitution "expressly vests power" to set federal election rules "in 'the Legislature' of each State, a deliberate choice" that the Missouri Supreme Court failed to "respect." *Moore*, 600 U.S. at 34. This Court has required a clear statement before concluding that a State has displaced its legislature's congressional redistricting authority. *See Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 576 U.S. 787, 796-97 (2015). Missouri's generic referendum provision says *nothing* about congressional redistricting and thus lacks any clear statement. But even if Missouri law somehow provided a clear statement, the Elections Clause would still forbid the regime the Missouri Supreme Court sanctioned: one in which approximately 3.3% of the electorate can suspend and nullify a congressional redistricting plan and require the State to revert to a prior plan—including *between* a primary and general election.

Equitable considerations also strongly weigh in favor of this Court's intervention. Absent a stay, the State will be enjoined from effectuating a duly-enacted statute and forced to implement a repealed one, a quintessential form of irreparable injury. Intervenors-Respondents likewise will suffer irreparable harm. Their candidates are campaigning in the HB 1 districts, their resources have been deployed in reliance on those districts, but now they will have to start from scratch,

in redrawn districts, weeks before the general election. By contrast, Respondent will suffer no injury from proceeding under HB 1, the status quo on which every candidate, voter, and election official in Missouri has relied for the past year. *See Malliotakis*, 146 S. Ct. at 811 (Alito, J., concurring).

## I. THE MISSOURI SUPREME COURT VIOLATED FEDERAL LAW BY ORDERING THE STATE TO REVERT TO THE 2022 MAP AFTER THE PRIMARY.

This Court would likely vacate the Missouri Supreme Court's injunction because it violates the U.S. Constitution and federal law by changing Missouri's congressional map between the primary and general elections. The circuit court identified these violations and declined to order an unconstitutional remedy. *See* 42a-46a. But the Missouri Supreme Court ignored them altogether. Instead, it opined that it did not need to consider *federal* law because under *state* law, the Secretary's review of a referendum petition is "limited to 'examin[ing] the petition to determine whether it complies with the Constitution of Missouri" and state law. 5a.

That holding alone would warrant summary reversal on this Court's ordinary docket. *Every* state officer in America must apply and adhere to the U.S. Constitution—the supreme law of the land—in every action he undertakes. *See* U.S. Const. art. VI; *see also* Mo. Const. art. I, § 4. That includes the Missouri Secretary of State. And it also includes the Missouri Supreme Court when it crafts remedies. No statute or state constitutional provision can override that obligation. The notion that the Secretary and the Missouri Supreme Court had to bury their heads in the sand at violations of the U.S. Constitution in order to enforce a state referendum provision

flips the Supremacy Clause on its head.

If the Missouri Supreme Court had not ignored federal law, it would have concluded that federal law prohibited it from suspending the General Assembly's duly enacted map and requiring the state to resurrect the repealed 2022 map. That is true for at least three reasons.

### A. The Injunction Violates Article I, Section 2 Of The U.S. Constitution.

*First*, the Missouri Supreme Court's order requiring a general election to be held under a different congressional map than the one used in the August 4 primary violates Article I, Section 2 of the U.S. Constitution. That provision guarantees that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States." U.S. Const. art. I, § 2. This Court has long recognized that "[w]here the state law has made the primary an integral part of the procedure of choice," then "the right of the elector to have his ballot counted at the primary[] is likewise included in the right protected by Article I, § 2." *United States v. Classic*, 313 U.S. 299, 318 (1941).

Missouri law makes the primary integral: "all candidates for elective office shall be nominated at a primary election," § 115.339, RSMo., and "[t]he person receiving the greatest number of votes at a primary election as a party candidate for an office shall be the only candidate of that party for the office at the general election," § 115.343, RSMo. A candidate may be replaced only if he or she dies, is disqualified, or voluntarily withdraws. *See* § 115.363.3(1)-(3), .4, RSMo. The Missouri Supreme Court has thus confirmed that "primary elections have constitutional stature" and

serve as an "*integral* part of [the State's] election machinery." *State ex rel. McClellan v. Kirkpatrick*, 504 S.W.2d 83, 86 (Mo. banc 1974) (emphasis added).

The Missouri Supreme Court's injunction plainly violates the right of Missouri voters to have their ballot counted. More than 1.2 million Missourians voted in the August 4 congressional primaries under the HB 1 map and selected nominees in each of Missouri's eight districts. *See* 19a-20a ¶ 15. The injunction requires the State to ignore those votes, stripping the nominees of the mandate their voters conferred. *See* 13a-14a.

