**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| ROBERT "BOB" ONDER, ET AL.,<br><br>*Plaintiffs*,<br><br>v.<br><br>STATE OF MISSOURI, ET AL.,<br><br>*Defendants*. | Case No. 4:26-cv-01424-SRC |

**<u>DEFENDANTS' STATEMENT IN RESPONSE TO THIS COURT'S ORDERS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ 3

INTRODUCTION AND FACTUAL BACKGROUND ........ 7

STATEMENT ........ 15

- Intervention ........ 15
- Adversity ........ 15
- Abstention Doctrines ........ 17
- Rooker-Feldman Doctrine ........ 20
- *Purcell* Principle ........ 22
- The Anti-Injunction Act ........ 23
- Res Judicata and Collateral Estoppel ........ 24
- Standing ........ 25
- The Elections Clause ........ 26
- Whether changing congressional maps between the Primary and General Elections Violates the Constitution ........ 28
- 3-Judge Panel ........ 29
- Improper Defendant ........ 29
- Impact of the Pending Stay Application ........ 29

CERTIFICATE OF SERVICE ........ 32

## TABLE OF AUTHORITIES

### Cases

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) .......... 24

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
("AIRC"), 576 U.S. 787 (2015) .......... 27

*Baker v. Carr*,
369 U.S. 186 (1962) .......... 17

*Beavers v. Ark. State Bd. of Dental Examiners*,
151 F.3d 838 (8th Cir. 1998) .......... 18

*Bond v. United States*,
564 U.S. 211 (2011) .......... 16

*Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026) .......... 25

*Colo. River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976) .......... 17

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) .......... 28

*Does 1-3 v. Mills*,
142 S. Ct. 17 (2021) .......... 30

*England v. La. State Bd. of Med. Examiners*,
375 U.S. 411 (1964) .......... 17, 20

*Ex parte Young*,
209 U.S. 123 (1908) .......... 29

*Gray v. Sanders*,
372 U.S. 368 (1963) .......... 28

*Hadley v. Junior Coll. Dist. Of Metro. Kansas City*,
460 S.W.2d 1 (Mo. 1970) .......... 11, 12, 13

*Healey v. Missouri*,
732 S.W.3d 827 (Mo. banc 2026) .......... 10

*Hill v. Martin*,
296 U.S. 393 (1935) .......... 24

*Huffman v. Pursue Ltd*,
420 U.S. 592 (1975) .......... 19

*INS v. Chadha*,
462 U.S. 919 (1983) .......... 16, 17

*Johnson v. De Grandy*,
512 U.S. 997 (1994) .......... 21

*Lance v. Dennis*,
546 U.S. 459 (2006) .......... 20, 21

*Luther v. Hoskins*,
730 S.W.3d 567 (Mo. banc 2026) .......... 10

*Maggard v. Missouri*,
733 S.W.3d 411 (Mo. banc 2026) .......... 10, 25

*Malliotakis v. Williams*,
146 S. Ct. 809 (2026) .......... 23

*Mo. Gen. Assembly v. Von Glahn*,
No. 4:25-CV-1535-ZMB, 2025 WL 3514277 (E.D. Mo. Dec. 8, 2026) .......... 9, 18

*Moore v. Harper*,
600 U.S. 1 (2023) .......... 27

*Muskrat v. United States*,
219 U.S. 346 (1911) .......... 15

*NAACP v. Kehoe*,
734 S.W.3d 338 (Mo. banc 2026) .......... 10

*Nat'l Republican Senatorial Comm. v. FEC*,
146 S. Ct. 2404 (2026) .......... 15, 16

*Ohio ex rel. Davis v. Hildebrandt*,
241 U.S. 565 (1916) .......... 27

*People ex rel. Salazar v. Davidson*,
79 P.3d 1221 (2003) .......... 20, 21

*Plouffe v. Ligon*,
606 F.3d 890 (8th Cir. 2010) .......... 19

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 16

*Smiley v. Holm*,
285 U.S. 355 (1932) ........ 27

*Sprint Commc'ns, Inc. v. Jacobs*,
571 U.S. 69 (2013) ........ 19

*Taylor v. Sturgell.*,
553 U.S. 880 (2008) ........ 21

*Tony Alamo Christian Ministries v. Selig*,
664 F.3d 1245 (8th Cir. 2012) ........ 19

*Trbovich v. United Mine Workers of Am.*,
404 U.S. 528 (1972) ........ 16

*United States v. Classic*,
313 U.S. 299 (1941) ........ 28

*United States v. Gradwell*,
243 U.S. 476 (1917) ........ 24, 26

*United States v. Mosley*,
238 U.S. 383 (1915) ........ 28

*United States v. Windsor*,
570 U.S. 744 (2013) ........ 16, 17

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) ........ 29

**Constitutional Provisions**

Article I ........ 11, 21

Mo. Const. art. III, §§ 52(a), 52(b) ........ 8, 11

U.S. Const. Article I ........ 11, 21

U.S. Const. art. I, § 2, cl. 2 ........ 14

U.S. Const. art. I, § 4, cl. 1 ........ 26

U.S. Const. art. VI, cl. 2 ........ 20

**Statutes**

2 U.S.C. § 2 .......... 29

2 U.S.C. § 7 .......... 14

28 U.S.C. § 2284(a) .......... 29

52 U.S.C. § 20302 .......... 13, 22

52 U.S.C § 20302(a)(8) .......... 14

Mo. Rev. Stat. § 116.120 .......... 9, 10

Mo. Rev. Stat. § 116.150.3 .......... 11, 26

## INTRODUCTION AND FACTUAL BACKGROUND

On September 12, 2025, the Missouri General Assembly passed House Bill 1 ("HB 1"), which redistricted the boundaries of Missouri's eight congressional districts. HB 1 abrogated Missouri's previous congressional map enacted in 2022. A copy of the two maps is reproduced below:

**Missouri's 2025 Congressional Map**



**Missouri's 2022 Congressional Map**




HB 1 passed overwhelmingly in the Missouri General Assembly and was signed by Governor Kehoe on September 28, 2025. *See* Mo. Senate J. 25–26 (2d Extra. Sess., 103d Gen. Assembly, Sept. 12, 2025); Mo. House J. 37–38 (2d Extra. Sess., 103d Gen. Assembly, Sept. 9, 2025).

