**United States Court of Appeals**
***For The Eighth Circuit***
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

**Susan E. Bindler**
***Clerk of Court***

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

September 21, 2026

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

RE: 26-2797 Congressman Robert Onder, et al v. Richard von Glahn, et al
26-2827 Congressman Robert Onder, et al v. State of Missouri, et al

Dear Sir or Madam:

A published opinion was filed today in the above case.

Counsel who presented argument on behalf of the appellants/cross-appellees and appeared on the brief was Charles W. Hatfield, of Jefferson City, MO. The following attorney(s) also appeared on the appellants/cross-appellees' brief; Jeremy A. Root, of Jefferson City, MO, Alexander C. Barrett, of Jefferson City, MO, Alixandra S. Cossette, of Jefferson City, MO, Greta M. Bax, of Jefferson City, MO.

Counsel who presented argument on behalf of appellees/cross-appellants Brattin, Havens, Onder & Thomas and appeared on the brief was Marc Henry Ellinger, of Jefferson, MO. The following attorney(s) also appeared on the appellees'/cross-appellants' brief; Cole David Bradbury, of Jefferson City, MO, Stephanie S. Bell, of Jefferson City, MO.

Counsel who presented argument on behalf of appellees Hoskins and State of Missouri and appeared on the brief was Louis Joseph Capozzi, III, AAG, of Saint Louis, MO. The following attorney(s) also appeared on the appellees' brief; Graham D. Miller, AAG, of Saint Louis, MO, John Michael Patton, AAG, of Kansas City, MO, William James Seidleck, AAG, of Saint Louis, MO.

The following attorney(s) appeared on the amicus brief of Missouri Association of County Clerks and Election Authorities on behalf of appellants/cross-appellees; Evan Kennedy, of Jefferson City, MO, Brianna L. Lennon, of Columbia, MO.

The following attorney(s) appeared on the amicus brief of Jake Maggard & Gregg Lombardi on behalf of appellants/cross-appellees; Kevin J. Hamilton, of Seattle, WA, Jonathan Patrick Hawley, of Seattle, WA, Tori Schafer, of Clayton, MO, Matthew P. Gordon, of Seattle, WA.

The following attorney(s) appeared on the amicus brief of Campaign Legal Center, ACLU of Missouri Foundation and ACLU Foundation; Gillian R. Wilcox, of Kansas City, MO, Sophia Lin Lakin, of New York, NY, Annabelle E. Harless, of Chicago, IL, Mark P. Gaber, of Washington, DC, Jonathan D. Schmid, of Saint Louis, MO, Kristin Marie Mulvey, of Saint Louis, MO, Jason Orr, of Kansas City, MO, Ming Cheung, of New York, NY, Aseem Mulji, of Washington, DC, Simone Leeper, of Washington, DC, Isaac DeSanto, of Washington, DC, Dayton Campbell-Harris, of New York, NY, Benjamin Phillips, of Washington, DC.

The following attorney(s) appeared on the amicus brief One Hundred Ten Missouri Voters on behalf of appellants/cross-appellees; Elad J. Gross, of Saint Louis, MO, Anat Gross, of Saint Louis, MO.

The following attorney(s) appeared on the amicus brief of Club for Growth on behalf of appellees/cross-appellants; John M. Reeves, of Saint Louis, MO, Michael Donnelly, of Washington, DC.

The judge who heard the case in the district court was Honorable Stephen R. Clark.

If you have any questions concerning this case, please call this office.

Susan E. Bindler
Clerk of Court

HAG

Enclosure(s)

cc: MO Lawyers Weekly

District Court/Agency Case Number(s): 4:26-cv-01424-SRC

**United States Court of Appeals**
***For The Eighth Circuit***
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

**Susan E. Bindler**
***Clerk of Court***

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

September 21, 2026

Charles W. Hatfield
STINSON LLP
230 W. McCarty Street
Jefferson City, MO 65101

RE: 26-2797 Congressman Robert Onder, et al v. Richard von Glahn, et al
26-2827 Congressman Robert Onder, et al v. State of Missouri, et al

Dear Counsel:

The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion.

Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules.

Susan E. Bindler
Clerk of Court

HAG

Enclosure(s)

cc: Alexander C. Barrett
Greta M. Bax
Stephanie S. Bell
Cole David Bradbury
Dayton Campbell-Harris
Louis Joseph Capozzi III
Ming Cheung
Clerk, U.S. District Court, Eastern District of Missouri
Alixandra S. Cossette
Isaac DeSanto
Michael Donnelly
Marc Henry Ellinger
Mark P. Gaber
Matthew P. Gordon
Anat Gross
Elad J. Gross

Kevin J. Hamilton
Annabelle E. Harless
Jonathan Patrick Hawley
Evan Kennedy
Sophia Lin Lakin
Simone Leeper
Brianna L. Lennon
Darrell Leon McClanahan III
Graham D. Miller
Aseem Mulji
Kristin Marie Mulvey
Jason Orr
John Michael Patton
Benjamin Phillips
John M. Reeves
Jeremy A. Root
Tori Schafer
Jonathan D. Schmid
William James Seidleck
Gillian R. Wilcox

District Court/Agency Case Number(s): 4:26-cv-01424-SRC

# United States Court of Appeals
## For the Eighth Circuit

---

No. 26-2797

---

Congressman Robert Onder; Richard Ray Brattin; Patricia Thomas; Debra Havens

*Plaintiffs - Appellees*

v.

State of Missouri; Denny L. Hoskins, in his official capacity as Missouri Secretary of State

*Defendants - Appellees*

Richard Von Glahn; People Not Politicians

*Intervenors - Appellants*

------------------------------

Missouri Association of County Clerks and Election Authorities; Jake Maggard; Gregg Lombardi; Campaign Legal Center; American Civil Liberties Union of Missouri Foundation; American Civil Liberties Union Foundation; One Hundred Ten Missouri Voters

*Amici on Behalf of Appellant(s)*

Club for Growth

*Amicus on Behalf of Appellee(s)*

No. 26-2827

Congressman Robert Onder; Richard Ray Brattin; Patricia Thomas; Debra Havens

*Plaintiffs - Appellants*

v.

State of Missouri; Denny L. Hoskins, in his official capacity as Missouri Secretary of State

*Defendants - Appellees*

Richard Von Glahn; People Not Politicians

*Intervenors - Appellees*

------------------------------

Club for Growth

*Amicus on Behalf of Appellant(s)*

American Civil Liberties Union Foundation; American Civil Liberties Union of Missouri Foundation; Campaign Legal Center; One Hundred Ten Missouri Voters

*Amici on Behalf of Appellee(s)*

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

Submitted: September 17, 2026
Filed: September 21, 2026
[Published]

Before LOKEN, STRAS, and JUSTIN D. SMITH, Circuit Judges.

---

PER CURIAM.

On November 3, 2026, Missourians will vote for federal and state candidates in this year's general election. Spirited congressional and ballot measure campaigns have intersected in federal and state courts. The question presented to this Court is which congressional district map Missouri should use for the November 2026 elections: the map adopted in 2025 and used in the August 2026 primary election, or the map adopted in 2022. The people of Missouri deserve an answer to this important question.

This Court holds that Missouri's current plan to use the 2022 map in the November 2026 general election violates the Constitution. Only use of the 2025 map complies with the Constitution and federal law. We affirm the district court[1] and remand for entry of a permanent injunction.

I.

Pursuant to the process set forth by the Constitution, *see* U.S. CONST. art. I., § 2, cl. 3, the 2020 Census (like the 2010 Census before it) apportioned Missouri eight congressional seats. Before the next congressional election, in 2022, Missouri's General Assembly truly agreed and finally passed House Bill 2909, which enacted new congressional district boundaries upon then-Governor Michael L. Parson's signature (the "2022 map"). Missouri used the 2022 map in the primary and general elections in 2022 and 2024.

---

[1]The Honorable Stephen R. Clark, Chief Judge, United States District Court for the Eastern District of Missouri.

Missouri redrew its congressional district maps again in advance of the 2026 elections.[2] In an extraordinary session called by Governor Mike Kehoe more than one year ago,[3] the Missouri General Assembly truly agreed and finally passed House Bill 1 ("H.B. 1"), which repealed the 2022 map and enacted new congressional district boundaries (the "2025 map"). The most prominent changes in the 2025 map related to Missouri's Fifth Congressional District, which Missouri lawmakers expected to benefit Republicans. *See* Mitch Smith, *Missouri House Approves Map That Boosts Republicans*, N.Y. TIMES (Sept. 9, 2025), https://perma.cc/Z9GF-FUJ7.[4] H.B. 1 passed by a margin of 21 to 11 in the Missouri Senate and 90 to 65 in the Missouri House of Representatives. Governor Kehoe signed H.B. 1 on September 28, 2025. Unlike the 2022 map, the 2025 map lacked an emergency clause and thus would not take effect until 90 days after the General Assembly adjourned its extraordinary session on September 12, 2025. MO. CONST. art. III, § 29.

Under the state constitution, the people of Missouri have reserved the "power to approve or reject by referendum any act of the general assembly" that does not contain an emergency clause. *Id.* §§ 49, 52(a). A bill will be subject to a referendum

---

[2]Missouri is not the only State to redraw its congressional district maps "[w]ith an eye on the upcoming 2026 midterm elections." *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025). "Texas adopted the first new map, then California responded with its own map for the stated purpose of counteracting what Texas had done." *Id.* Since 2025, nine States—California, Florida, Louisiana, Missouri, North Carolina, Ohio, Tennessee, Texas, Utah—have redrawn their maps, and three other States have begun the process to do so—Maryland, Mississippi, New York. *Changing the Maps: Tracking Mid-Decade Redistricting*, NAT'L CONF. STATE LEGIS., https://perma.cc/BJR4-24G4 (last visited Sept. 21, 2026).