This Court has long recognized that primary and general elections are not separate events but a unified process. In *Smith v. Allwright*, the Court described "[t]he fusing . . . of the primary and general elections into a single instrumentality for choice of officers." 321 U.S. 649, 660 (1944). Because the primary and general election constitute a "single instrumentality for choice of officers," *id.*, then changing the districts between those two stages does not merely alter the ballot; it fractures the instrumentality itself, *see also Storer v. Brown*, 415 U.S. 724, 735 (1974) (describing the primary as "not merely an exercise or warm-up for the general election but an integral part of the entire election process, the initial stage in a two-stage process by which the people choose their public officers"). Article I, Section 2 forbids this result.

### B. The Injunction Violates The Equal Protection Clause.

*Second*, the Missouri Supreme Court's injunction violates the Equal Protection Clause by requiring a general election under a different congressional map than the

one used in the primary. U.S. Const. amend. XIV, § 1. This Court has held that primary-election procedures constitute "'state action' within the meaning of the Fourteenth Amendment" and "must be exercised in a manner consistent with the Equal Protection Clause." *Bullock v. Carter*, 405 U.S. 134, 140-41 (1972). This Court has also made clear that "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Gray v. Sanders*, 372 U.S. 368, 379 (1963).

The injunction violates this standard. Indeed, it forces hundreds of thousands of Missourians to vote in the general election in districts different from the ones in which they cast their primary ballots. *See* 45a ¶ 145. Those voters would possess materially less voting power than voters whose districts remained the same because the former group would have to select from candidates they never had the opportunity to evaluate, support, or oppose in the primary. *See id.* ¶ 146. The displaced voters would thus be denied the right to choose their own representative through the integrated primary and general elections. Meanwhile, voters who happened to remain in the same district would retain the full benefit of their primary vote. *See* 46a ¶ 147. The Missouri Supreme Court's order thus creates two classes of voters—those who had the opportunity to select their general election candidate and those who did not—in direct violation of the Equal Protection Clause. *See id.*

### C. The Injunction Forces State Officials To Violate UOCAVA.

*Third*, UOCAVA protects the voting rights of military service members and citizens living abroad by requiring state election officials to transmit absentee ballots no fewer than 45 days before any federal election. *See* 52 U.S.C. § 20302(a)(8); *see also* § 115.914, RSMo. The Missouri Supreme Court's injunction would force state officials to violate UOCAVA.

That conclusion follows directly from the circuit court's factual finding that it would be "impossible" to change the map before the general election. 52a ¶ 170. As the circuit court explained, before ballots can be designed, tested, and printed, state election officials must assign each Missouri voter to a proper congressional district in MCVR. *See id.* ¶¶ 170-71. But, as the circuit court found, that database cannot be changed before November. *See id.* The Missouri Supreme Court did not disturb—let alone address—those factual findings.

If there were any doubt, the Secretary of State submitted a sworn declaration to the Missouri Supreme Court confirming that state officials could not comply with UOCAVA's deadlines under the Missouri Supreme Court's order. *See* Decl. of Denny Hoskins ¶¶ 9-11. As the Secretary explained, he is "confident Missouri will be forced to violate federal law," and he is "gravely concerned that Missouri's ability to hold timely congressional elections in 2026 will be jeopardized." *Id.* ¶ 12.

Accordingly, no path exists for Missouri officials to comply with *both* the Missouri Supreme Court's injunction and UOCAVA. It is hornbook law that a State may not conduct federal elections in conflict with congressionally mandated timing

under 2 U.S.C. § 7, which sets the general election for November 3. *See Foster v. Love*, 522 U.S. 67, 74 (1997). The injunction against HB 1 would therefore require state officials to violate UOCAVA because they lack sufficient time to comply with it by the November 3 general election day. And UOCAVA is enforceable by the U.S. Attorney General in federal court, 52 U.S.C. § 20307(a), meaning that the Missouri Supreme Court's remedy would expose Missouri officials to an adverse federal lawsuit. This Court can, and should, avoid that result by staying the Missouri Supreme Court's injunction.

## II. THE MISSOURI SUPREME COURT IGNORED FEDERAL LAW BY OUSTING THE GENERAL ASSEMBLY'S REDISTRICTING AUTHORITY WITHOUT A CLEAR STATEMENT.

The Missouri Supreme Court's injunction also flouts the U.S. Constitution's express assignment of authority over congressional redistricting to the General Assembly. *See* U.S. Const. art. I, § 4. Where the U.S. Constitution delegates decisional authority to a specific actor, this Court requires a clear statement before concluding that it was pawned off elsewhere. This principle spans the vertical and horizontal separation of powers, guarding the prerogatives of all three branches of the federal government, *see, e.g.*, *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016), and protecting the states from federal intrusions, *see, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

It applies equally to protect state legislatures from having their constitutionally assigned responsibilities overridden. As this Court recently instructed, courts "*must respect*" the Constitution's "deliberate choice" to "expressly

vest[] power" to set federal election rules "in 'the Legislature' of each State." *Moore*, 600 U.S. at 34.