In response, Proposed Interveners—People Not Politicians and Richard von Glahn—initiated the referendum petition at issue in this case. Proposed Interveners' public statements have long emphasized that they merely want a statewide vote on the HB 1 map. But they have also acknowledged a less democratic goal: exploiting the Missouri Constitution's referendum provisions to suspend the State's congressional map merely by submitting a referendum *petition* signed by "five percent of the legal voters in each of two-thirds of the congressional districts in the state" (approximately 3.3% of Missouri's voters). Mo. Const. art. III, §§ 52(a), 52(b); *see also* Jason Rosenbaum, *Missouri's stack of redistricting lawsuits expected to grow over whether*

*new map is in effect*, ST. LOUIS PUBLIC RADIO (Dec. 16, 2025) (Von Glahn claimed, "[Secretary Hoskins] has to issue a certificate of sufficiency or insufficiency, and until that point, the law is suspended.").[1] To be clear, Proposed Interveners' theory is that state law entitles them to suspend a duly-enacted congressional map for an entire election cycle *without* a referendum vote—even though this has never been attempted before in Missouri history. Also, as far as Missouri is aware, this tactic has never been tried in any other State.

Keenly aware of Proposed Interveners' objective, the Missouri Secretary of State (alongside the Missouri General Assembly and the State of Missouri) sued Proposed Interveners in this Court last October—seeking an injunction and declaratory relief preventing displacement of the HB 1 map. *See Mo. Gen. Assembly v. Von Glahn*, No. 4:25-CV-1535-ZMB, 2025 WL 3514277, at *2 (E.D. Mo. Dec. 8, 2026). The State argued that the Elections Clause prohibits referenda from proceeding against congressional maps in Missouri. *Id.*

Judge Bluestone dismissed that complaint on two bases. First, he found that Missouri's claim was not ripe—because Secretary Hoskins could simply reject the referendum on constitutional grounds using Missouri's certification process for the referendum. *Id.* at *1, *4 n.4 (citing Mo. Rev. Stat. § 116.120). Second, Judge Bluestone found that *Pullman* abstention was appropriate, reasoning that the Missouri Supreme Court could avoid any federal constitutional issue by finding that the Missouri Constitution does *not* authorize referenda against federal congressional plans. *Id.* at *5–6.

On December 9, 2025, the day after Judge Bluestone's decision, Respondent submitted his referendum petition to the Secretary of State's office. Compl. ¶ 18. The Attorney General and

[1] https://www.stlpr.org/government-politics-issues/2025-12-16/missouris-redistricting-lawsuits-whether-new-map-effect.

Secretary promptly declared that the HB 1 map had gone into effect and would remain in effect—at least until the Secretary certified the referendum as legal. The Missouri Supreme Court subsequently rejected a challenge to that public declaration in *Maggard v. Missouri*—holding that the mere submission of a referendum petition does not freeze a duly enacted congressional map. 733 S.W.3d 411, 419–20 (Mo. banc 2026). The *Maggard* decision also expressly reserved the question whether referenda can proceed against federal congressional maps. *Id.* at 414 n.7.

The Missouri Supreme Court also rejected three other legal challenges to the HB 1 map—including as recently as May 2026. *See Luther v. Hoskins*, 730 S.W.3d 567 (Mo. banc 2026); *Healey v. Missouri*, 732 S.W.3d 827 (Mo. banc 2026); *NAACP v. Kehoe*, 734 S.W.3d 338 (Mo. banc 2026). Because of those decisions, even Democracy Docket—the publication founded by Marc Elias, the Democratic Party's leading election lawyer—admitted the HB 1 map would likely need to govern Missouri's elections in 2026. Jen Rice & Yunior Rivas, *Missouri blocks antigerrymander referendum from November ballot in attempt to silence voters*, DEMOCRACY DOCKET (Aug. 4, 2026).[2]

While all this litigation was unfolding, the Secretary strictly complied with his state-law duties in processing Proposed Interveners' referendum petition. *See* Mo. Rev. Stat. §§ 116.120–116.150. Within two weeks of the petition's submission, the Secretary forwarded Proposed Interveners' referendum petition to Missouri's 116 local election authorities so that they could begin reviewing the signatures on Respondent's petition to verify validity. *See id.* § 116.130.1. After the time-intensive signature verification process concluded, Secretary Hoskins then issued a certification decision rejecting the referendum petition on state and federal constitutional grounds

[2] https://www.democracydocket.com/news-alerts/missouri-blocks-anti-gerrymander-referendum-from-november-ballot-in-attempt-to-silence-voters/.

on August 4, 2026—the state-law deadline for issuing a decision. Compl. ¶ 25; *see also* Mo. Rev. Stat. § 116.150.3. That same day, Missouri conducted its 2026 Primary Election under the HB 1 map. Compl. ¶ 21. About 1.2 million Missourians voted in the elections. *Id.* ¶ 22.

Proposed Intervener von Glahn immediately sued in state court. *Id.* ¶ 26. His complaint sought an injunction "reversing Defendant Hoskins' certification decision," and an injunction "[r]estrain[ing]" the Secretary "and those acting in concert with him from taking any further steps to implement or mandate the use of HB 1." Pet. at 8 (prayer for relief), *von Glahn v. Hoskins*, No. 26AC-CC00440 (Cole Cnty. Cir. Ct. Aug. 4, 2026).