[3]A session outside of the normal legislative session is an "extraordinary session" when convened by the governor, *see* MO. CONST. art. IV, § 9, and a "special session" when convened by super-majorities in both legislative chambers, *see id.* art. III, § 20(b).

[4]While "[d]isapproval of partisan gerrymandering dates back to the founding," partisan advantage is "a constitutionally permissible criterion that States may rely on as desired." *Louisiana v. Callais*, 146 S. Ct. 1131, 1156 (2026).

vote by filing with the Secretary of State "petitions signed by five percent of the legal voters in each of two-thirds of the congressional districts in the state." *Id.* § 52(a). According to Secretary Hoskins, this requirement thus requires signatures from approximately 3.3% of Missouri's legal voters. State Br. 3, 16. The petition must be submitted within the 90-day period before the bill takes effect. MO. CONST. art III, § 52(a).

Some organizations and individuals dissatisfied with the outcome of the extraordinary session immediately pursued a statewide vote on the 2025 map. Before the ink dried on the governor's signature, on September 29, 2025, People Not Politicians and its executive director, Richard von Glahn (collectively, "PNP"), submitted a petition to Secretary Hoskins seeking to force a referendum vote on H.B. 1. Prior to the 90-day deadline, PNP submitted, by its calculation, more than 300,000 referendum petition signatures to Secretary Hoskins on December 9, 2025. PNP Br. 11.

Upon receipt of a referendum petition, the Secretary bears responsibility for determining whether the petition may be certified for the ballot.[5] *See* Mo. Rev. Stat. §§ 116.120–116.150. The Secretary must determine that the petition "complies with the Constitution of Missouri" and applicable state law. *Id.* § 116.120.1. The Secretary also must verify that the petition has been signed by a sufficient number of Missouri voters. *Id.* § 116.130.1. The parties agree that, under state law, *see id.* § 116.150.3, Secretary Hoskins had until August 4, 2026, to issue a certificate of sufficiency or insufficiency on the referendum petition for the 2025 map. *See* State Br. 11; PNP Br. 11.[6]

---

[5]Referendum measures are placed on the November general election ballot unless the General Assembly orders a special election. MO. CONST. art. III, § 52(b).

[6]One group of amici claim, without evidence, that "[t]here is no question that the Secretary violated Missouri law" in conducting the August 2026 primary election under the 2025 map. 110 Mo. Voters Br. 24. No party or amicus has identified any law that Secretary Hoskins violated in conducting the August 2026 primary election under the 2025 map.

PNP and its allies repeatedly—and unsuccessfully—filed cases in state court that would prevent the 2025 map from being used in the August 2026 primary election. Both a Missouri trial court and the Missouri Supreme Court rejected a challenge to the governor's ability to convene the extraordinary session that passed the 2025 map. *See NAACP Mo. State. Conf. v. Kehoe*, 734 S.W.3d 338, 343 (Mo. 2026). Both a Missouri trial court and the Missouri Supreme Court rejected a challenge to the General Assembly's ability to redistrict more than once per decade. *See Luther v. Hoskins*, 730 S.W.3d 567, 574 (Mo. 2026). Two Missouri trial courts and the Missouri Supreme Court rejected challenges to the 2025 map's compactness, population division, and contiguity. *See Healey v. State*, 732 S.W.3d 827, 852 (Mo. 2026). And both a Missouri trial court and the Missouri Supreme Court rejected a challenge to Secretary Hoskins' determination that the filing of a referendum petition did not automatically suspend the 2025 map under state law. *See Maggard v. State*, 733 S.W.3d 411, 421 (Mo. 2026). Until September 3, 2026, the 2025 map withstood every legal challenge against it.

As a result, Missouri conducted virtually all of its 2026 congressional district elections to date under the 2025 map. Starting February 24, 2026, candidates began filing for Missouri's eight congressional districts. *See* Mo. Rev. Stat. § 115.349.2. When candidate filing closed on March 31, 2026, *id.* § 115.349.1, more than 60 candidates had filed to run for Congress, *see Certified Candidate List: 2026 Primary Election*, MO. SEC'Y STATE, https://perma.cc/7VUD-8YK2 (last visited Sept. 20, 2026). By the time that the August 2026 primary election arrived, "[m]ore than $6.5 million ha[d] been spent on broadcast ads to influence congressional primaries, mainly in the 1st, 5th and 6th Districts." Rudi Keller, *Missouri turnout could hit 1.4 million as ballot measures drive primary interest*, MO. INDEP. (Aug. 3, 2026), https://perma.cc/Q54N-TY8T. Advocacy groups invested more than $3.5 million in the Fifth Congressional District Republican primary election alone. Rudi Keller, *Missouri congressional incumbents flush with cash heading into primary election*, MO. INDEP. (July 24, 2026), https://perma.cc/M3VA-58BK.

More than 1.2 million Missourians voted in the primary election on August 4, 2026. Representative Robert "Bob" Onder won the Republican nomination for the Third Congressional District. Candidate Richard "Rick" Brattin won the Republican nomination for the Fifth Congressional District. Because they received the greatest number of votes in the August 2026 primary election, Representative Onder and Candidate Brattin "shall be the only candidate of that party for the office at the general election," and their names "shall be placed on the official ballot at the general election unless [they are] removed or replaced as provided by law." Mo. Rev. Stat. § 115.343.

Also on August 4, 2026, Secretary Hoskins issued a certificate of insufficiency for the referendum petition "because the Missouri Constitution does not authorize a referendum on congressional redistricting plans passed by the General Assembly." *See* Stipulated Ex. 5, *von Glahn v. Hoskins*, No. 26AC-CC00440 (Mo. Cir. Ct. Aug. 18, 2026).[7] Secretary Hoskins' certificate of insufficiency incorporated by reference and attached an opinion by the Missouri Attorney General, which concluded that the "Constitution and federal law require Missouri election officials to enforce House Bill 1 during the November 2026 election." *See id.*

Von Glahn sued Secretary Hoskins in state court one hour after Secretary Hoskins announced his decision. Von Glahn sought to enjoin the Secretary "and those acting in concert with him from taking any further steps to implement or mandate the use of HB 1." Pet. ¶ 61, *von Glahn v. Hoskins*, No. 26AC-CC00440 (Mo. Cir. Ct. Aug. 4, 2026). The state trial court issued judgment in favor of Secretary Hoskins on August 19, 2026. *See* Judgment, *von Glahn v. Hoskins*, No.

---

[7]PNP asks the Court to take judicial notice of the parties' "filings in the state-court action and at the U.S. Supreme Court," which "were not formally made part of the record at the district court" "[d]ue to the fast-moving nature of this case." PNP Br. 9 n.1. "[F]ederal courts may *sua sponte* take judicial notice of proceedings in other courts if they relate directly to the matters at issue." *Conforti v. United States*, 74 F.3d 838, 840 (8th Cir. 1996) (citation omitted). The Court grants PNP's request and takes judicial notice of filings and proceedings in other courts directly relating to this matter, which are referenced as appropriate in this opinion.

26AC-CC00440 (Mo. Cir. Ct. Aug. 19, 2026). In its ruling, the state trial court found that using the 2022 map instead of the 2025 map in the general election "would move hundreds of thousands of voters into different districts for the imminent 2026 general election compared to the districts in which they cast their ballots in the August primary elections . . . ." *Id.* ¶ 20.

Von Glahn appealed to the Missouri Supreme Court on August 20, 2026, which ordered expedited briefing[8] in advance of an expedited oral argument on September 2, 2026. The day after the oral argument, on September 3, 2026, the Missouri Supreme Court reversed the trial court. The Missouri Supreme Court ordered Secretary Hoskins "to issue a certificate of sufficiency as to the referendum petition . . . to place the referendum petition on the November 2026 general election ballot, and to take any and all additional steps necessary to place the referendum petition on the ballot at that election before September 8, 2026." *von Glahn v. Hoskins*, --- S.W.3d ---, 2026 WL 2628846, at *7 (Mo. Sept. 3, 2026). The Missouri Supreme Court also "restrained and enjoined" Secretary Hoskins "and all of those acting in concert with him . . . from implementing, using, or mandating the use of the congressional redistricting in HB 1 for the November 2026 general election or at any other time thereafter unless and until HB 1 is approved by the voters at the November 2026 general election and takes effect 30 days thereafter." *Id.* At the same time that it issued its judgment, which prohibited any post-judgment motions, the Missouri Supreme Court also issued its mandate.

Secretary Hoskins immediately sought to stay the Missouri Supreme Court's ruling based on arguments under the Constitution that the Missouri Supreme Court declined to address. Within hours of the decision's release, Secretary Hoskins asked the Missouri Supreme Court to stay its injunction while Secretary Hoskins pursued an emergency application to the Supreme Court. The Missouri Supreme Court overruled Secretary Hoskins's stay motion on September 4, 2026, in an unreasoned

[8]The Supreme Court ordered von Glahn to file his brief by noon on August 25, 2026; Secretary Hoskins to file his brief by noon on August 27, 2026; and von Glahn to file his reply brief by noon on August 31, 2026.

order. Later that day, Secretary Hoskins filed an emergency application for stay and administrative stay pending appeal with the Supreme Court. Justice Kavanaugh, the circuit justice for the Eighth Circuit, denied Secretary Hoskins's application on September 8, 2026. *See Hoskins v. Von Glahn*, No. 26A304, 2026 WL 2647016, at *1 (U.S. Sept. 8, 2026).