The Missouri Supreme Court did the opposite. With no textual footing in Missouri law or historical precedent for their position, the Missouri Supreme Court permitted a fraction of the electorate to wrest control over redistricting from the Missouri General Assembly. That ruling invites practical and structural upheaval, transforming deliberative lawmaking into a plebiscite animated by special interest groups. Because the Missouri Constitution contains no clear statement transferring authority to conduct congressional redistricting from the General Assembly, this Court would likely reverse and halt Respondent's effort to do by referendum what the Constitution expressly vests in "the Legislature."

### A. Clear Statement Rules Protect And Uphold The U.S. Constitution's Express Delegations Of Authority.

Enforcing constitutional boundaries ranks among courts' most vital duties. Consistent with that role, courts will not lightly infer a significant restructuring of a constitutional allocation of power. Where the Constitution assigns authority to a specific actor, that power cannot be divested absent a clear statement. *See West Virginia v. EPA*, 597 U.S. 697, 735 (2022) (Gorsuch, J., concurring) (explaining that clear-statement rules "operate[] to protect foundational constitutional guarantees").

Courts deploy an array of clear statement rules to safeguard the prerogatives of each branch of the federal government in its proper sphere. For example, Article I of the Constitution delegates responsibility "to make the laws that govern us" to "the people's elected representatives." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109,

124 (2022) (Gorsuch, J., concurring). To protect Article I's grant of authority, courts will not infer that Congress delegated to executive agencies the power to resolve major policy questions absent a clear statement. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000). This expectation of clarity reflects and reinforces the constitutional structure. *See West Virginia*, 597 U.S. at 723 (explaining that the major questions doctrine rests on "both separation of powers principles and a practical understanding of legislative intent"). "Because the Constitution vests Congress with 'all legislative Powers,' a reasonable interpreter would expect it to make the big-time policy calls itself, rather than pawning them off to another branch." *Biden v. Nebraska*, 600 U.S. 477, 515 (2023) (Barrett, J., concurring) (citation omitted). Accordingly, the clear statement rule keeps the legislative power "where . . . it belongs." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 124 (Gorsuch, J., concurring).

Clear statement rules likewise protect the President's constitutional prerogatives in Article II. It is axiomatic that "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) (quotations omitted). So "unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect," courts will presume it does not apply extraterritorially. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (citation modified). In this context, the clear statement rule reflects the structural principle that Congress does not ordinarily intend to intrude on the President's authority to conduct foreign relations. *See RJR Nabisco*, 579 U.S. at 348.

Underscoring the point, federal courts routinely employ clear statement rules to protect their Article III authority. Federal courts will not imply a repeal of their jurisdiction in "the absence of clear congressional language mandating" that result. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 483-84 (1991); *see also Goncalves v. Reno*, 144 F.3d 110, 122 (1st Cir. 1998) (applying "the long standing rule disfavoring repeal of jurisdictional provisions by implication"). For example, this Court has long required that if Congress intends to make exceptions to this Court's appellate jurisdiction, it must do so with unmistakable clarity, not "by mere implication." *Ex parte Yerger*, 75 U.S. 85, 106 (1869). This principle ensures that any retrenchment of federal courts' core functions occurs, if at all, only by Congress speaking with the clarity the Constitution's separation of powers demands.

Clear statement rules also help police the "constitutional balance of federal and state powers." *Gregory*, 501 U.S. at 460. The Constitution's structure, including the Tenth Amendment's reservation of powers, counsels restraint in inferring federal limitations on state authority. Hence, "if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 65 (1989) (cleaned up). This clear statement rule governs attempts to displace state sovereign immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 55 (1996) ("unequivocal[] express[ion]" required "to abrogate the immunity") (quotations omitted), to preempt state legislation, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (courts will assume state police

powers not superseded "unless that was the clear and manifest purpose of Congress"), to impose conditions on states accepting federal funds, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("unambiguous[]" language required to "impose a condition on the grant of federal moneys"), and to criminalize conduct traditionally regulated by the states, *Bond v. United States*, 572 U.S. 844, 857 (2014) (absent "clear indication," courts will not read statutes to "intrude[] upon traditional state criminal jurisdiction") (quotations omitted).