The Cole County Circuit Court (Green, J.) rejected Respondent's challenge on every conceivable ground. It agreed with the Secretary that the Missouri Constitution does not authorize referenda on congressional maps. Judgment ¶¶ 28–70, *von Glahn v. Hoskins*, No. 26AC-CC00440 (Cole Cnty. Cir. Ct. Aug. 19, 2026). It also held that the U.S. Constitution's Elections Clause forbids changing Missouri's congressional map based on a referendum petition signed by just "five percent of the legal voters in each of two-thirds of the congressional districts in the state." *Id.* ¶ 110 (quoting Mo. Const. art. III, § 52(a)). The trial court further held that changing Missouri's congressional map between a primary and general election would violate Article I, Section 2 of the U.S. Constitution and the Equal Protection Clause of the Fourteenth Amendment. *Id.* ¶¶ 107–22. Finally, the trial court held that *even if* it were wrong on the first three bases for its judgment, it would still decline to change the HB 1 map before the 2026 election in light of the *Hadley* principle—which is Missouri's equivalent of the *Purcell* principle. *Id.* ¶ 161–63 (citing *Hadley v. Junior Coll. Dist. Of Metro. Kansas City*, 460 S.W.2d 1 (Mo. 1970)).

The Circuit Court's holdings were also buttressed by several factual findings. It found that "changing the maps at this late juncture is not just 'impractical,' it is impossible." *Id.* ¶ 170. The

Circuit Court also found that, "Candidate filing closed months ago. Over 1.2 million Missourians voted in the August 4 primary. Nominees have been selected. Campaigns for the general election are underway." *Id.* ¶ 165. Also, the Circuit Court found that "revert[ing] Missouri to the plan the General Assembly repealed in HB 1 . . . would move hundreds of thousands of voters into different districts for the imminent 2026 general election compared to the districts in which they cast their ballots in the August primary elections." *Id.* ¶ 20. The Circuit Court also found that "[t]hose voters would possess materially less voting power than voters whose districts remained the same." *Id.* ¶ 146. The court further emphasized that "Plaintiff has not demonstrated how State officials could reverse course and implement some entirely new map, how nominees selected by voters in one set of districts would campaign in different ones, or how voters would make sense of a last-minute overhaul of the districts they just voted in." *Id.* ¶ 165. In light of these findings, the Circuit Court "decline[d] to order an unprecedented remedy that is impossible to implement." *Id.* ¶ 171.

Shockingly, the Missouri Supreme Court reversed and directly issued an injunction prohibiting the Secretary—"and all those acting in concert with him"—"from implementing, using, or mandating the use of the congressional redistricting in HB 1." *Von Glahn v. Hoskins*, No. SC101805, slip op. at 13 (Mo. banc Sept. 3, 2026). Although the court provided no detail on *how* Missouri is to comply with is order, a footnote in the court's opinion stated that Missouri must use "the congressional redistricting [plan] the General Assembly established in 2022." *Id.* at 12.

The Missouri Supreme Court's decision rested solely on state law. Indeed, the court suggested Secretary Hoskins was barred from even considering federal law in his certification decision. *Id.* at 5–6 & 5.[3] Addressing state law, the court concluded that the Missouri Constitution

[3] Confusingly, the Missouri Supreme Court then cited federal cases for the proposition that the Constitution did not prohibit States from employing referenda. *Id.* at 6. But no one was

clearly authorizes referenda on federal congressional maps. *Id.* at 7–8. And—entirely ignoring the State's Elections Clause argument—the court concluded that it followed that a referendum petition submitted by around 3.3% of the State's voters automatically voids a duly enacted congressional map and forces the use of a different map *before* a statewide vote. *Id.* The Missouri Supreme Court also entirely ignored the State's argument that switching congressional maps between the Primary and General Elections would violate the U.S. Constitution and disenfranchise primary voters. *See* Brief for Sec'y Hoskins at 53–63, *Von Glahn v. Hoskins*, No. SC101805 (Mo. Aug. 27, 2026).

Even more bizarrely, the Missouri Supreme Court entirely ignored the Circuit Court's finding that changing congressional maps would be "impossible" and force Missouri to violate the federal election calendar. Instead, the court explicitly eschewed any consideration of the "confusion, expense, and practical difficulties" that "may result" from its injunction. *Von Glahn v. Hoskins*, No. SC101805, slip op. at 12 n. 8. Any fallout, the court hinted, was justified by the need to punish Secretary Hoskins for using all allotted time to process the referendum under the state-law deadline. *See id.*

After ignoring the U.S. Constitution, the Missouri Supreme Court is now the first court—*ever*—to enjoin an entire congressional map four weeks after a *completed* primary election. Moreover, federal law requires voting to start in just *13 days*. *See* 52 U.S.C. § 20302. The State has informed the Supreme Court that—absent relief from a federal court—it cannot comply with both the Missouri Supreme Court's order and the federal election calendar. *See* Application for Stay at 1–6, *Hoskins v. von Glahn*, No. 26A304 (Kavanaugh, J., Sept. 4, 2026). Across the State,

---

contesting that point in the case. The Missouri Supreme Court's musings on that point are dictum—especially as the relevant discussion ended with an explicit holding under state law. *Id.* at 8.

Missouri election officials are scrambling to pick up the pieces. There is a public disagreement between election officials on whether it is even *possible* to switch the congressional map. *See, e.g.*, Jack Harvel, *Court ruling raises questions about Missouri primary winners under a different map*, KANSAS CITY STAR (Sept. 4, 2026).[4] In light of the trial court's finding that it will be "impossible" for Missouri election officials to change the congressional map, Judgment ¶ 170, *von Glahn*, No. 26AC-CC00440, the Secretary is gravely concerned that Missouri will be unable to conduct lawful congressional elections by November 3. Decl. Hoskins, Appendix, Application for Stay at 1667a–68a, *Hoskins v. von Glahn*, No. 26A304 (Kavanaugh, J., Sept. 4, 2026); *see also* U.S. Const. art. I, § 2, cl. 2 (requiring a congressional election "every second Year"); 2 U.S.C. § 7; 52 U.S.C § 20302(a)(8).