While Secretary Hoskins pursued his emergency stay application to the Supreme Court, Representative Onder, Candidate Brattin, and two voters, Patricia "Pat" Thomas and Debra Havens (collectively, the "Plaintiffs"), filed this lawsuit against Secretary Hoskins in the district court. Representative Onder and Candidate Brattin (collectively, the "candidate Plaintiffs") alleged that using the 2022 map for the November 2026 general election would significantly change their congressional districts from the August 2026 primary election. Thomas and Havens (collectively, the "voter Plaintiffs") alleged that they voted in the Fifth Congressional District in the August 2026 primary election, but they would vote in the Third Congressional District if the 2022 map were used in the November 2026 general election. Plaintiffs alleged that using a different congressional district map in the general election than in the primary election would violate the Elections Clause, Article I, Section 2, and the Equal Protection Clause. Plaintiffs moved for a temporary restraining order to require use of the 2025 map in the November 2026 general election.

Shortly after Justice Kavanaugh denied Secretary Hoskins' emergency application to stay the Missouri Supreme Court's decision on September 8, 2026, the district court granted Plaintiffs' motion for a temporary restraining order. The district court found that Plaintiffs were likely to succeed on their claims that using the 2022 map in the November 2026 general elections violated Article I, Section 2 and the Equal Protection Clause. The district court "enjoin[ed], on federal law grounds, . . . Hoskins—as well as his officers, agents, employees, and attorneys—from implementing, using, publishing, distributing, or mandating the use of any congressional district map other than the HB 1 map for the November 3, 2026 general election." R. Doc. 35 at 13. The temporary restraining order "remains in effect" through September 22, 2026.

PNP immediately sought to stay the district court's ruling. Both the district court and this Court denied PNP's emergency stay motions on September 9, 2026. However, on September 10, 2026, the Supreme Court granted PNP's emergency stay application in a short order. *See People Not Politicians v. Onder*, No. 26A326, 2026 WL 2659767, at *1 (U.S. Sept. 10, 2026). The Court stayed the district court's temporary restraining order "pending the disposition of the appeal in the United States Court of Appeals for the Eighth Circuit and disposition of a petition for a writ of certiorari in this Court, if such a writ is timely sought." *Id.*

Because Secretary Hoskins advised local election authorities to use the 2025 map after receiving the district court's temporary restraining order, in the two days following the district court's temporary restraining order, the Missouri Supreme Court conducted expedited contempt proceedings. After the Supreme Court's stay, Secretary Hoskins advised local election authorities of the stay and directed them to use the 2022 map. PNP App. 738. The Missouri Supreme Court ultimately held Secretary Hoskins in contempt, but concluded that he purged the contempt by directing local election authorities to use the 2022 map.

Pursuant to the Supreme Court's order, and in light of the looming November 2026 general election and associated deadlines, this Court scheduled expedited briefing and arguments on PNP's appeal of the district court's temporary restraining order. Plaintiffs cross-appealed the district court's decision on their claim under the Elections Clause.[9]

II.

This Court reviews de novo the legal issues underlying a district court's injunctive relief order, including questions of jurisdiction, abstention, and the merits of the underlying claims. *See Revenue Mgmt. Sols., LLC v. Com. Bank*, 183 F.4th

[9]Even though Plaintiffs were not aggrieved by the district court's decision, because this Court is resolving this case on the merits, the Court grants Plaintiffs' motion to consolidate their appeal with PNP's appeal.

618, 624 (8th Cir. 2026). The Court reviews the district court's decision to not require a bond for abuse of discretion. *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991).

A.

"The Judiciary Act of 1789 'established the general principle that only final decisions of the federal district courts would be reviewable on appeal.'" *Abbott v. Perez*, 585 U.S. 579, 594 (2018) (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83 (1981)). Congress later created an exception that "gives the courts of appeals jurisdiction over '[i]nterlocutory orders of the district courts' 'granting, continuing, modifying, refusing or dissolving injunctions,' 'except where a direct review may be had in the Supreme Court.'" *Id.* (quoting 28 U.S.C. § 1292(a)(1)). Pursuant to this exception, this Court has jurisdiction to review a district court's interlocutory order granting a preliminary injunction. *See La Belle Dairy, LLC v. Sharpe Hldgs., Inc.*, 183 F.4th 606, 611 (8th Cir. 2026). Yet even under this exception, this Court generally lacks jurisdiction "to hear an interlocutory appeal from the district court's grant or denial of a TRO." *In re Rutledge*, 956 F.3d 1018, 1026 (8th Cir. 2020).[10]

However, in limited circumstances, this Court has jurisdiction over a temporary restraining order when it "has the 'practical effect' of granting an injunction." *La Belle Dairy*, 183 F.4th at 611 (quoting *Abbott*, 585 U.S. at 594). The Supreme Court implicitly determined that it had jurisdiction when it granted PNP's emergency stay application. *See People Not Politicians*, 2026 WL 2659767, at *1. Following the Supreme Court's stay order, all parties agree that this Court has jurisdiction to review the appeal. PNP Br. 1; State Br. 1; Pls. Br. 12–13. The district court's temporary restraining order effectively requiring use of the 2025 map in the November 2026 general election would have governed ballot printing and mailing

[10]The Court cited *Rutledge* when it denied PNP's motion to stay the district court's temporary restraining order, explaining alternative reasons that "we either lack jurisdiction over the appeal or, based on the briefing we have so far, the stay factors have not been met."

of absentee ballots, which is "in practical effect a preliminary injunction." *La Belle Dairy*, 183 F.4th at 612. Therefore, the Court concludes that this is a limited circumstance in which it has jurisdiction to hear this appeal.

Plaintiffs argue that PNP lacks both Article III and appellate standing because PNP has succeeded in its effort to place the 2025 map referendum on the November 2026 general election ballot.[11] This Court concludes that PNP has standing.

B.

PNP raises five arguments why this Court should not reach the merits of this appeal: three different jurisdictional arguments, an abstention argument, and a mootness argument. PNP also contends that the district court abused its discretion by failing to require a bond. The Court rejects each argument.

1.

PNP first argues that the district court lacked jurisdiction because a three-judge court was required. Under federal law, "[a] district court of three judges shall be convened … when an action is filed challenging the constitutionality of the apportionment of congressional districts . . . ." 28 U.S.C. § 2284(a). But unlike the previous version of Section 2284, the "duty to refer the matter for convening of a three-judge court" is not triggered upon the "'filing of the application' to enjoin an unconstitutional state law." *Shapiro v. McManus*, 577 U.S. 39, 43–44 (2015). Instead, "the current § 2284(b)(1) triggers the district judge's duty "'[u]pon the filing of a *request* for three judges.'" *Id.* at 44 (emphasis in original) (quoting 28 U.S.C. § 2284(b)(1)). Congress' amendment to the statute makes clear that a request must

[11]At oral argument, counsel for PNP represented that, like the voter Plaintiffs, von Glahn resides in a different congressional district under the 2025 map than he did under the 2022 map. The Court has not found the factual support for this representation in the affidavit that von Glahn filed in support of PNP's motion to intervene below or elsewhere in the record for this case.

be filed before the district court must refer the matter for convening of a three-judge court.

PNP claims that it "request[ed] a three-judge panel," PNP Br. 16, but it never did. To support its assertion, PNP's sole citation is to the motion to dismiss that it filed at the district court. *See id.* (citing PNP App. 55–74, R. Doc 12–4). On the last page of its motion to dismiss, PNP faulted Plaintiffs for not requesting a three-judge court. PNP App. 73. PNP did not file a stand-alone request for a three-judge court, nor has it identified any statement in the record in which it affirmatively requested such a court. Without a request for a three-judge court, the law did not require the district court to refer this matter for the convening of a three-judge court.

Nor would PNP prevail on this point even if it had filed a request for a three-judge court. While the Court doubts that an action contesting which map Missouri should use in the November 2026 election "challeng[es] the constitutionality of the apportionment of congressional districts" handled by three-judge courts, 28 U.S.C. § 2284(a), federal law allows the district court to "grant a temporary restraining order" without referring the matter for convening of a three-judge court, *id.* § 2284(b)(3). Accordingly, the district court did not lack jurisdiction when it issued a temporary restraining order without referring the matter for the convening of a three-judge court.

2.

PNP next argues that the district court lacked jurisdiction because this lawsuit is neither a case nor a controversy because Plaintiffs and Secretary Hoskins "take the same position on the constitutionality" of using the 2022 map in the November 2026 general election. *INS v. Chadha*, 462 U.S. 919, 939 (1983). Contrary to PNP's argument, adversity still exists between the government and a private party who agree on a litigation position if the government is bound to act in a way adverse to the legal interests of the private party. *Id.* at 939–40. "[I]t would be a curious result if, in the administration of justice, a person could be denied access to the courts

because the Attorney General of the United States"—or here, the Missouri Attorney General—"agreed with the legal arguments asserted by the individual." *Id.* at 939.

Notwithstanding any agreement between Plaintiffs and Secretary Hoskins on litigation positions, the Missouri Supreme Court's injunction in *von Glahn* requires Secretary Hoskins to act in an adverse manner to Plaintiffs. Indeed, the day that Plaintiffs filed this lawsuit, Secretary Hoskins advised local election authorities to use the 2022 map. *See* Hannah Falcon, *Missouri Supreme Court Decision to Block Republican-Drawn Map Leaves Questions*, KVFS News 12 (Sep. 4, 2026), https://perma.cc/R5TN-BE8Q. In the days since, Secretary Hoskins has formally directed local election authorities to use the 2022 map. PNP App. 738. This Court's decision thus will have "real meaning," *Chadha*, 462 at 939: if the Court rules for Plaintiffs, Missouri will use the 2025 map; if the Court rules against Plaintiffs, Missouri will use the 2022 map. Therefore, the parties are adverse.