This Court has long applied the same clear-statement principle to a State's alleged surrender of sovereign authority. *Providence Bank v. Billings*, 29 U.S. 514, 561 (1830) ("[T]he relinquishment of such a power is never to be assumed" and "its abandonment ought not to be presumed[] in a case in which the deliberate purpose of the [S]tate to abandon it does not appear"). That rule extends beyond any particular sovereign power. *Jefferson Branch Bank v. Skelly*, 66 U.S. 436, 446 (1861) ("[N]othing passes but what has been granted in clear and explicit terms" and "neither the right of taxation, nor any other power of sovereignty, will be held by this Court to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken"). Indeed, the rule applies "with special force" when the claimed surrender "calls for any abridgment of the powers of the government, or any restraint upon their exercise." *In re Delaware R.R. Tax*, 85 U.S. 206, 225–26 (1874) ("Nothing can be taken against the State by presumption or inference"; "rights, privileges, and immunities not expressly granted are reserved"; and "the surrender when claimed must be shown by clear, unambiguous language, which will admit of no reasonable construction

consistent with the reservation of the power"). A State therefore cannot be presumed, from general language or implication, to have surrendered or displaced authority expressly assigned by the U.S. Constitution to a particular state institution.

In short, across multiple doctrinal settings, clear statement rules serve as a structural safeguard ensuring that only a deliberately expressed choice—not ambiguity or implication—can recalibrate the Constitution's usual balance of shared authorities among competing actors.

### B. The Elections Clause Requires A Clear Statement To Displace The State Legislature's Redistricting Authority.

The Elections Clause, no less than other enumerated delegations, requires a clear statement before courts may determine that a state has reallocated power over redistricting from the state legislature. This clear statement rule flows from the Elections Clause itself, which expressly provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S. Const. art. I, § 4 (emphasis added).

This delegation reflects a reasoned constitutional settlement. The Framers recognized "electoral districting problems and considered what to do about them," and they "settled on a characteristic approach, assigning the issue to the state legislatures, expressly checked and balanced by the Federal Congress." *Rucho v. Common Cause*, 588 U.S. 684, 699 (2019). Courts "must respect" the Constitution's

"deliberate choice" to "expressly vest[] power" to conduct congressional redistricting "in 'the Legislature' of each State." *Moore*, 600 U.S. at 34.

As with other express delegations in the U.S. Constitution, courts require a clear statement before concluding that a state has displaced its legislature's authority over congressional redistricting. It is well established that Congress must employ "positive and clear statutes" in order to override a state legislature's prerogative to regulate federal elections. *Gradwell*, 243 U.S. at 485. Because Congress—the sole actor the Elections Clause empowers to supersede state legislative regulations—may do so only through unmistakable, affirmative enactments, any contention that some state actor or process has displaced the state legislature's redistricting role must at a minimum rest on equally explicit and unequivocal language.

This Court's Elections Clause cases confirm the point. In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, this Court weighed whether Arizona could create an independent commission to draw congressional districts. 576 U.S. at 792-93. This Court sustained that arrangement because Arizona's Constitution expressly "remove[d] congressional redistricting authority from the State Legislature." *Id.* at 796-97. Likewise, in *Hildebrant*—a case in which it did *not* consider the Elections Clause's application to state law—this Court considered whether a constitutional referendum could displace the Ohio General Assembly's authority to redistrict. 241 U.S. at 566-67. This Court concluded that it could only because state law "conclusive[ly]" "ma[d]e[] it clear that . . . the referendum constituted a part of the state Constitution and laws" applicable to congressional

redistricting. *Id.* at 568. In both cases, no doubt existed that the state had deliberately overridden the legislature's authority.

The Missouri Supreme Court leaned heavily on *Hildebrant*, suggesting that it establishes that a state may subject congressional redistricting to the referendum without any express constitutional statement to that effect. *See* 6a-7a. That account mischaracterizes *Hildebrant* in several respects.

*First*, the provisions of the Ohio Constitution at issue in *Hildebrant* materially differ from the provisions of the Missouri Constitution before this Court. Ohio had no provision vesting authority to draw congressional districts in the General Assembly. Missouri does. *See* Mo. Const. art. III, § 45. Moreover, Ohio had no provision exempting redistricting from the referendum. Missouri has two such provisions, each of which states in unqualified terms that "[n]o redistricting plan shall be subject to the referendum." Mo. Const. art. III, § 3(i); *id.* § 7(h). Those provisions rebut the Missouri Supreme Court's conclusion that there is "no meaningful difference" between the language in *Hildebrant* and the Missouri Constitution. 7a.