On September 4, just one day after the Missouri Supreme Court's decision, the Secretary sought an emergency stay from the U.S. Supreme Court. Justice Kavanaugh has ordered Proposed Intervener von Glahn to respond by 12:00 EST on Monday, September 7.

Also on September 4, Plaintiffs filed this action. *See generally* Compl. Plaintiffs are two congressional candidates and two Missouri voters. *Id.* ¶¶ 1–10. The congressional candidates will—absent relief—be forced to run in dramatically different districts in the General Election than the Primary Election. The voters will be forced to vote for candidates in the General Election that they had no role in nominating in the Primary Election. Plaintiffs moved for a TRO and preliminary injunction the same day. ECF 2.

On September 5, Defendants filed a statement indicating that they agree that Plaintiffs are entitled to a TRO and preliminary injunction. ECF 11. Defendants take their obligation to defend state laws seriously. But under the extraordinary and unprecedented circumstances in this case,

---

[4] https://www.kansascity.com/news/politics-government/article317133985.html.

Defendants believe their oath to comply with the U.S. Constitution prevents them from defending the use of a different congressional map for the General Election. *Cf. Nat'l Republican Senatorial Comm. v. FEC*, 146 S. Ct. 2404, 2413 (2026) (federal government concluding U.S. Constitution obliged them to concede that challenged law was unconstitutional).

Also on September 5, Proposed Interveners moved to intervene. ECF 12. Before the motion was filed, Defendants communicated that they take no position on the intervention motion.

On the evening of September 5, this Court issued an order for all parties to brief the applicability of the *Rooker-Feldman* doctrine, whether abstention doctrines apply, and how the State's pending emergency stay application at the Supreme Court could affect this case. ECF 13. The same evening, the Court ordered the parties to file any responses to Proposed Interveners' intervention and dismissal motions. ECF 14.[5] This filing responds to both of the Court's orders.[6]

## STATEMENT

### 1. Intervention

As Defendants indicated to Proposed Interveners on September 5, they take no position on the motion to intervene.

### 2. Adversity

Proposed Interveners fundamentally misunderstand the adversity doctrine. Defendants are *legally* adverse to Plaintiffs because Defendants cannot voluntarily provide the relief that they seek—due to the Missouri Supreme Court's state-law order. This case is thus nothing like *Muskrat v. United States*, 219 U.S. 346, 361 (1911) (parties not legally adverse).

[5] Defendants thank the Court for acting so promptly on a holiday weekend. Missouri is facing unprecedented chaos in trying to run an imminent federal election.

[6] This filing responds to two orders and is within the combined page limits of this Court's order and the local rules. Defendants are also filing a motion for leave to file excess pages in an abundance of caution.

Notably, this reality makes the parties *more* adverse than many other cases that routinely arise in the federal legal system. To give one recent example, the National Republican Senatorial Committee recently sued the Federal Elections Commission—arguing that a campaign finance statute was unconstitutional. *See Nat'l Republican Senatorial Comm.*, 146 S. Ct. at 2414. The federal government ultimately *agreed* with that position. *Id.* at 2413. Even though the federal government could have committed not to enforcing (and thus not injuring the plaintiffs), the Supreme Court proceeded to decide the case. *See id.* There are many other examples of similar cases where a governmental entity declines to defend a challenged law. *See, e.g.*, *United States v. Windsor*, 570 U.S. 744, 760–61 (2013); *INS v. Chadha*, 462 U.S. 919, 939 (1983); *Seila Law LLC v. CFPB*, 591 U.S. 197, 209 (2020); *Bond v. United States*, 564 U.S. 211, 215–16 (2011). Unless the courts lacked jurisdiction in all those cases, Plaintiffs' adversity position is wrong.

Proposed Interveners' observation that Defendants and Plaintiffs agree on many legal questions—but not all, *see infra* at 24–25—is thus beside the point. Defendants are responsible with enforcing *Missouri's* interest. *Cf. Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 539 (1972). While Defendants are appropriately concerned about their individual citizens—like Plaintiffs Ms. Thomas and Ms. Havens—from losing their federal right to vote, Proposed Interveners cite no precedent suggesting citizens cannot assert their own constitutional rights without the State speaking for them. And Defendants certainly do not represent the partisan interests of Plaintiffs Congressman Onder and Mr. Brattin, who care only about getting elected. Although Defendants and Plaintiff candidates may have overlapping *legal* views, they have distinct interests. *Cf. Trbovich*, 404 U.S. at 539. And again, Proposed Interveners cite no authority suggesting third parties should lose their federal constitutional rights merely because some other party lost on a state-law dispute in state court. Indeed "it would be a curious result if, in the

administration of justice, a person could be denied access to the courts because the Attorney General . . . agreed with the legal arguments asserted by the individual." *Chadha*, 462 U.S. at 939.

Proposed Interveners also note that Plaintiffs have hired a lawyer involved in litigation at the Missouri Supreme Court. Defendants are unaware of any authority suggesting parties lose their federal rights merely because they hire a lawyer who lost on state-law issues in a separate case. Certainly, nothing in the adversity doctrine supports Proposed Interveners' contrary insinuation.

One final point bears mentioning here. Aside from its narrow jurisdictional reach, the adversity doctrine also seeks to ensure there is "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Windsor*, 570 U.S. at 760 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Proposed Interveners will "assure[]" such adversarial presentation. *Id.*; *accord Chadha*, 462 U.S. at 939. That is part of the reason Defendants are not objecting to Proposed Interveners being parties in this case.