3.

PNP also argues that the district court lacked jurisdiction because the *Rooker-Feldman* doctrine bars this action. The *Rooker-Feldman* doctrine precludes suits in federal court that seek "what in substance would be appellate review of [a] state judgment." *T.M. v. Univ. of Md. Med. Sys. Corp.*, 146 S. Ct. 1739, 1749 (2026) (alteration in original) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994)). *Rooker-Feldman* applies to "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

*Rooker-Feldman* does not apply here because Plaintiffs were not parties to the state-court action and because the complaint here raised only federal-law claims that the Missouri Supreme Court did not address in the state-court action. *See von Glahn*, 2026 WL 2628846, at *2 n.5 (Mo. Sept. 3, 2026) (expressly limiting its decision to an issue of state law). In a case remarkably similar to this action, the Supreme Court

emphasized that *Rooker-Feldman* is a "narrow doctrine" that "does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment." *Lance v. Dennis*, 546 U.S. 459, 464, 466 (2006). In *Lance*, Colorado citizens filed suit in federal district court to force the Colorado Secretary of State to use the Colorado General Assembly's redistricting plan, rather than the plan imposed by the Colorado Supreme Court. *Id.* at 460–61. The district court ruled that *Rooker-Feldman* barred the suit on the theory that the citizen-plaintiffs were in privity with the Colorado General Assembly, which was a losing party in the earlier state-court action. *Id.* at 462. The Supreme Court reversed, explaining that "*Rooker–Feldman* is not simply preclusion by another name." *Id.* at 466. At oral argument in this case, counsel for PNP acknowledged that "*Lance* is a problem for [their] *Rooker* analysis." *Onder v. von Glahn*, No. 26-2797, Hearing at 23:51–56 (8th Cir. Sept. 17, 2026).

Like *Lance*, Plaintiffs "were plainly not parties to the underlying state-court proceeding." *Lance*, 546 U.S. at 465. Accordingly, the *Rooker-Feldman* doctrine does not bar this action.

4.

PNP next argues that the district court should have abstained under *Younger v. Harris*, 401 U.S. 37 (1971). As a general rule, federal courts are "obliged to decide cases within the scope of federal jurisdiction," even if "a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). "*Younger* abstention only applies to three 'exceptional' categories of cases: (1) 'ongoing state criminal prosecutions;' (2) 'certain civil enforcement proceedings;' and (3) 'pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Wassef v. Tibben*, 68 F.4th 1083, 1087 (8th Cir. 2023) (quoting *Sprint Commc'ns*, 571 U.S. at 78). The Supreme Court recognized these three categories in *New Orleans Public Service, Inc. v. Council of the City of New Orleans* ("*NOPSI*"), 491 U.S. 350, 368 (1989).

PNP only argues the third *NOPSI* category, relying on the Missouri Supreme Court's contempt proceedings to argue that state proceedings were "ongoing." However, the action before this Court does not interfere with the Missouri Supreme Court's contempt proceedings because those proceedings did not begin until after the district court issued its temporary restraining order, and they are not pending now. The Supreme Court has recognized that "the relevant principles of equity, comity, and federalism 'have little force in the absence of a pending state proceeding.'" *Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (quoting *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 509 (1972)). When no state proceeding "is pending at the time the federal complaint is filed," federal litigation does not duplicate or disrupt the state's legal system. *Id.* In this case, the Missouri Supreme Court issued its mandate before Plaintiffs filed their federal complaint, and no contempt proceedings were pending at that time. "Requiring the federal courts totally to step aside when no state [civil proceeding] is pending against the federal plaintiff would turn federalism on its head." *Id.* at 472.

Nor did Plaintiffs have the "opportunity to present their federal claims in the state proceedings." *Juidice v. Vail*, 430 U.S. 327, 337 (1977). They could not; Plaintiffs were not parties to the state proceedings. Secretary Hoskins also was prevented from asserting in the state proceedings any of the federal claims pending before this Court. *von Glahn*, 2026 WL 2628846, at *2 n.5 (noting that "claimed federal law violations and whether the congressional redistricting in HB 1 should or must remain in place through the 2026 election cycle" were arguments "outside the scope of Secretary Hoskins's authorized statutory review in section 116.120.1").[12]

---

[12]The Missouri Supreme Court also found that Secretary Hoskins did not properly preserve these federal arguments by attaching an opinion from the Attorney General of Missouri containing them. *See von Glahn*, 2026 WL 2628846, at *2 n.5. This finding does not affect this Court's analysis since the Missouri Supreme Court then explained that it would not have considered the federal arguments even had they been preserved. *See id.*

State proceedings ended before Plaintiffs filed their federal complaint initiating this action. Plaintiffs were not part of those proceedings, and Secretary Hoskins did not have the opportunity in the state proceedings to present the federal claims pending before this Court. Accordingly, *Younger* abstention is inapplicable here. Because no *NOPSI* category is present, the Court need not consider the *Middlesex* factors.[13]

5.

PNP also argues mootness. Article III limits federal-court jurisdiction to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. A case becomes moot under Article III "when the issues presented are no longer 'live'" and "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citations omitted). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307–08 (2012) (citation omitted). "A court with jurisdiction has a 'virtually unflagging obligation' to hear and resolve questions properly before it." *FBI v. Fikre*, 601 U.S. 234, 240 (2024) (citation omitted).

In their brief, PNP identifies two factual developments that it believes render this appeal "likely moot." PNP Br. 3. First, PNP argues that the Supreme Court's stay of the district court's temporary restraining order renders the order "unenforceable" on a timeline that "will likely extend beyond September 22, when the [temporary restraining order] expires." *Id.* at 3–4. However, the Supreme Court did not vacate or modify the temporary restraining order or rule on its validity; it

[13]The district court also rejected arguments made by PNP that the court should abstain under *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), and that the Anti-Injunction Act applied. PNP does not raise these arguments on appeal, and thus they are waived. *See Beadle v. City of Omaha*, 983 F.3d 1073, 1075 (8th Cir. 2020) ("by not briefing the issue, [the appellant] has waived review").

merely stayed that order. *People Not Politicians*, 2026 WL 2659767, at *1. In addition, this Court is issuing a final judgment on the merits before September 22, 2026, which wholly removes the temporary restraining order's expiration as a basis for mootness.

PNP's second argument is that Secretary Hoskins "has now directed election officials to use the 2022 congressional map." PNP Br. 4. This argument, which relies on *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), "confuses mootness with the merits." *Chafin*, 568 U.S. at 174. PNP does not cite any decision in which a court applied *Purcell* to find a case moot, and the Court declines to apply *Purcell* in that manner.

At oral argument, PNP also pointed to certain election deadlines that it claims affect mootness: the deadline for transmitting military and overseas ballots, and the commencement of absentee voting. The Court examines each in turn.

The Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") requires Missouri to "transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter … in the case in which the request is received at least 45 days before an election for Federal office, not later than 45 days before the election." 52 U.S.C. § 20302(a)(8)(A). While the federal deadline for UOCAVA ballot transmission for the November 3, 2026, general election fell on September 19, 2026, Missouri moved this Saturday deadline to the preceding business day, September 18, 2026. Mo. Rev. Stat. § 115.914.1.[14] But as counsel for Plaintiffs noted at oral argument, UOCAVA itself contemplates circumstances in which a State cannot comply with that deadline: Congress authorized hardship waivers where, among other circumstances, a "legal contest" creates an undue

[14] If an absentee ballot application from a voter covered by UOCAVA arrives within 45 days of election, the ballot must be sent to the voter "not later than two business days after the application arrives." Mo. Rev. Stat. § 115.914.3. This deadline would arrive no sooner for any voter than September 22, 2026, and thus it has not yet passed.

hardship preventing timely transmission. 52 U.S.C. § 20302(g)(2)(B)(ii). A state may request such a waiver "as soon as practicable." *Id.* § 20302(g)(3)(B). The Court need not decide whether Missouri would receive such a waiver.[15] Instead, its availability demonstrates that UOCAVA ballot transmission on September 18, 2026, is not itself a jurisdictional point of no return and effectual relief remains available. *Chafin*, 568 U.S. at 172.

Though uncommon, this situation is not unprecedented. Courts around the country have ordered ballot changes after absentee ballots already have been distributed under UOCAVA. For example, on October 2, 2002—just 34 days before the general election— the New Jersey Supreme Court granted a request by the New Jersey Democratic State Committee to replace U.S. Senator Robert Torricelli on the November 2002 general election ballot. *See New Jersey Democratic Party, Inc. v. Samson*, 814 A.2d 1028, 1031 (N.J. 2002). The New Jersey Supreme Court acknowledged that approximately 1,700 absentee ballots had been mailed "and few had been returned." *Id.* at 1039. However, the New Jersey Supreme Court was "[c]onvinced that the absentee ballots can be handled in a manner that will not disenfranchise absentee voters," including "preparation of an explanatory letter to all voters to whom a revised ballot has been sent" and "military and civilian absentee ballots to be given first priority in preparation and mailing." *Id.* at 1040. Because most new absentee ballots "could be prepared and mailed within five business days,"

---

[15] Guidance for UOCAVA specifically identifies "a ballot legality challenge" as an "emergent circumstance[]" justifying a hardship waiver. *Guidance on Procedures and Processes for Submitting Uniformed and Overseas Citizens Absentee Voting Act Undue Hardship Waivers*, Memorandum for Chief State Election Officials, DOD-UPR-00003 (Apr. 18, 2022), https://perma.cc/JGG8-QWDE. In 2022, for example, the Department of Defense determined that Ohio established an undue hardship due to a legal contest in which the Ohio Supreme Court required the redrawing of Ohio's congressional district map, which prevented local election authorities from meeting UOCAVA's 45-day deadline in advance of a primary election. Letter from Under Secretary of Defense Gilbert R. Cisneros, Jr. to Ohio Secretary of State Frank LaRose (Mar. 4, 2022), https://perma. cc/2QA3-RLVU (denying hardship waiver on other grounds by finding Ohio's comprehensive plan insufficient).