*Second*, *Hildebrant* did not even address whether the Elections Clause permits a State to displace the legislature's authority over congressional redistricting without a clear statement or through a referendum. *See Hildebrant*, 241 U.S. at 567-68; *see also Arizona State Legislature*, 576 U.S. at 840 (Roberts, C.J., dissenting) ("*Hildebrant* in no way suggested that the state legislature could be displaced from the redistricting process."). Instead, this Court addressed only *Congress's* authority

under the Elections Clause as part of its inquiry into whether Congress had permitted a referendum to displace state legislative authority over congressional redistricting in the Appropriation Act of 1911. *See Hildebrant*, 241 U.S. at 568-69. There is no such issue of Congress's authority in this dispute. Moreover, the only federal constitutional question this Court addressed with respect to Ohio's state-law referendum arose under the Guarantee Clause. *See id.* at 569-70; *accord Arizona State Legislature*, 576 U.S. at 840 (Roberts, C.J., dissenting). This Court concluded that question was a nonjusticiable political question. *See Hildebrant*, 241 U.S. at 567-70.

*Third*, *Hildebrant* arose in a non-election year. The referendum was conducted in November 1915, not between a primary and general election in the same year. *See id.* at 566; 94 Ohio St. 154, 154-55 (1916). It thus did not present the concerns at issue here regarding disruption to an ongoing election in which more than 1.2 million citizens have already voted.

*Fourth*, *Hildebrant* pre-dated this Court's one-person, one-vote jurisprudence and other subsequent legal developments that require states to conduct congressional elections in equipopulous single-member districts. *See, e.g., Kirkpatrick v. Preisler*, 394 U.S. 526 (1969). At the time of *Hildebrant*, extending a referendum to a congressional map did not place the state in peril of violating the one-person, one-vote mandate or other federal requirements that foreclose the Missouri Supreme Court's remedy. Those developments fundamentally alter the analysis and render *Hildebrant* inapplicable to these circumstances.

### C. Missouri's Referendum Provisions Do Not Provide A Clear Statement Displacing The General Assembly's Authority.

The Missouri Constitution does not supply *any* statement—let alone a clear one—reallocating authority over congressional redistricting away from the General Assembly to a referendum process. Article III, Section 45 mandates that "the *general assembly* shall by law divide the state into [congressional] districts," Mo. Const. art. III, § 45 (emphasis added). Indeed, the Missouri Constitution supplies the opposite of what Respondent needs by declaring that "[n]o redistricting plan shall be subject to the referendum." Art. III, § 3(i); *id.* § 7(h).

The Missouri Supreme Court did not identify any clear statement in Missouri law displacing the General Assembly's authority over congressional redistricting. Instead, it pointed to the generic referendum provision in Article III, Section 49, which provides that "[t]he people reserve power . . . to approve or reject by referendum any act of the general assembly." Mo. Const. art. III, § 49; *see* 7a. This is a textbook example of a broad, undifferentiated clause that does not provide a clear statement overriding the U.S. Constitution's express grant of authority over congressional redistricting to the General Assembly. *See Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 139 (2005) (plurality opinion) ("[C]lear statement rules ensure [the state] does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation."). Section 49 gives no indication that Missouri "specifically considered" whether to displace the General Assembly's federally assigned authority over redistricting and "intentionally legislated on the matter." *Sossamon v. Texas*, 563 U.S. 277, 290 (2011). Accordingly, it does not

provide a "conclusive" statement divesting the General Assembly of its Elections Clause authority over congressional redistricting, much less vesting that authority in the referendum process. *Hildebrant*, 241 U.S. at 568.

### D. The Elections Clause Invalidates Article III, Section 52(b) As Applied To A Congressional Map Enacted By The Legislature.

The Missouri Supreme Court's decision violates the Elections Clause for another reason. Even if a clear statement were not necessary to subject congressional redistricting to the referendum, the Elections Clause forbids the application of Article III, Section 52(b) to a congressional map enacted by the General Assembly.

As discussed, the Elections Clause vests redistricting authority squarely in the state legislature. *See* U.S. Const. art. I, § 4; *see supra* at 20-21. Indeed, this Court recently cautioned that state law may not be wielded to "arrogate" the "power vested in state legislatures to regulate federal elections." *Moore*, 600 U.S. at 36.

That is precisely what would happen if Article III, Section 52(b) applies to congressional maps. The Missouri Supreme Court held that Section 52(b) provides that legislation subject to a referendum is suspended once a sufficient petition is filed. Mo. Const. art. III, § 52(b); *see also Maggard*, 733 S.W.3d at 418. A referendum petition is sufficient if signed by merely "five percent of the legal voters in each of two-thirds of the congressional districts in the state." Mo. Const. art. III, § 52(a). The Missouri Supreme Court thus held that a small fraction of voters can freeze a congressional map duly enacted by the General Assembly before any majority of Missourians has voted for or against it—and even after that map has been used to conduct primary elections. *See* 11a.