**3. Abstention Doctrines**

Defendants are, frankly, confused by Proposed Interveners' invocation of abstention doctrines. As a general matter, federal courts apply abstention doctrines narrowly. *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976) ("Abstention from the exercise of federal jurisdiction is the exception, not the rule."). The narrow purpose of abstention doctrines is to preserve the right of state courts to decide *state law* questions and *avoid* potential federal constitutional questions. *See England v. La. State Bd. of Med. Examiners*, 375 U.S. 411, 415–16 (1964). But here, Missouri's state courts already had that opportunity. *See Von Glahn*, No. SC101805, slip op. at 13. Judge Bluestone already abstained last fall when Missouri brought

federal constitutional objections to Proposed Interveners' referendum. *See Mo. Gen. Assembly*, 2025 WL 3514277, at *5. As he explained, the Missouri Supreme Court could have theoretically concluded—under state law—that referenda cannot proceed against federal congressional maps. *Id.*

The Missouri Supreme Court did not go down the path Judge Bluestone hypothesized when he abstained. Instead, the Missouri Supreme Court issued a conclusive determination of *state law* and *guaranteed* conflicts with the U.S. Constitution. *Von Glahn v. Hoskins*, No. SC101805, slip op. at 13 (Mo. banc Sept. 3, 2026). The Missouri Supreme Court also declined to address federal constitutional objections to its actions. *Id.* at 5–6 & n.5. State court proceedings in *von Glahn v. Hoskins* are now over. The Missouri Supreme Court denied rehearing. *Id.* at 14. It denied the motion for a stay. Order, *Von Glahn v. Hoskins*, No. SC101805 (Mo. banc Sept. 4, 2026). There is nothing more that any state court could do to avoid the necessity of a federal court resolving Plaintiffs' claims.

Thus, it is clear that no abstention doctrine applies here. *Pullman* abstention does not apply because the Missouri Supreme Court has already issued a final, conclusive ruling on the Missouri Constitution and there is no further possibility that a state court could rely on state law to address Plaintiffs' federal constitutional objections. There are thus no "available state remedies" Plaintiffs could pursue to vindicate their constitutional rights. *Beavers v. Ark. State Bd. of Dental Examiners*, 151 F.3d 838, 841 (8th Cir. 1998). Judge Bluestone gave Missouri's courts a chance to avoid Plaintiffs' constitutional claims; the Missouri Supreme Court conclusively rejected that opportunity. *See Von Glahn*, No. SC101805, slip op. at 13.

*Younger* abstention does not apply because there is no "parallel, pending state criminal proceeding," "state civil proceeding[] that [is] akin to criminal prosecution[]," or proceeding "that

implicate[s] a State's interest in enforcing the orders and judgments of its courts." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72–73 (2013). *Younger* extends "no further" that these three "exceptional circumstances." *Id.* at 82. But even if *von Glahn v. Hoskins* could somehow be characterized as an enforcement proceeding, abstention would not be appropriate because—in the words of Proposed Interveners' own cited authority—there are no "ongoing state proceedings" in this case. *Huffman v. Pursue Ltd*, 420 U.S. 592, 605 (1975). And *Tony Alamo Christian Ministries v. Selig* is not relevant (among many reasons) because—at the time dismissal was warranted—there *were* ongoing state-court proceedings. 664 F.3d 1245, 1251 (8th Cir. 2012).

In any event, *Younger* abstention cannot apply because there is no "adequate opportunity to raise any relevant federal questions in the state proceeding." Intervener Br. at 9 (quoting *Plouffe v. Ligon*, 606 F.3d 890, 892 (8th Cir. 2010)). The Missouri Supreme Court refused to address Secretary Hoskins's federal arguments. *Von Glahn*, No. SC101805, slip op. at 5–6 & n.5. It certainly cannot do so at this point.

Finally, *Colorado River* abstention does not apply because there is no pending "parallel" state-court proceeding. Intervener Br. at 5. Once again, the Missouri Supreme Court has issued final judgment on all state-law questions. It denied rehearing. It denied a stay. Only *federal* legal questions are pending before a *federal* court—the U.S. Supreme Court—considering whether to address such questions in a *discretionary* review posture. Defendants are aware of *zero* authority suggesting a pending petition for discretionary relief before the Supreme Court bars a federal district court from considering federal constitutional claims. Rather, the opposite: "The possibility of appellate review by [the Supreme Court] of a state court determination may not be substituted, against a party's wishes, for his right to litigate his federal claims fully in the federal courts. . . . '[A] party has the right to return to the District Court, after obtaining the authoritative state court

construction for which the court abstained, for a final determination of his claim.'" *England*, 375 U.S. at 465–66 (citation omitted).

In short, Proposed Interveners' position seems to boil down to the remarkable contention that individuals should not be allowed to bring federal claims in federal court because a state court issued a final judgment guaranteeing a conflict between federal and state law. Proposed Interveners see potential federal constitutional rulings as an "indirect attempt[] to undermine [a] state court decision[]." Intervener Br. at 6. But what Proposed Interveners are *actually* unhappy about is the Supremacy Clause—which requires state law to give way when it conflicts with federal constitutional rights. U.S. Const. art. VI, cl. 2. The Court thus cannot abstain.

**4. *Rooker-Feldman* Doctrine**

The *Rooker-Feldman* doctrine does not apply here—for at least two reasons. *First*, the *Rooker-Feldman* doctrine does not apply because Plaintiffs were not parties in the Missouri Supreme Court proceedings. *See Lance v. Dennis*, 546 U.S. 459, 466 (2006). *Rooker-Feldman* is "not simply preclusion by another name." *Id.* It is straightforward why the *Rooker-Feldman* doctrine does not apply here. It would make no sense to say that individuals lose their right to bring federal constitutional rights in federal court because separate individuals lost state-law arguments in a state court. And under materially identical circumstances to the present case, the Supreme Court so held. *See id.*

In *Lance*, after the Colorado legislature had performed a mid-decade redistricting, the state attorney general sued the secretary of state seeking to require the use of the previous redistricting map. *Id.* at 460. The Colorado Supreme Court construed the Colorado Constitution "to limit congressional redistricting to 'once per decade'" and "ordered the secretary of state to use the [previous plan]." *Id.* at 460–61 (quoting *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1231