*id.* at 1039, the New Jersey Supreme Court rejected the Republican nominee's UOCAVA arguments because "the expeditious handling of amended absentee ballots will assure that the voters who use those ballots will have their votes counted in the general election," *id.* at 1041.[16]

Other courts also have concluded that ballot changes may be made after UOCAVA ballots have been distributed. *See State ex rel. DeMora v. LaRose*, 217 N.E.3d 715, 726 (Ohio 2022) ("While we are mindful of the burdens it may place on a few boards to prepare a new ballot after the UOCAVA date has passed, we will not hesitate to order that a wrongly excluded candidate be added to the ballot, notwithstanding the passage of the UOCAVA date."); *Wilson v. Hosemann*, 185 So. 3d 370, 380 (Miss. 2016) (UOCAVA "does not 'govern ballot content'") (quoting *United States v. Pennsylvania*, No. 1:CV-04-830, 2004 WL 2384999, at *4 (M.D. Pa. Oct. 20, 2004)); *see also Hawkins v. Wisconsin Elections Comm'n*, 948 N.W.2d 877, 896 (Wis. 2020) (Ziegler, J., dissenting) ("Ballots already sent by e-mail [to UOCAVA voters] could be quickly and easily retrieved by sending another e-mail directing the voter to ignore or destroy the first ballot as the court has ordered ballots reprinted and instructing that as soon as the new ballot is available, it will be e-mailed."). Here, the alleged harm did not arise until September 3, 2026, only two months before the November 2026 general election; Plaintiffs did not cause the harm from which they seek relief and are instead seeking to restore the status quo under which the candidate Plaintiffs campaigned for approximately one year and under which the voter Plaintiffs voted in the August 2026 primary election; Plaintiffs expeditiously sought injunctive relief the day after the Missouri Supreme Court's decision; and local election authorities transmitted ballots under UOCAVA just one business day before this Court's decision. In light of these considerations and the

[16] The Supreme Court denied the Republican nominee's stay application and petition for a writ of certiorari. *See Forrester v. New Jersey Democratic Party, Inc.*, 537 U.S. 1083 (2002). The Republican nominee raised UOCAVA compliance as a question presented. *See* Pet., *Forrester v. New Jersey Democratic Party, Inc.*, No. 02-555 (U.S. Oct. 8, 2002).

cases previously cited, the transmission of ballots on September 18, 2026 does not moot this case.

For all Missouri voters not covered by UOCAVA, absentee ballots may be requested and cast beginning on September 22, 2026. Mo. Rev. Stat. § 115.281.1. That deadline has not yet arrived, and thus general absentee voting has not yet begun. Accordingly, the September 22, 2026, absentee ballot commencement date does not moot this case.[17]

6.

Finally, PNP argues that the district court abused its discretion by failing to require a bond under Rule 65(c). PNP lacks standing to raise this argument because it was not the party "enjoined or restrained." *See* Fed. R. Civ. P. 65(c). In addition, PNP's argument is moot since this Court is entering a final judgment.

---

[17]Other courts have ordered ballot changes that delayed the commencement of absentee voting because ballots had to be reprinted. For example, three days after absentee ballots were supposed to be mailed under state law, *see* N.C. Gen. Stat. § 163-227.10, the North Carolina Supreme Court issued a decision requiring Robert F. Kennedy, Jr.'s name to be removed as a presidential candidate on the 2024 general election ballot. *See Kennedy v. N. Carolina State Bd. of Elections*, 905 S.E.2d 55, 58 (N.C. 2024). The North Carolina State Board of Elections estimated that the process to update the ballots would "take at least two weeks to complete." *Id.* at 70 (Riggs, J., dissenting). However, the North Carolina Supreme Court ordered the printing of new ballots despite the "considerable time and effort by our election officials and significant expense to the State." *Id.* at 58; *see also Holloway v. Byrne*, 874 A.2d 504, 505 (N.J. 2005) (ordering, 20 days before a municipal election, new ballots prepared and absentee ballots "reprinted and remailed to absentee voters with appropriate instructions to the voters on the need to submit the revised ballot even if the prior version had been returned").

III.

Having dismissed PNP's procedural objections, the Court now considers Plaintiffs' claims. Before the Court is a purely legal issue of whether Missouri should use the 2025 map or the 2022 map. No discovery or further hearing is needed to decide this case, and the Court is not presented with "a tentative and provisional record with conflicting material facts." *Campaign for Fam. Farms v. Glickman*, 200 F.3d 1180, 1187 (8th Cir. 2000). Accordingly, this Court may reach the merits and issue a final judgment. *See id.* (citing cases).

In reaching its decision, this Court does not review the decision of the Missouri Supreme Court. That court rendered a decision interpreting Missouri's state constitutional referendum provision. Secretary Hoskins may appeal that decision in a petition for a writ of certiorari to the Supreme Court. Instead, this Court reviews whether using the 2022 map in the November 2026 general election after using the 2025 map in the August 2026 primary election violates the United States Constitution.

A.

In their verified complaint, Plaintiffs allege that "[h]olding a general election under a different congressional map than the one used in the August 4 primary would violate Article I, Section 2 of the U.S. Constitution." R. Doc. 1 ¶ 75. The district court agreed, concluding that "[b]ecause voters have already cast their ballots in the primaries . . . , replacing the applicable map for the general election would disenfranchise voters of their votes in the primary election, in clear violation of Article I, Section 2." R. Doc. 35 at 9. The district court further found that "[v]oters reassigned to [a] different district would have cast their votes in vain for candidates now connected to other districts, effectively nullifying their votes." *Id.*

The Court begins with the constitutional text. Article I, Section 2 provides that "[t]he House of Representatives shall be composed of Members chosen every

second Year by the People of the several States . . . ." U.S. CONST. art. I, § 2, cl. 1. This provision creates a "right of qualified voters within a state to cast their ballots and have them counted at Congressional elections." *United States v. Classic*, 313 U.S. 299, 315 (1941). The Supreme Court has interpreted Article I, Section 2 to mean that "no matter where he live[s], each voter should have a voice equal to that of every other in electing members of Congress." *Wesberry v. Sanders*, 376 U.S. 1, 10 (1964).

These principles are not limited to general elections. Instead, Article I, Section 2 "applies to the entire process by which federal legislators are chosen." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 227 (1986). Thus, "[w]here the state law has made the primary an integral part of the procedure of choice," Article I, Section 2 encompasses "the right to choose at a primary election, a candidate for election as representative." *Classic*, 313 U.S. at 315, 318. "If primaries were not subject to the requirements" in Article I, Section 2, "the fundamental principle of free electoral choice would be subject to the sort of erosion these prior decisions were intended to prevent." *Tashjian*, 479 U.S. at 227.

Missouri has made its primary "an integral part of the general election laws of the state for the election of public officers, including Members of Congress." *Klein v. United States*, 176 F.2d 184, 187 (8th Cir. 1949). State law requires "all candidates for elective office" to be nominated at a primary election, Mo. Rev. Stat. § 115.339, and provides that the candidate receiving the most primary votes becomes the party's sole candidate for that office at the general election, *id.* § 115.343. In Missouri, "[i]t is clear that the vote at the primary election determines the name of the candidate of a political party to appear on the ballot at the general election, and we think it follows that the right to vote at such a primary for the nomination of candidates for Congress, and to have the vote counted as cast, is a right secured by the Federal Constitution." *Klein*, 176 F.2d at 187. Missouri's primary and general elections are thus "fused" "into a single instrumentality for choice of officers." *Smith v. Allwright*, 321 U.S. 649, 660 (1944).

Secretary Hoskins reports that PNP has "never contested that—if Missouri's congressional map changes—over one million Missourians will vote for representatives in the General Election that they never had the opportunity to consider in the Primary Election." State Br. 41. Based on 2020 Census population data, Amicus Club for Growth calculates that "1,419,242 Missourians—approximately 23.1 percent of the State's population—reside in different districts under the two maps." Club for Growth Br. 14. The Club for Growth further estimates that approximately 284,000 Missourians "voted in one district but will receive a general-election ballot for another," which again is about one-fourth of all Missouri voters who cast a congressional primary ballot. *Id.* at 15. If these estimates are correct, more than 1.4 million Missourians could not vote for the congressional district nominees who will appear on their November 2026 general election ballot, and more than a quarter-million Missourians who voted in the August 2026 primary election cast a vote for a congressional district candidate who now cannot represent them.