Exhibit 2

That theory inverts the constitutional design. The Elections Clause guarantees that the People's elected representatives control the time, place, and manner of federal elections. But according to the Missouri Supreme Court, a small, unelected minority wields effective veto power over the General Assembly's redistricting decisions. This case illustrates the point. HB 1 passed overwhelmingly in both chambers of the General Assembly and was signed by the Governor. *See* Mo. Senate J. 25–26 (2d Extra. Sess., 103d Gen. Assembly, Sept. 12, 2025); Mo. House J. 37–38 (2d Extra. Sess., 103d Gen. Assembly, Sept. 9, 2025). Yet the Missouri Supreme Court held that a small minority of voters can suspend the map months before the election without any statewide vote. The Elections Clause forbids any arrangement that would so thoroughly "annihilate[]" the General Assembly's redistricting authority. *Hildebrant*, 241 U.S. at 569.

The Missouri Supreme Court seemed to think that *Hildebrant* "permits a state to authorize a referendum as to legislation drawing new congressional districts." 6a. It did nothing of the sort. *See supra* at 22-23. But even if *Hildebrant* could be read to approve the *concept* of a referendum on a congressional map, it certainly does not approve the relief the Missouri Supreme Court ordered. In *Hildebrant*, the people of Ohio actually voted to reject a redistricting plan in a non-election year. 241 U.S. at 566. Here, by contrast, the Missouri Supreme Court held that petition signatures from a fraction of Missouri's electorate can suspend the General Assembly's map before any statewide vote occurs and after that map has already been used to conduct primary elections. *Hildebrant* approved no such maneuver.

**III. APPLICANT WILL SUFFER IRREPARABLE HARM ABSENT A STAY, AND THE BALANCE OF THE EQUITIES CLEARLY FAVORS A STAY.**

The equities also weigh strongly in favor of granting a stay. Missouri has already completed its August 4 primary elections, in which over 1.2 million Missourians selected nominees who are now the only candidates of their respective parties for the general election. *See* § 115.343, RSMo. The general election, in turn, will be completed less than nine weeks from now. *See* 47a ¶ 150. Absent a stay, the Missouri Supreme Court's injunction will cause—and, indeed, already is causing—"voter confusion and consequent incentive to remain away from the polls" and an erosion of the "[c]onfidence in the integrity of our electoral processes . . . essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).

Months ago, this Court stayed a three-judge federal district court's order enjoining use of Texas's 2025 congressional redistricting plan and requiring the State to revert to its 2022 plan. *Abbott*, 146 S. Ct. at 419. The district court issued its injunction shortly after the opening of candidate filing, approximately four months before the primary, and eleven months before the November 2026 general election. *See League of United Latin Am. Citizens v. Abbott*, 809 F. Supp. 3d 502 (W.D. Tex. 2025). This Court issued the stay because the district court had "improperly inserted itself into an active primary campaign, causing much confusion" with its late-breaking injunction. *Abbott*, 146 S. Ct. at 419; *see Robinson v. Ardoin*, 37 F.4th 208, 228-29 (5th Cir. 2022) (per curiam), *stay issued sub nom.*, *Ardoin v. Robinson*, 142 S. Ct. 2892, 2892-93 (June 28, 2022) (staying injunction of congressional redistricting

plan issued five months before primary elections); *Callais v. Landry*, 732 F. Supp. 3d 574, 613-14 (W.D. La. Apr. 30, 2024), *stay issued sub nom.*, *Robinson v. Callais*, 144 S. Ct. 1171 (May 15, 2024) (staying injunction of congressional redistricting plan issued more than six months before the next election).

It is a "basic tenet of election law" that "[w]hen an election is close at hand, the rules of the road should be clear and settled." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (mem.) (Kavanaugh, J., concurring). "[L]ate-breaking, court-ordered rule changes can 'result in voter confusion and consequent incentive to remain away from the polls,' and thus undermine the '[c]onfidence in the integrity of our electoral processes . . . essential to the functioning of our participatory democracy.'" *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 80 (2026) (quoting *Purcell*, 549 U.S. at 4-5); *see also Abbott*, 146 S. Ct. at 419. After all, "running a statewide election is a complicated endeavor," involving "a host of difficult decisions about how best to structure and conduct the election." *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring). And those decisions must then be communicated to the "state and local officials" tasked with implementing them, who in turn "must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting." *Id.* When a "court alters election laws near an election," *id.*, candidates, voters, and even officials are left scrambling to understand the court-imposed alteration, "inviting confusion and chaos and eroding public confidence in electoral outcomes," *id.* at 30 (Gorsuch, J., concurring).