(2003) (en banc)). Following the *Salazar* decision, four Coloradans, "unhappy with [the decision,] filed an action in the District Court seeking to require the secretary of state to use the legislature's [new redistricting] plan." *Id.* at 461. Those plaintiffs "argued that [the Colorado Constitution], as interpreted by the Colorado Supreme Court, violated the Elections Clause of Article I, § 4, of the U.S. Constitution." *Id.* The Supreme Court held that the citizen-plaintiffs "were plainly not parties to the underlying state-court proceeding" and were thus "not in a 'position to ask this Court to review the state court's judgment.'" *Id.* at 465 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1006 (1994)). Thus, *Rooker-Feldman* did not bar that federal action. *Id.* at 466. And this was true even though the secretary of state was the defendant in both the original state suit and the federal suit. *See id.* at 460–61 & n.1.

Proposed Intervener's contrary position would rob many voters and candidates of their right to bring federal claims in federal court after the State lost a case in state court. And such a holding would violate the Due Process Clause, which generally prohibits judgments from extinguishing absent third parties' claims. *See Taylor v. Sturgell.* 553 U.S. 880, 884–85 (2008).

*Second*, even if Proposed Interveners' privity exception held water, no party is asking this Court to reconsider any holding of the Missouri Supreme Court. That court decided *state-law* questions. Even though Secretary of State Hoskins made federal constitutional arguments to that court, the court simply ignored those arguments and declined to rule on them. For example, Secretary Hoskins argued that an order to switch Missouri's congressional map between the Primary and General Elections would violate the U.S. Constitution. *See* Brief for Sec'y Hoskins at 53–63, *Von Glahn v. Hoskins*, No. SC101805 (Mo. Aug. 27, 2026). The Missouri Supreme Court simply ignored that argument.

Proposed Interveners are thus wrong when they say that Plaintiffs are seeking to re-litigate matters decided by the Missouri Supreme Court. Intervener Br. at 6–7. Frankly, there is no meaningful overlap. The Missouri Supreme Court issued the following holdings: (1) a state-law holding that the Missouri Constitution authorizes referenda against congressional maps; and (2) a state-law holding that Missouri may not use the same congressional map it used during the Primary Election *because of state law*. *Von Glahn*, No. SC101805, slip op. at 11, 13. By contrast, Plaintiffs ask the Court to decide only *federal* questions: (1) whether the Elections Clause prohibits displacing the HB 1 congressional map, Compl. ¶¶ 50–73, and (2) whether Missouri would violate the U.S. Constitution if it uses a different congressional map for the General Election than it used during the Primary Election, *id.* ¶¶ 74–109. If the Court drew Venn Diagrams, the circles would not even touch.

**5. *Purcell* Principle**

Proposed Interveners' position here is, frankly, astounding. They obtained a state-court judgment to change Missouri's governing congressional map *after* the 2026 Primary Election and a couple weeks before the start of voting in the 2026 General Election. Because of their efforts, Missouri is facing unprecedented and catastrophic harms as it will imminently be forced to violate the federal election calendar, *see* 52 U.S.C. § 20302; Decl. Hoskins, Appendix, Application for Stay at 1667a–68a, *Hoskins v. von Glahn*, No. 26A304 (Kavanaugh, J., Sept. 4, 2026), and election officials are scrambling to figure out whether it is even possible to comply with the Missouri Supreme Court's order. Indeed, a state trial court found it would be "impossible" to switch congressional maps, Judgment ¶ 170, *von Glahn*, No. 26AC-CC00440—a finding the Missouri Supreme Court simply ignored. Proposed Interveners' invocation of *Purcell* is thus equivalent to an arsonist objecting that a water hose would prevent him from continuing to burn down a house.

Unsurprisingly, the Supreme Court rejected an invocation of *Purcell* in virtually identical circumstances. In *Malliotakis v. Williams*, New York state courts relied on *state law* to change a congressional map several months before an upcoming primary election. 146 S. Ct. 809, 810–11 (2026). A candidate believed this state-law ruling violated her federal law rights. So she sought relief from the Supreme Court—which granted a stay. *Id.* at 809. The Supreme Court granted relief even though New York invoked *Purcell* and argued it was too late for a federal court to switch back a rule that a state court had just changed. *See id.* at 811. But as Justice Alito's concurrence explained, the Court's "stay, far from causing disruption or upsetting legitimate expectations, eliminates much of the uncertainty and confusion that would exist if the [New York] Independent Redistricting Commission proceeded to draw a new district that this Court would likely strike down if the cases reached us in time." *Id.* at 811.

This case is far easier than *Malliotakis*. There, New York's Primary Election was scheduled to begin four months after the Court granted the stay. *See id.* at 816 (Sotomayor, J., dissenting from grant of stay). The Supreme Court has recognized that a state court changing a congressional map before a Primary—as occurred in *Malliotakis*—is disruptive. *Id.* at 810–11 (Alito, J., concurring in grant of stay). Certainly changing a map after the Primary is far worse. And here, voting for the 2026 General Election begins in just 13 days—three-and-a-half months less time than existed before the Primary Election in New York.

**6. The Anti-Injunction Act**

The Anti-Injunction Act does not bar Plaintiffs' suit because Plaintiffs are not asking for an injunction against any pending state court proceeding. They are asking for an injunction against Missouri changing its congressional map and putting Proposed Interveners' referendum on the ballot. Compl. at 26 (prayer for relief). They are not asking for an injunction that interferes with

any "step[] taken or which may be taken in the state court or by its officers." Intervener Br. at 10 (quoting *Hill v. Martin*, 296 U.S. 393, 403 (1935)). Once again, there is no pending state court proceeding that could possibly be interfered with.