The result is that, if the 2022 map is used in the November 2026 general election, some Missouri voters will have more say than others on who represents them in Congress. For example, more than half of the Missourians living in the Fifth Congressional District under the 2025 map used in the August 2026 primary election—57%—will find themselves in other districts if the 2022 map is used in the November 2026 general election. *Id.* at 14–15. As a result, a majority of residents in the Fifth Congressional District had no voice in who will appear on their November 2026 ballot; they will be forced to choose from nominees selected by a minority of residents in the district as well as voters who are no longer in the district.[18] The Supreme Court has rejected this outcome: "It would defeat the

[18]Underscoring this issue, some Missouri voters and unsuccessful primary candidates have challenged Secretary Hoskins' certification of the August 2026 primary election results for the Fifth Congressional District. *See* Pet. ¶ 37, *Hueffmeier v. Hoskins*, No. 26AC-CC00613 (Mo. Cole Cnty. Cir. Ct. Sept. 17, 2026) ("A majority of the electorate that was eligible to participate in the August 4, 2026 Republican primary for the 'Fifth District' will not be eligible to vote in the

principle solemnly embodied in the Great Compromise—equal representation in the House for equal numbers of people—for us to hold that, within the States, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others." *Wesberry*, 376 U.S. at 14. Yet some voters will have a greater voice if the 2022 map is used for the November 2026 general election.

PNP argues that Article I, Section 2 has not been violated because all qualified Missouri voters "had the opportunity to vote in the primary, the primary votes were counted and used to select nominees, and all nominees will appear on the general election ballot." PNP Br. 47. PNP overlooks the important fact that one-in-four Missourians had no opportunity to choose the congressional nominees that will appear on their November 2026 ballot. In addition to those problems already discussed, many districts are drawn in a manner where the primary is the only election that matters. In the 2024 general election, conducted under the 2022 map, the winners of five of Missouri's eight congressional districts received more than 70% of the vote, and two others received more than 60%. *General Election Results – November 5, 2024*, MO. SEC'Y STATE, https://perma.cc/Z2AX-SX6K. "[W]e cannot close our eyes to the fact already mentioned that the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election even though there is no effective legal prohibition upon the rejection at the election of the choice made at the primary and may thus operate to deprive the voter of his constitutional right of choice." *Classic*, 313 U.S. at 319; *see also Klein*, 176 F.2d at 186 ("success in the primary was said to be tantamount to election so that the primary was in effect an election"). Denying approximately one-fourth of Missourians the ability to vote for the nominees that will appear on their November 2026 general election ballot deprives these voters of their constitutional right of choice under Article I, Section 2.

---

November 3, 2026 general election for the Fifth District. Conversely, a substantial body of Republican voters who reside in the Fifth District as it actually exists, and who will cast ballots for that seat in November, were given no opportunity to participate in the selection of the nominee they will be presented with.").

The people's freedom to choose their congressional representatives "was one of the great purposes of our Constitutional scheme of government." *Classic*, 313 U.S. at 316. That free choice is made by a defined constituency. A congressional primary selects the candidates who will compete to represent a particular district, and the general election determines which of those candidates will represent that same district. Article I, Section 2's right to participate in the procedure of choosing a member of Congress requires continuity in the constituency throughout all stages of a single election. Changing district lines between the primary and general election prevents an affected voter from participating in either district's complete procedure of choice.[19]

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry*, 376 U.S. at 17. Missouri's primary is "the initial stage in a two-stage process by which the people choose their public officers." *Storer v. Brown*, 415 U.S. 724, 735 (1974). Missouri cannot deprive more than 1.4 million of its residents of their choice in half of that process without violating Article I, Section 2. "Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right," such that "no matter where he live[s], each voter should have a voice equal to that of every other in electing members of Congress." *Wesberry*, 376 U.S. at 10, 17–18.[20]

---

[19]A voter transferred from District A to District B after the primary participated in selecting District A's nominees but cannot participate in the general election choice between them. At the same time, that voter must make a general election choice between District B's nominees without having participated in their selection. The voter participates in the first stage of the procedure for choosing District A's representative and the second stage of selecting District B's representative but in the complete procedure for neither. The protected right of participation in the choice of representatives cannot be satisfied by giving voters two halves of two different procedures.

[20]This opinion does not hold that voters have the right to vote for a particular candidate or class of candidates. *Contra* PNP Br. 45–46. Neither does this opinion freeze congressional district lines indefinitely or restrict Missouri's authority to

Therefore, this Court holds that, because Missouri used the 2025 map in the August 2026 primary election, using the 2022 map in the November 2026 general election violates Article I, Section 2.

B.

For the same reasons, Plaintiffs make a colorable argument that using the 2022 map in the November 2026 general election also violates the Equal Protection Clause. Based on this provision, the Supreme Court has held that "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Gray v. Sanders* 372 U.S. 368, 379 (1963). "The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote." *Reynolds v. Sims*, 377 U.S. 533, 567 (1964). In other recent redistricting litigation, at least one amicus supporting PNP has argued that changing district maps between the primary election and the general election violates the Equal Protection Clause.[21]

---

redraw them for future elections. Instead, the Court requires continuity of constituency during the 2026 election already underway.

[21]Under a 2026 plan adopted by Galveston County, Texas, "the precinct lines applicable to the upcoming November general election, for both county commissioners and justices of the peace, would be different from the lines used for the March primary election." *In re Rose*, No. 26-0916, 2026 WL 2672098, at *1 (Tex. Sept. 11, 2026). In an emergency petition on behalf of voters filed with the Texas Supreme Court in August 2026, the Campaign Legal Center argued that changing the district maps between the primary election and the general election violated the Equal Protection Clause "by precluding certain voters and potential candidates from participating in the primary election on an equal basis as others." Original Emergency Pet. for Writ of Mandamus at 1, 14–15, *In re Rose*, No. 26-0916 (Tex. Aug. 4, 2026), https://perma.cc/3WKM-2YWJ; *see also id.* at 14–15 (relying on *Gray*, 372 U.S. at 380). The Texas Supreme Court agreed that "the implicit claim that a governmental authority may unsettle the electoral map during an ongoing election for any reason (or none at all) implicates serious constitutional concerns." *In re Rose*, 2026 WL 2672098, at *1. The Texas Supreme Court ultimately found in

However, in light of the Court's decision in favor of Plaintiffs on their Article I, Section 2 claim, it is unnecessary to reach the parties' Equal Protection Clause arguments. Moreover, no party has explicitly addressed the applicable standard of review, and PNP did not argue what state interests might apply (or what discovery, if any, might be needed to support those state interest arguments). Although the Court finds the district court's Equal Protection Clause analysis compelling, given the posture of this case, the Court declines to reach this claim. Similarly, it is unnecessary to reach the parties' arguments on the Elections Clause.

IV.

PNP contends that "the *Purcell* principle bars interference in Missouri's election machinery at this late date." PNP Br. ii. The *Purcell* principle "reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring in grant of applications for stays); *Democratic Nat'l Comm. v. Wis. State Legislature*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay) (same). This principle recognizes that "'late judicial tinkering' … 'can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others.'" *Malliotakis v. Williams*, 146 S. Ct. 809, 811 (2026) (Alito, J., concurring in grant of stay) (brackets accepted) (quoting *Merrill*, 142 S. Ct. at 881) (Kavanaugh, J., concurring in grant of application for stays). "Judicial restraint" thus "not only prevents voter confusion but also prevents election administrator confusion." *Democratic Nat'l Comm.*, 592 U.S. at 1044 (Kavanaugh, J., concurring in denial of application to vacate stay) (brackets accepted). Therefore, Missouri has an

---

favor of the Campaign Legal Center's clients on state law grounds and held that a primary could not be "[d]ecoupl[ed]" from the general election without "chang[ing] the nature of both." *Id.* at *3. In its amicus brief to this Court, the Campaign Legal Center does not mention the Texas Supreme Court's decision or the Equal Protection Clause. *See generally* Campaign Legal Ctr. Br.

"extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J. concurring in grant of application for stays).

Advancing an absolute prohibition on federal-review of last-minute state-court decisions, PNP argues that this Court must reverse because "*Purcell* does not govern whether *state* courts may interpret their own election laws," but "forbids" the district court from "prohibiting implementation of Missouri law as unanimously interpreted by the Missouri Supreme Court." PNP Br. 21 (emphasis in original). Yet "under the U. S. Constitution, the state courts do not have a blank check to rewrite state election laws for federal elections." *Democratic Nat'l Comm.*, 592 U.S. at 1048 n.1 (Kavanaugh, J., concurring in denial of application to vacate stay). "The Constitution provides that state legislatures—not federal judges, not state judges, not state governors, not other state officials—bear primary responsibility for setting election rules." *Id.* at 1041 (Gorsuch, J., concurring in denial of application to vacate stay) (citing U.S. CONST. art. I, § 4, cl. 1). "The provisions of the Federal Constitution conferring on state legislatures, not state courts, the authority to make rules governing federal elections would be meaningless if a state court could override the rules adopted by the legislature simply by claiming that a state constitutional provision gave the courts the authority to make whatever rules it thought appropriate for the conduct of a fair election." *Republican Party of Pa. v. Boockvar*, 592 U.S. 1068, 1070 (2020) (statement of Alito, J., joined by Thomas & Gorsuch, JJ.). Allowing state courts to issue, without any federal-court review, last-minute decisions affecting the conduct of federal elections would increase the volume of last-minute requests to state courts, decrease the public's confidence in the election results, and potentially allow a handful of state judges to render decisions that decide the outcome of a presidential election or party control of Congress. Refusing to correct an erroneous, "late-breaking" state court decision based on the *Purcell* principle would "turn *Purcell* on its head." *Democratic Nat'l Comm.*, 592 U.S. at 1044 (Kavanaugh, J., concurring in denial of application to vacate stay).