These considerations counsel judicial restraint and deference to the democratic process on the eve of an election. The General Assembly is responsible for redrawing the State's congressional districts. *See* U.S. Const. art. I, § 4, cl. 1; *see also Ariz. State Legis.*, 576 U.S. at 808. This allocation makes practical sense. Legislatures "enjoy far greater resources for research and factfinding" than courts, and "make policy and bring to bear the collective wisdom of the whole people when they do, while courts dispense the judgment of only a single person or a handful." *Democratic Nat'l Comm.*, 141 S. Ct. at 29 (Gorsuch, J., concurring). "It is one thing for state legislatures to alter their own election rules in the late innings and to bear the responsibility for any unintended consequences. It is quite another thing for a . . . court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent." *Id.* at 31 (Kavanaugh, J., concurring).

This case presents the exact harm *Purcell* identified. If it would cause confusion and uncertainty to change a congressional map four months before a primary, *see Abbott*, 146 S. Ct. at 419, imagine what will happen if Missouri must change its map *after* the primary has already occurred and mere weeks before the general election. Candidate filing closed months ago. Over 1.2 million Missourians voted in the August 4 primary. Nominees have been selected. Campaigns for the general election are underway. *See* 50a ¶ 165. The disruption the Missouri Supreme Court introduced would dwarf anything contemplated in *Abbott*, *Ardoin*, or *Callais*.

The Missouri Supreme Court's decision only confirms that the disruption to voters, candidates, and officials alike would be staggering absent a stay. The

Missouri Supreme Court did not even purport to explain what happens next, merely stating that the 2022 plan is "in full force." 13a. What that means is anyone's guess. But it raises a cascade of unanswered questions that underscore the chaos the injunction will unleash. Are the nominees selected by 1.2 million voters in the August 4 primary disqualified? If not, which districts are they running in? If so, how are replacement nominees selected—and under what legal authority? Namely, would the State have to conduct a new primary under the 2022 plan—and if so, how, given that UOCAVA's 45-day ballot-transmission deadline applies to *both* the primary and general elections, creating a deadline that has already passed? The Missouri Supreme Court answered none of these questions. It simply declared the 2022 plan operative and left the State, its officials, its candidates, and its voters to sort out the wreckage.

In fact, changing the maps at this late juncture is not just impractical, it is "impossible." *See* 52a ¶¶ 170-71. The circuit court credited the affidavit of a Missouri election official, who explained that implementing a new congressional map requires local election officials to transfer hundreds of thousands of individual voters in the MCVR system. *Id.* ¶ 170. That is a meticulous process involving careful analysis of printed maps and multiple rounds of proofreading; it ordinarily takes more than two weeks, and at least 7-10 days even under emergency conditions. *Id.* But even that timeline is academic here, because the MCVR system locks shortly before absentee ballots are distributed and remains locked until an election is certified two weeks after election day. *Id.* ¶ 171. The circuit court found that this year, the system will

remain locked until at least mid-November because of a Jackson County special election in September 2026. *Id.*

A stay would also prevent significant injuries to Intervenors-Respondents' political operations. Courts have repeatedly recognized that political parties suffer cognizable injuries when courts force them to compete under election rules other than those enacted by legislatures. *See, e.g.*, *Mecinas v. Hobbs*, 30 F.4th 890, 898 & n.3 (9th Cir. 2022) (candidates and political parties have a "shared interest in fair competition" and suffer injury when forced "to participate in an illegally structured competitive environment") (cleaned up); *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 86-87 (D.C. Cir. 2005) (candidates suffer injury when changes to election laws and procedures "alter the competitive environment's overall rules" and force them to "adjust their campaign strategy"). Here, the Missouri Supreme Court is forcing Intervenors-Respondents to compete under rules contradicting those enacted by the General Assembly. Consequently, Intervenors-Respondents must scrap months of campaign planning and redirect resources to educate candidates, poll watchers, and voters about the new congressional plan established by the Missouri Supreme Court's decision. *See* 1251a ¶¶ 12-15; 1256a-1257a ¶¶ 12-15; 1262a ¶¶ 12-15.

By contrast, a stay would not significantly harm any party. Quite the opposite. "[F]ar from causing disruption or upsetting legitimate expectations" a stay would "eliminate[] much of the uncertainty and confusion that would exist if" Missouri has to revert to the 2022 plan after the primary and weeks before the general election.

*Malliotakis*, 146 S. Ct. at 811 (Alito, J., concurring). That is all the more reason for this Court to stay the Missouri Supreme Court's injunction.