**7. Res Judicata and Collateral Estoppel**

Proposed Interveners are simply wrong when they claim the Missouri Supreme Court decided Plaintiffs' federal constitutional claims. To the contrary, that court (wrongly) suggested that federal claims were not before it because state law only allowed Secretary Hoskins to consider state law in rejecting the referendum. *Von Glahn*, No. SC101805, slip op. at 5–6 & n.5.

The Missouri Supreme Court did proceed to discuss a proposed clear-statement rule. But the Missouri Supreme Court was discussing a potential *state-law* clear statement rule, and it found any such rule satisfied. *Id.* at 7–8. The Missouri Supreme Court could not have been addressing a proposed federal Elections Clause clear statement rule. Indeed, that court did not even *mention* the State's primary proposed federal legal authority—*United States v. Gradwell*, 243 U.S. 476 (1917). And whatever *state-law* clear statement rules entail, federal-law clear statement rules have their own requirements. One of them is that vague, open-ended phrases using broad words like "any"—which is the word the Missouri Constitution's referendum provision employs—are *not enough* to satisfy a clear statement rule. *See id.* at 479–90; *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 220 n.4 (2008).

The Missouri Supreme Court also did not address whether a State violates the Elections Clause when it allows 3.3% of registered voters to unilaterally void an enacted congressional map by merely submitting signatures—before any statewide vote. The State prominently briefed and orally argued that point, *see* Brief for Sec'y Hoskins at 49–52, *Von Glahn v. Hoskins*, No. SC101805 (Mo. Aug. 27, 2026), but the Missouri Supreme Court did not even mention it.

And the Missouri Supreme Court did not even mention—let alone decide—the State's argument that switching congressional maps between the Primary and General Election would violate the U.S. Constitution. Nothing. Such cavalier treatment of federal constitutional claims is, frankly, shocking. It cannot foreclose this Court from considering federal legal questions.

**8. Standing**

Proposed Interveners' observations here are (again) downright bizarre. They seem to be saying that federal candidates have no legally protected interest in challenging the congressional districts they run in. *Contra Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77–79 (2026). This is so, Proposed Interveners claim, because the Missouri Supreme Court adopted a legal fiction that the HB 1 map used in the Primary Election must be deemed *retroactively invalid.*

To start, this legal fiction makes no sense even on its own terms. The Missouri Supreme Court in *Maggard* held that—under state law—a referendum petition cannot freeze a law enacted by the General Assembly and signed by the Governor *until* it is certified. *Maggard*, 733 S.W.3d at 419–20. When the Primary Election occurred in Missouri, the referendum petition was not certified. Therefore, in the real world, when the Primary Election happened, the HB 1 map was in effect.

But more importantly, the Missouri Supreme Court's *state-law fiction* does not really matter here. This is a federal court. This Court hears federal legal claims. All agree that Plaintiff candidates *did run* under the House Bill 1 map in the Primary Election. And all agree that Missouri is currently poised to force Plaintiff candidates to run in dramatically different districts in the General Election. Plaintiff candidates obviously have standing to challenge that decision. *Bost*, 607 U.S. at 77–79. Retroactive state-law legal fictions cannot insulate state actions from federal judicial review.

**9. The Elections Clause**

Proposed Interveners are wrong about the Elections Clause—in at least two respects. *First*, the Missouri Constitution does not provide a "positive and clear" statement subjecting federal congressional maps to referenda. *Gradwell*, 243 U.S. at 485.

All Proposed Interveners point to is vague, open-ended language that does not specifically address federal redistricting. That is simply not good enough to satisfy a federal clear-statement rule. In *Gradwell* itself, the criminal statute at issue prohibited conspiracy "to defraud the United States in *any* manner for *any* purpose." *Id.* at 479 (emphasis added). Yet despite the broad statutory language, the Supreme Court applied the Election Clause's clear statement rule and held that "it would be a strained and unreasonable construction to apply" the criminal statute to election fraud because that would undermine state legislative authority. *Id.* at 485.

The fact that Missouri law is clearly not equipped to facilitate referenda on congressional redistricting plans reinforces the lack of a clear statement. According to state law, voters considering referenda must do so with only a 100-word summary statement and no pictures. Mo. Rev. Stat. § 116.334.1. Proposed Interveners thus expect Missourians to vote on congressional plans without knowing which counties go in which districts or even which district they would be in. That is absurd. Further, all agree that the Secretary of State has until the day of the Primary Election to make a certification decision on a proposed referendum. *See id.* § 116.150.3. That obviously makes no sense for a redistricting referendum—as this case acutely instructs.

*Second*, the Elections Clause does not permit a tiny minority of registered voters to unilaterally void an enacted congressional map before a statewide vote. The U.S. Constitution's Elections Clause states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I,

§ 4, cl. 1. Yes, the Supreme Court has rejected the position that *only* state legislatures can be involved in redistricting. It has employed a history-and-tradition approach to uphold state-court judicial review and the gubernatorial veto, both of which co-existed with state legislative authority over federal elections since the founding. *See Moore v. Harper*, 600 U.S. 1, 24–25 (2023); *Smiley v. Holm*, 285 U.S. 355, 368 (1932). More controversially, the Supreme Court sanctioned statewide referenda votes (at least when state law clearly requires them) and independent redistricting commissions. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n ("AIRC")*, 576 U.S. 787, 824 (2015).

But the Supreme Court has *never* sanctioned the profoundly anti-democratic arrangement greenlighted by the Missouri Supreme Court under state law. Allowing a small minority of Missourians to unilaterally override the People's elected representatives in the General Assembly for an election cycle *before* a statewide vote is implausible. And *AIRC*'s logic—which rested substantially on the notion of strengthening democracy, *see* 576 U.S. at 797–98; *id.* at 816–17; *id.* at 822–24 —actually undercuts Proposed Interveners' defense of an anti-democratic system where small minorities of voters can unilaterally void congressional maps.