For these reasons, "[t]he *Purcell* principle is a presumption against disturbing the status quo." *Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020). "The Constitution's answer" for the status quo "is generally the state legislature," *id.*, which in this case would be the 2025 map codified in H.B. 1. PNP argues that the 2025 map "was never the legal status quo." PNP Br. 41 (citing *von Glahn*, 2026 WL 2628846 at *6 n.8). But that imagines away all the lawful activity conducted under the 2025 map. More than 60 congressional candidates filed under the 2025 map. Candidates and their supporters invested countless hours and millions of dollars implementing primary and general election strategies designed for the 2025 map. More than 1.2 million Missourians voted for congressional candidates under the 2025 map. The 2025 map was the status quo for virtually all of this election cycle until the Missouri Supreme Court issued its September 3, 2026 ruling in *von Glahn*. The Missouri General Assembly "set the status quo," the Missouri Supreme Court "upset it," "and it is our duty, consistent with *Purcell*, to at least preserve the possibility of restoring it." *Carson*, 978 F.3d at 1062.

As the Supreme Court has recognized, the *Purcell* principle is not "absolute." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring in grant of application for stays). Justice Kavanaugh has refined the *Purcell* principle into a four-part test, *see id.*, each of which supports our ruling in favor of Plaintiffs here.

First, "the underlying merits are entirely clearcut in favor of the plaintiff[s]." *Id.* As set forth in Part III of this opinion, the merits are "entirely clearcut" in favor of Plaintiffs on their claims under Article I, Section 2 and the Equal Protection Clause.

Second, "the plaintiff[s] would suffer irreparable harm absent the injunction." *Id.* The voter Plaintiffs are irreparably harmed if they are forced to vote in different districts in the November 2026 general election than the districts in which they voted in the August 2026 primary election. The candidate Plaintiffs are irreparably harmed if they are forced to campaign in different geographic districts with different voters for the November 2026 general election than in the August 2026 primary election.

This harm is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (citation omitted).

Third, "the plaintiff[s] ha[ve] not unduly delayed bringing the complaint to court." *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring in grant of application for stays). Plaintiffs filed this action and moved for injunctive relief just one day after the Missouri Supreme Court's decision in *von Glahn*.

Finally, "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.* In an amicus brief, the Missouri Association of County Clerks & Election Authorities ("MACCEA") raises concerns relating to implementing a new congressional district map. *See* MACCEA Br. 8–11. It is unclear from the local election authorities' brief how many jurisdictions would need to change ballots if this Court ordered use of the 2025 map. *Id.* at 11 n.2 ("Not every election authority would be required to reprint its ballots because some would be in the same congressional district regardless of map used.") It also is unclear from the local election authorities' brief how much cost would be incurred to change the maps. *Id.* at 9 (discussing "in-house ballot printers"), 11 ("*Amicus* members expect that these costs would range anywhere from a couple hundred dollars in a smaller jurisdiction to $15,000 to $30,000 to reprint ballots per county, not including the cost of staff time for reprogramming and proofing.").

The local election authorities do not identify any specific length of time that it would take to implement a new congressional map. Presumably, local election authorities needed only a few days to implement the 2022 map following the rapid activity in the state and federal courts this month. In fact, two MACCEA executive board members, including a signatory to the amicus brief to this Court, assured the Missouri Supreme Court that "[w]hile it is true that the redistricting process is manual and time-intensive for local election officials, … the Court need not consider that concern in this case." Br. of Amici Curiae Rachel Lightfoot, County Clerk & Election Authority of Polk County and Brianna L. Lennon, County Clerk & Election

Authority of Boone County ("Lightfoot and Lennon State Amicus Br.") at 5, *von Glahn v. Hoskins*, No. SC101805 (Mo. Aug. 24, 2026).[22]

Using the 2025 map also will lead to the least amount of confusion for voters subjected to a string of changes this month. For approximately one year, Missouri operated under the 2025 map. During that time, Missourians filed to run for Congress, met candidates, watched campaign advertisements, received campaign mail, and voted under the 2025 map. Any confusion stems from the last-minute decision by a state court to switch the congressional map. "When the constitutionally mandated locus for election decisions is disregarded, whether by a federal court, a state court, a state agency, or a state official, the same rationale that works to prevent election interference by federal courts also works to prevent interference by other entities as well." *Carson*, 978 F.3d at 1062.

Therefore, the Court concludes that *Purcell* supports, not prevents, its decision in favor of Plaintiffs.

V.

Secretary Hoskins has respectfully requested "direct guidance on what effect a federal injunction—issued on federal legal grounds—has on a conflicting state-law injunction issued on state-law grounds." State Br. 33. This is understandable considering Secretary Hoskins's compliance with the district court's temporary restraining order resulted in a contempt proceeding before the Missouri Supreme Court. Although PNP concedes to this Court that the district court's temporary restraining order "effectively nullifie[d]" the Missouri Supreme Court's judgment, PNP Br. 54, PNP argued the opposite in its contempt briefing. *See, e.g.*, Emergency Application for Order Holding Secretary of State in Contempt at 4, *von Glahn v.*

[22]The state court amicus brief explained that the Missouri Centralized Voter Registration system allows local election officials to choose either the 2022 or 2025 maps for the November 2026 general election. Lightfoot and Lennon State Amicus Br. at 6.

*Hoskins*, No. SC101805 (Mo. Sept. 8, 2026) ("This Court should make clear that regardless of other orders (except from the United States Supreme Court) the Missouri Secretary of State must comply with this court's injunction"); Suggestions Regarding Contempt at 12, *von Glahn v. Hoskins*, No. SC101805 (Mo. Sept. 9, 2026) (claiming the Missouri Supreme Court's injunction "is in full force").

The Supremacy Clause provides that "the Judges in every State shall be bound" by the Federal Constitution, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. As the Supreme Court has explained, "this Clause creates a rule of decision" directing state courts that they "must not give effect to state laws that conflict with federal law[ ]." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 488 (2020) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015)). After all, the "historical record makes clear that the Supremacy Clause's exclusive function is to disable state laws that are substantively inconsistent with federal law." *Haywood v. Drown*, 556 U.S. 729, 752 (2009) (Thomas, J., dissenting). Given the conflict between Article I, Section 2 with an interpretation of Missouri law that would suspend a congressional district map for a general election after its use in a primary election, the "*supreme* law of the land," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803) (emphasis in original), prohibits using a different congressional district map in the general election than in the primary election.

Nor does this Court's ruling leave Missouri without a congressional district map. *Contra* Campaign Legal Ctr. Br. 11–13. The Constitution requires Missouri to choose its members to the U.S. House this year. *See* U.S. CONST. art. I, § 2. These elections must be conducted pursuant to a congressional district map established by law. *See* 2 U.S.C. § 2c. Under the Supremacy Clause, the Missouri Supreme Court's decision to suspend the 2025 map must yield to the Constitution's prohibition on using a congressional district map in the general election different from the congressional district map in the primary election. *See Espinoza*, 591 U.S. at 488.

The Court recognizes that election preparations must be made sooner rather than later. The Court is ordering the district court to administratively stay the permanent injunction for seven days to allow for Supreme Court review. If the Supreme Court has not stayed or otherwise altered the permanent injunction by that time, Secretary Hoskins and all others bound by this judgment must fully implement the 2025 map for the November 2026 general election. The Court trusts that the Missouri Supreme Court will respect this Court's decision under the Supremacy Clause.[23] *See Testa v. Katt*, 330 U.S. 386, 393 (1947) ("a state court cannot 'refuse to enforce the right arising from the law of the United States because of conceptions of impolicy or want of wisdom on the part of Congress in having called into play its lawful powers.'") (quoting *Minneapolis & St. L.R. Co. v. Bombolis*, 241 U.S. 211, 222 (1916)).

VI.

The Constitution does not permit Missouri to use a different congressional district map in the November 2026 general election than it used in the August 2026 primary election. Accordingly, the Court holds that use of the 2022 map in the November 2022 general election violates the Constitution. The Court therefore affirms the district court's temporary restraining order and remands to the district court for entry of a permanent injunction prohibiting Secretary of State Hoskins—as well as Secretary Hoskins's officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Secretary of

[23]The Missouri Supreme Court restrained and enjoined Secretary Hoskins from "implementing, using, or mandating the use of the" 2025 map. *von Glahn*, 2026 WL 2628846, at *7. The Missouri Supreme Court's injunction did not restrict advocacy by Secretary Hoskins and his counsel in this litigation or his public comments (so long as they are not directives to local election authorities to implement the 2025 map), and any attempt to do so would raise freedom of speech concerns under the state and federal constitutions, *see* U.S. CONST. amend. I, MO. CONST. art. I, § 8, and separation of powers concerns under state law, *see State Auditor v. Joint Comm. on Legis. Rsch.*, 956 S.W.2d 228, 231 (Mo. 1997).

State Hoskins or his officers, agents, servants, employees, or attorneys[24]—from implementing, using, publishing, distributing, or mandating the use of any congressional district map other than the 2025 map for the November 3, 2026, general election.

To allow for appellate review, the district court should administratively stay its permanent injunction until September 28, 2026, at 5 p.m. Central Daylight Time. Without any stay, Secretary Hoskins and local election authorities would be required to immediately begin implementing the 2025 map before the Supreme Court receives or decides any appeal. And without a limit to the stay, PNP could wait to file its petition for a writ of certiorari until the December 21, 2026, due date, *see* SUP. CT. R. 13.1, thus preventing the Supreme Court from considering the merits of this case until after Missouri has conducted the November 2026 general election. The mandate shall issue forthwith.