## IV. THIS COURT WOULD LIKELY GRANT CERTIORARI DUE TO THE IMPORTANT QUESTIONS PRESENTED BY THIS CASE.

This case presents a question of serious national importance that justifies granting certiorari. *See Does 1-3*, 142 S. Ct. at 18 (Barrett, J., concurring). To begin, the Missouri Supreme Court entirely ignored the supremacy of federal law. It accordingly ordered an extraordinarily disruptive change to the congressional map between the primary and general election—without identifying *any* prior judicial order changing a State's congressional map between a primary and a general election. 51a ¶ 167.

In fact, it ignored the cases cited by Intervenors-Respondents in which federal courts have rejected attempts to change district boundaries after a primary. For example, in *Terrazas v. Slagle*, 821 F. Supp. 1154 (W.D. Tex. 1992), after Texas held its primary elections under court-ordered interim state senate redistricting plans, the Secretary of State issued a directive attempting to switch the general election to entirely different senate districts under a new plan. The three-judge federal court enjoined the directive and explained that "[p]rimary elections for offices chosen by the electorate in separate geographical districts obviously make no sense unless the districts are the same for the ensuing general election as for the primary." *Id.* at 1159. The court agreed with the Justice Department's undisputed assertion that the State

had "never held or sought to hold a general election under a redistricting plan different from the plan used for the preceding primary election." *Id.*

Moreover, courts have refused to change maps even when the existing districts are unconstitutional. In *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), the court found that the state legislature had engaged in one of the most extensive unconstitutional racial gerrymanders ever encountered by a federal court, affecting nearly 70% of House and Senate districts. *See Covington v. North Carolina*, 270 F. Supp. 3d 881, 892, 896 (M.D.N.C. 2017). Yet with "the 2016 primary elections already held under the challenged maps and Election Day less than three months away," the court concluded that immediate injunctive relief was "impractical" and allowed the general election to proceed under the unconstitutional maps. *Id.* at 887, 892; *see also Covington*, 316 F.R.D. at 177.

Maintaining the integrity of the primary is essential to ensuring safe, secure, and timely federal elections. Consider the consequences if the result were otherwise. If federal law permits Missouri to ignore its own primary elections, then *any* state can do that. That would mean that any state could, *right now*, weeks before the general election, redraw its congressional maps and force the winners of the primary into different districts. That result is plainly untenable and only illustrates why this Court must intervene. Making matters worse, the Missouri Supreme Court's decision could plausibly tip control of the U.S. House of Representatives. Republicans currently have a narrow House majority with 219 seats to the 212 held by Democrats, and the balance of power "is on the line" in the coming weeks. *See* Wall Street Journal,

*The 2026 Races That Could Determine House Control* (Aug. 28, 2026), https://www.wsj.com/politics/elections/the-2026-races-that-could-determine-house-control-9500c90d (last visited September 4, 2026). The question of whether the General Assembly's duly enacted map governs Missouri's election is plainly "an important federal question." Sup. Ct. R. 10; *see also Labrador v. Poe*, 144 S. Ct. 921, 931 (2024) (Kavanaugh, J., concurring) ("[S]ome of the most significant and difficult emergency applications will readily clear the certworthiness bar.").

More fundamentally, this case presents a clean vehicle to address significant open questions about how this Court will review state-court interpretations of federal election rules. *First*, this case squarely presents the question of whether federal law bars a state court from changing the State's congressional map between a primary and general election. There is no barrier to the Court reaching that question; the only reason the Missouri Supreme Court failed to address it is because it flagrantly disregarded the supremacy of federal law. *Second*, this case squarely presents the question of whether a state can permit a small fraction of voters to oust its legislature's authority over congressional redistricting. The Missouri Supreme Court plainly thought it could and did not require a clear statement under Missouri law to reach that conclusion.

In all events, this case is an important test of whether this Court will provide meaningful review of state-court interpretations of federal electoral rules. This Court promised in *Moore* that such review would not be "abdication." 600 U.S. at 39 (Kavanaugh, J., concurring). If this Court will not intervene in a case with facts as

stark as these, politically aligned entities will be emboldened to seek favorable last-minute rule changes for federal elections. Given the particular circumstances and timing of this decision, there is no one else who can intervene except for this Court—and every reason for it to do so.

## CONCLUSION

The Court should stay the Missouri Supreme Court's order.

Respectfully submitted,

Date: September 4, 2026

/s/ *John M. Gore*
JOHN M. GORE
*Counsel of Record*
E. STEWART CROSLAND
NATHANIEL C. SUTTON
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
jmgore@jonesday.com

MARC H. ELLINGER
STEPHANIE S. BELL
COLE D. BRADBURY
ELLINGER BELL LLC
308 East High Street, Suite 300
Jefferson City, MO 65101
Phone: (573) 750-4100
mellinger@ellingerlaw.com

*Counsel for Intervenors-Respondents*