Nor does *Ohio ex rel. Davis v. Hildebrandt*, 241 U.S. 565 (1916), support this outlandish arrangement. As Chief Justice Roberts has explained, "[t]he result of the decision was to send *the Ohio Legislature* back to the drawing board to do the redistricting." *AIRC*, 576 U.S. at 840 (Roberts, C.J., dissenting). *Hildebrant* certainly did not address an attempt by a small minority of voters to unilaterally void a congressional map for an election cycle.

If that arrangement complies with federal law, then it is hard to see what's left of the Elections Clause. Under Proposed Intervener's theory, a State could simply empower the Chairman of one of its political parties to unilaterally draw a congressional map. Or perhaps

Missouri could just allow Mr. von Glahn to unilaterally void a map at his discretion—even three days before a general election—by signing a piece of paper. Proposed Interveners' theory proves far too much and is not supported by precedent.

**10. Whether changing congressional maps between the Primary and General Elections Violates the Constitution**

This question is not hard. The U.S. Constitution protects a right to vote—including in primary elections. *United States v. Classic*, 313 U.S. 299, 318 (1941). Although the precise bounds of the Constitution's right to vote are contested, *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189–91 (2008) (plurality op.), it obviously prohibits rendering hundreds of thousands of primary votes absolutely pointless, *see United States v. Mosley*, 238 U.S. 383, 386 (1915) (right to vote protects having ballots given legal effect).

That is what Missouri must do absent a federal court order. The voter Plaintiffs illustrate this dilemma. They voted in very different districts in the Primary Election than they would in the General Election. Now Missouri must force them to vote for General Election candidates they had no role in nominating. That bait-and-switch is unconstitutional. *See Classic*, 313 U.S. at 318; *Mosley*, 238 U.S. at 386; *Crawford*, 553 U.S. at 189–91 (plurality op.).

Additionally, the Equal Protection Clause forbids weighting the votes of some Missourians "more heavily" than others. *Gray v. Sanders*, 372 U.S. 368, 379 (1963). "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit." *Id.* (emphasis added). "This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications." *Id.* at 379–80. That rule is violated here

because—absent relief—the hundreds of thousands of Missourians moved to new districts will have their votes diluted in favor of those voters not moved into new districts.

Proposed Interveners' contrary responses fail. 2 U.S.C. § 2 merely empowers States to run federal elections consistent with state law. This statute does not (and cannot) authorize Missouri to disenfranchise hundreds of thousands of people. And the Missouri Supreme Court's state-law fiction about retroactively disappearing maps cannot justify violating federal constitutional rights.

**11. 3-Judge Panel**

This case does not fall within 28 U.S.C. § 2284(a). Plaintiffs are not challenging the constitutionality of an apportionment enacted by the General Assembly. They are arguing that referenda on congressional maps in Missouri violate the Elections Clause and that ordering Missouri to switch to an old map between elections violates the Constitution. No one is challenging the underlying constitutionality of any apportionment plan, and thus § 2284(a) does not apply here.

**12. Improper Defendant**

Defendants plan to file a motion to dismiss the State of Missouri as a defendant. Missouri is "immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). In the interim, Defendants respectfully request that the Court not grant any injunctive relief against the State of Missouri itself. Defendants acknowledge that Plaintiff's constitutional claims for equitable relief may proceed against the state officer Defendants. *See Ex parte Young*, 209 U.S. 123, 159–60 (1908).

**13. Impact of the Pending Stay Application**

Finally, the Court asked Defendants to address the potential impact of Secretary Hoskins's stay application before the Supreme Court. The answer is straightforward.

If the Supreme Court grants the stay, Plaintiffs' claim for a TRO or preliminary injunctive relief under Counts II and III (¶¶ 74–109) is moot. The fate of Count I (¶¶ 50–73) depends on the scope of the stay. Secretary Hoskins did not ask the Supreme Court to stay the Missouri Supreme Court's order to put Proposed Interveners' referendum *on the ballot*; he only asked for a stay of the injunction to switch congressional maps. Application for Stay at 1–6, *Hoskins v. von Glahn*, No. 26A304 (Kavanaugh, J., Sept. 4, 2026). If the Supreme Court only grants that requested stay, Count I remains a live claim because Plaintiffs request broader relief—barring the referendum from the ballot. Notably, the Intervener-Defendants in *von Glahn v. Hoskins* asked for a stay of the Missouri Supreme Court's entire order—including putting the referendum on the ballot. *See* Brief for Republican Nat'l Comm. in Support of Application for Stay at 18–29, No. 26A304 (Kavanaugh, J., Sept. 4, 2026). If the Supreme Court grants that broader stay, Plaintiffs' request for temporary or preliminary injunctive relief under Count I would be moot.

If the Supreme Court denies the stay, nothing in this case is moot. The Supreme Court could deny the stay for a host of reasons—many of which would not even suggest that this case fails on the merits. For example, the Supreme Court considers certworthiness in granting stays. *See Does 1-3 v. Mills*, 142 S. Ct. 17, 17–18 (2021) (Barrett, J., concurring in the denial). A stay denial on that basis (and many other types) would not suggest Plaintiffs here are unlikely to succeed on the merits.

Dated: September 6, 2026

Respectfully submitted,

**CATHERINE L. HANAWAY**
ATTORNEY GENERAL

/s/ *Louis J. Capozzi III*
Louis J. Capozzi III, #77756(MO)
*Solicitor General*
William James Seidleck, #77794(MO)
*Principal Deputy Solicitor General*
Graham Miller, #77656(MO)
*Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
Old Post Office Building
815 Olive Street, Suite 200
St. Louis, MO 63101
Phone: (573) 645-9662
Louis.Capozzi@ago.mo.gov
William.Seidleck@ago.mo.gov
Graham.Miller@ago.mo.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2026 the foregoing was filed electronically through the Court's electronic filing system to be served electronically on counsel for all parties.

/s/ *Louis J. Capozzi III*