STRAS, Circuit Judge, concurring in part and dissenting in part.

There are multiple problems with this appeal. The court names one: a probable violation of Article I, section 2 of the Constitution as interpreted. *See ante*,

---

[24]PNP emphasizes that Secretary Hoskins is the defendant in both this case and in the Missouri Supreme Court's *von Glahn* case. *See, e.g.*, PNP Br. 13–17, 34. Neither case included local election authorities as parties. To the Missouri Supreme Court, PNP suggested that a difference in language between the Missouri Supreme Court's injunction ("acting in concert") and the district court's temporary restraining order ("agents" and "officers") required local election authorities to follow the Missouri Supreme Court's injunction, but not the district court's temporary restraining order. *See* Suggestions Regarding Contempt at 9 n.2, *von Glahn v. Hoskins*, No. SC101805 (Mo. Sept. 9, 2026). The "in active concert" language here reaches at least as far as the Missouri Supreme Court's "acting in concert" language, which PNP acknowledged "undoubtedly covered" local election authorities. *Id.* The Court trusts that counsel will not instruct local election authorities to violate the Constitution as clearly established by this opinion. *See* 42 U.S.C. §§ 1983, 1985(3).

at 23–27. But I would not even get that far because People Not Politicians and Richard von Glahn lack standing. For that reason, I would dismiss the appeal.[25]

I.

Cases and controversies are our bread and butter. Anyone suing *or* appealing needs standing. *See* U.S. Const. art. III, § 2. At each stage, a "personal stake in the outcome" must exist, *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (citation omitted), a way for the person invoking federal jurisdiction to answer "[w]hat's it to you?" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). This "irreducible constitutional minimum" requires an injury "particularized" enough to set a party apart from everyone else. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 340 (2016) (citation omitted). A "generally available grievance seeking . . . relief that no more directly and tangibly benefits [a party] than it does the public at large" does not cut it. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992).

Sometimes overlooked is that standing must "persist throughout all stages of the litigation," even on appeal. *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662 (2019) (citation omitted). It "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 64 (1997). Intervenors, who often join the litigation only because someone else had enough of a stake to bring the case in the first place, are no exception. "As the [Supreme] Court has repeatedly recognized, to appeal a decision that the primary party does not challenge, an intervenor must independently demonstrate standing." *Bethune-Hill*, 587 U.S. at 663.

Only two parties possibly qualify here, both intervenors, who decided to bring their own appeal when Missouri's Secretary of State decided against it. The first,

[25]I agree with the court, however, that nothing requires us to remand to the district court with directions to dismiss the case. *See ante*, at 12–21.

People Not Politicians, is the organization that proposed the ballot referendum. The other, Richard von Glahn, is both a Missouri voter and the organization's executive director who litigated until the Supreme Court of Missouri put it up for a vote this November. *See von Glahn v. Hoskins*, ___ S.W.3d ___, SC101805, slip op. at 13 (Mo. banc Sept. 3, 2026). Nearly all the briefing in this case focused on whether they have a special status to litigate in federal court based on their "'distinct' role in the [referendum] process." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013).

For the answer, the starting point is *Hollingsworth v. Perry*, which sets the ground rules. There, the appealing intervenors claimed that their "'unique,' 'special,' and 'distinct' role in the initiative process" under California law gave them the right to defend the law they helped enact, even after it became law. *Id.* The Supreme Court said no, mostly because they had "no role—special or otherwise—in the [law's] enforcement." *Id.* at 707. Missing, in other words, was a "personal stake" different from the "general interest of every citizen of California." *Id.* (citation omitted).

The timing here is different, but the underlying problem is the same. Referendum proponents in Missouri may well have a "'unique,' 'special,' and 'distinct' role in" getting a measure on the ballot, just like in California. *Id.* at 706; *see, e.g.*, Mo. Rev. Stat. §§ 116.180, 116.332 (requiring certain notices to be sent to the proponent's designee). Or maybe not. *See id.* § 116.200.1 (allowing "any citizen," not just the proponents, to bring suit challenging the Secretary of State's decision not to certify a referendum petition). But either way, the district court's temporary restraining order will have *no* effect on whether the referendum appears on the ballot in November. Neither will this appeal. *See Campaign for Fam. Farms v. Glickman*, 200 F.3d 1180, 1186 (8th Cir. 2000) ("An appellate court, upon an appeal from an order granting or denying a temporary injunction, will ordinarily *not* consider the merits of a case further than is necessary to determine whether the trial court abused its discretion." (emphasis added) (citation omitted)); *see also* 16 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3921.1

(3d ed. 2026) ("Appellate consideration of interlocutory injunction appeals under [28 U.S.C.] § 1292(a)(1) ordinarily focuses on the injunction decision itself.").

At oral argument, People Not Politicians and von Glahn were candid about their only referendum-related interest: its *current* effect under Missouri law. *See* Mo. Const. art. III, § 52(b) ("Any measure referred to the people shall take effect when approved by a majority of the votes cast thereon, and not otherwise."). They want to delay the implementation of H.B. 1 pending the November vote. But this interest, which is merely to enforce Missouri law,[26] is "[in]distinguishable from the general interest of every citizen" in the state. *Hollingsworth*, 570 U.S. at 707; *see* Mo. Rev. Stat. § 116.200.1 (allowing "*any* citizen" to sue to challenge the decision not to certify a petition) (emphasis added); *see also* Brief for the United States as Amicus Curiae in Support of Respondents at 5, *People Not Politicians v. Onder*, No. 26A326 (U.S. Sept. 10, 2026). It is no way to get standing in federal court.[27] *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974) (rejecting "[t]he

[26]No one questions the standing of the parties who originally brought the case. Robert Onder and Richard Brattin must now run for election in different-looking districts. *Cf. Bost v. Ill. Bd. of Elections*, 607 U.S. 71, 76 (2026) ("[A] candidate has a personal stake in the rules that govern the counting of votes in his election."). Along with them were two voters who were negatively affected by the map change. *See Gill v. Whitford*, 585 U.S. 48, 65–66 (2018) ("alleg[ing] facts showing disadvantage to [voters] as individuals" is enough for standing (citation omitted)).

[27]The *Purcell* principle, as powerful as it may be, cannot be a shortcut around jurisdiction. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) (cautioning federal courts about changing election laws in the period leading up to an election). It is only "a sensible refinement of ordinary stay principles for the election context," *Merrill v. Milligan*,142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring), not an ironclad rule that allows *anyone* to advocate for its application. *See Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869) ("Without jurisdiction the court cannot proceed at all in any cause."); *Curtis v. City of Des Moines*, 995 F.2d 125, 128 (8th Cir. 1993) ("Standing is a fundamental element of federal court jurisdiction, without which federal courts are powerless to act."). Even those who have no right to be here.

proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions").

Von Glahn has one other interest that the organization does not share: his status as a voter. As clear as it is that a generalized interest in upholding the law does not satisfy Article III's case-or-controversy requirement, it is equally clear that voters who allege "facts showing disadvantage to themselves as individuals" do. *Gill*, 585 U.S. at 67 (2018) (citation omitted). But nowhere in the filings are there any allegations about *how* his interests as a voter would be harmed by using H.B. 1's map in November's general election. *See Jensen v. Minn. Bd. of Med. Prac.*, ___ F.4th ___, No. 25-1812, slip op. at 4 (8th Cir. Sept. 15, 2026) (holding that general factual allegations can be sufficient to confer standing); *see also* Brief for the United States as Amicus Curiae in Support of Respondents, *supra*, at 6 (noting the absence of factual allegations sufficient for standing).

The closest he gets is the following statement: he is "a qualified voter registered to vote in the State of Missouri" who lives in St. Louis County. He does not allege that his vote has been diluted, *see Gill*, 585 U.S. at 66 (holding that vote dilution can create standing), or that he will be unable to elect the candidate of his choice, *see McLain v. Meier*, 851 F.2d 1045, 1048 (8th Cir. 1988) (holding that limiting the ability of a voter to elect the candidate of his choice was sufficient for standing). Nor do the filings say whether changing maps would require him to vote in a different race or for a different candidate. If he has been injured as a voter, he has not told us how. And as the "party invoking federal jurisdiction" by appealing, it was his burden to do so. *Spokeo*, 578 U.S. at 338 (requiring a party to "'clearly . . . allege facts demonstrating' each element" of standing (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)); *see Bethune-Hill*, 587 U.S. at 663 ("As the Court has repeatedly recognized, to appeal a decision that the primary party does not challenge, an intervenor must independently demonstrate standing.").

II.

I have no doubt that both People Not Politicians and von Glahn are "deeply committed" to "zealous[ly]" challenging the district court's order. *Hollingsworth*, 570 U.S. at 707 (citation omitted). But the plea heard throughout oral argument—"if not us, then who?"—not only ignores obvious alternatives, but has never been "a reason to find standing." *Schlesinger*, 418 U.S. at 227. Regardless of whether they "would rather . . . fight on," neither can do so without it.[28] *Bethune-Hill*, 587 U.S. at 671.

---

[28]The cross-appeal must go too, because the candidates and voters are "not aggrieved" after receiving a temporary restraining order that gave them exactly what they requested. *United States v. Northshore Mining Co.*, 576 F.3d 840, 846 (8th Cir. 2009) (citation omitted); *see Lloyd v. Hardin County*, 207 F.3d 1080, 1082 n.2 (8th Cir. 2000) (dismissing a cross-appeal that "merely assert[ed] . . . additional grounds upon which the district court's order arguably could be affirmed").